# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| MALDEN TRANSPORTATION, INC., | ) |
| PEGM TRANSPORTATION, LLC, | ) |
| MEDFORD TRANS., INC., | ) |
| EVERETT CAR SERVICE, INC., | ) |
| TALKD TRANSP., INC., | ) CIVIL ACTION NO: |
| ARGON CAB, INC., | ) |
| CEDAR CAB, INC., | ) |
| COBALT CAB, INC., | ) |
| EVERGREEN CAB, INC., | ) |
| FLEET LEASING, INC., | ) |
| GREENWAY LEASING, INC., | ) |
| HARBOR LEASING, INC., | ) |
| HARVEST CAB, INC., | ) |
| MONUMENT LEASING, INC., | ) |
| MYSTIC LEASING, INC., | ) |
| PEARL CAB, INC., | ) |
| SAM'S CAB, INC., | ) |
| TRITON CAB, INC., | ) |
| UNION CAB, INC., | ) |
| VEITA CAB, INC., | ) |
| WEST END LEASING, INC., | ) |
| GREEN CAB CO., INC., | ) |
| GREEN AUTOMOTIVE, INC., | ) |
| COUNTRY CLUB TRANS., INC., | ) |
| LOCHMERE TAXI, INC., | ) |
| MT. PLEASANT TAXI, INC., | ) |
| CINEMA TAXI, INC., | ) |
| GREEN & YELLOW TNC, | ) |
| ALEWIFE TRANS. CO., INC., | ) |
| EASTERN TRANS., INC., | ) |
| SILCOR TRANS. CO., INC., | ) |
| ORMOND TRANS. CO., INC., | ) |
| SOMERVILLE TRANS. CO., INC., | ) |
| BABS CAB, INC., | ) |
|    Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UBER TECHNOLOGIES, INC., | ) |
| GOVERNOR CHARLES BAKER, | ) |
| COMMONWEALTH OF MASSACHUSETTS | ) |
|    Defendants. | ) |

_____ )

2A93594

## COMPLAINT

Plaintiffs, Malden Transportation, Inc. ("MTI"), PEGM Transportation, LLC ("PEGM"), Medford Trans., Inc. ("Medford"), Everett Car Service, Inc. ("ECS"), Talkd Transp. ("TTI"), Inc., Argon Cab, Inc. ("Argon"), Cedar Cab, Inc. ("Cedar"), Cobalt Cab, Inc. ("Cobalt"), Evergreen Cab, Inc. ("Evergreen"), Fleet Leasing, Inc. (Fleet), Greenway Leasing, Inc. ("Greenway"), Harbor Leasing, Inc. ("Harbor"), Harvest Cab, Inc. ("Harvest"), Monument Leasing, Inc. ("Monument"), Mystic Leasing, Inc. ("Mystic"), Pearl Cab, Inc. ("Pearl"), Sam's Cab, Inc. ("Sam's"), Triton Cab, Inc. ("Triton"), Union Cab, Inc. ("Union"), Veita Cab, Inc. ("Veita"), West End Leasing, Inc. ("WEL"), Green Cab Co., Inc. ("Green Cab"), Green Automotive, Inc. ("Green Automotive"), Country Club Trans., Inc. ("CCT"), Lochmere Taxi, Inc. ("Lochmere"), Mt. Pleasant Taxi, Inc. ("MPT"), Cinema Taxi Inc. ("Cinema"), Green & Yellow Tnc ("G&Y"), Alewife Trans. Co., Inc. ("ATI"), Eastern Trans., Inc. ("ETI"), Silcor Trans. Co., Inc. ("Silcor"), Ormond Trans. Co., Inc. ("Ormond"), Somerville Trans. Co., Inc. ("STC"), Babs Cab, Inc. ("Babs"). (collectively referred to as "Plaintiffs"), complaint against defendants Uber Technologies, Inc. ("Uber"), and Governor Charles Baker, Commonwealth of Massachusetts (collectively referred to as the "Commonwealth") as follows:

## INTRODUCTION

1.      Plaintiffs provide taxi services and manage leased taxi cabs in the Cities of Malden, Somerville, Medford, Everett, and Boston. They have invested substantial capital in complying with municipal rules and state laws, developed over the last several decades, that protect consumers, ensure public safety, and provide non-discriminatory service. Uber has created an illegal transportation service that violates state laws and municipal ordinances and deceives consumers regarding, *inter alia*: the fares they must pay to use Uber's services; the

2A93594

safety of the vehicles used by and/or on behalf of Uber and the individuals driving those vehicles.  Additionally, Plaintiffs bring this case because the Commonwealth of Massachusetts has violated Plaintiffs' constitutional rights by: (1) enacting a new law that applies to so-called Transportation Network Companies ("TNCs") and permits TNCs to operate in the Commonwealth, and (2) preempting cities and towns from regulating the TNCs, while simultaneously permitting cities and towns to exclusively regulate the taxi industry, thereby creating a system where two similarly situated industries are being regulated by different government bodies in an entirely unequal way in violation of Plaintiffs' constitutional rights.

2.      The product market relevant to the antitrust cause of action is the low-cost, on-demand, Ride-Hail ground transportation services that originate in the Malden, Medford, Boston, Somerville and Everett areas and that seat 3-4 passengers ("Ride-Hail Market"). The geographic market includes Boston, Malden, Medford, Everett and Somerville ("Greater Boston").  Upon information and belief, Uber currently controls in excess of 80% of the Ride-Hail Market.

**PARTIES AND JURISDICTION**

3.      MTI is a Massachusetts corporation and maintains a principal place of business at 290 Eastern Avenue, Malden, Massachusetts 02148.

4.      PEGM is a Massachusetts corporation and maintains a principal place of business at 290 Eastern Avenue, Malden, Massachusetts 02148.

5.      Medford Trans., Inc. is a Massachusetts corporation and maintains a principal place of business at 290 Eastern Avenue, Malden, Massachusetts 02148.

6.      Everett Car Service, Inc. is a Massachusetts corporation and maintains a principal place of business at 2 Surrey Road, Winchester, MA 01890.

7.      Talkd Transp., Inc., is a Massachusetts corporation and maintains a principal

place of business at 600 Windsor Place, Somerville, MA 02143.

8.      Argon is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

9.      Cedar is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

10.     Cobalt is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

11.     Evergreen is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

12.     Fleet is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

13.     Greenway is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

14.     Harbor is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

15.     Harvest is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

16.     Monument is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

17.     Mystic is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

18.     Pearl is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

2A93594

19.     Sam's is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

20.     Triton is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

21.     Union is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

22.     Veita is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

23.     WEL is a Massachusetts corporation and maintains a principal place of business at 138 Spring Street, Everett, Massachusetts 02149.

24.     Green Cab is a Massachusetts corporation and maintains a principal place of business at 600 Windsor Place, Somerville, Massachusetts 02143.

25.     Green Automotive is a Massachusetts corporation and maintains a principal place of business at 600 Windsor Place, Somerville, Massachusetts 02143.

26.     CCT is a Massachusetts corporation and maintains a principal place of business at 600 Windsor Place, Somerville, Massachusetts 02143.

27.     Lochmere is a Massachusetts corporation and maintains a principal place of business at 600 Windsor Place, Somerville, Massachusetts 02143.

28.     MPT is a Massachusetts corporation and maintains a principal place of business at 600 Windsor Place, Somerville, Massachusetts 02143.

29.     Cinema is a Massachusetts corporation and maintains a principal place of business at 600 Windsor Place, Somerville, Massachusetts 02143.

30.     G&Y is a Massachusetts corporation and maintains a principal place of business

2A93594

at 600 Windsor Place, Somerville, Massachusetts 02143.

31.     ATI is a Massachusetts corporation and maintains a principal place of business at 33 Nabnasset Street, P.O. Box 1676, Westford, Massachusetts 01886.

32.     ETI is a Massachusetts corporation and maintains a principal place of business at 33 Nabnasset Street, P.O. Box 1676, Westford, Massachusetts 01886.

33.     Silcor is a Massachusetts corporation and maintains a principal place of business at 33 Nabnasset Street, P.O. Box 1676, Westford, Massachusetts 01886.

34.     Ormond is a Massachusetts corporation and maintains a principal place of business at 33 Nabnasset Street, P.O. Box 1676, Westford, Massachusetts 01886.

35.     STC is a Massachusetts corporation and maintains a principal place of business at 33 Nabnasset Street, PO Box 1676, Westford, Massachusetts 01886.

36.     Babs is a Massachusetts corporation and maintains a principal place of business at 84 Braintree Street, Allston, Massachusetts 02134.

37.     Plaintiffs are engaged in interstate commerce and commerce within the Commonwealth.

38.     Upon information and belief, defendant Uber is a Delaware corporation with principal offices at 800 Market Street, San Francisco, California.  This Court has personal jurisdiction over Uber, as Uber operates a transportation-for-hire service in Malden, Somerville, Everett, Medford, Boston and other Massachusetts communities, consisting of unlicensed personal vehicles owned by individual drivers and offered through a cut- rate service advertised by Uber as "UberX."

39.     Defendants Uber are engaged in interstate commerce and in commerce within the Commonwealth of Massachusetts. Defendant, Governor Charles Baker, Governor of the

Commonwealth of Massachusetts, enacted the TNC Law, and the state agencies that he oversees will enforce the TNC law.

40.     Defendant, Commonwealth of Massachusetts is a sovereign entity and controls the state agencies that will enforce the TNC law.

41.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332, as Uber is a foreign corporation doing business in Massachusetts and the amount in controversy exceeds $75,000. Counts III and IV arise under the laws of the United States, thus also conferring federal jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

42.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### *Regulation of Taxis in the Greater Boston Area*

43.     The taxi industry is highly regulated by state statutes, municipal rules and ordinances, and multiple agreements that specify how medallion owners, radio associations and drivers must operate together. These legal controls are designed to protect consumers and ensure that taxi services in their respective municipalities will operate both safely and reliably.

44.     Pursuant to M.G.L. c. 40, § 22 and M.G.L. c. 159, municipalities have been given the authority to regulate vehicles used for the conveyance of persons for hire from place to place.

45.     Malden, Somerville, Medford, Everett, and Boston have all enacted legislation for the regulation of the taxi industry ("Taxi Rules").

46.     The City of Boston enacted Rule 403 through the Boston Police Hackney Carriage Unit, which applies to all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston."

47.     The City of Somerville enacted Municipal Code C. 13 Article 1 which applies to

all vehicles "used or to be used for the conveyance of persons for hire or fixed payment from place to place within the city."

48.     The City of Malden enacted The Code of the City of Malden, Massachusetts which applies to all vehicles "for hire engaged at the time the trip is to commence with charges based on distance traveled as metered in increments of a mile or fraction thereof; provided that nothing in this definition shall prevent a taxi from providing flat-rate or pre-arranged services." The Code of the City of Malden, Massachusetts, Section 6.27.[1]

49.     The City of Medford enacted the Revised Ordinances, City of Medford, Massachusetts, 2001 which applies to any "vehicle used or designed to be used for the conveyance of persons for hire from place to place within the City." Revised Ordinances, City of Medford, Massachusetts, 2001, Article II § 90-31.

50.     The City of Everett enacted The Revised Ordinances of the City of Everett, Massachusetts, 2007, as amended, Chapter 12, Section 12-51 and The City Council Rules, Rule 76 which applies to any "motor vehicle for hire for the transportation of people for a sum of money in the city."

51.     The current version of the Taxi Rules are the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled.  Plaintiffs and all licensed taxi owners operating in Malden, Somerville, Medford, Everett, and Boston have invested significant capital and resources to develop systems and infrastructure that meet the broad-ranging requirements of the Taxi Rules.

52.     The Taxi Rules of the Cities of Malden, Somerville, Medford, Everett, and Boston

---

[1] The municipal legislation regulating the taxi industry in each respective municipality is collectively referred to as the "Taxi Rules."

2A93594

use three fundamental methods of ensuring that taxi service is safe, reliable, and non-discriminatory: first, the municipalities issue a limited number of taxi licenses, or taxi "medallions," in the case of Boston and Somerville.  A taxicab cannot operate legally in any of the five municipalities without a city-issued taxi license and license owners must have cabs that meet strict requirements concerning vehicle age, condition, and installed equipment (for example, computerized dispatch machines, taximeters and approved credit card machines). Second, in Boston if you own more than 3 cabs, every cab must be a member of an approved "radio association."  Third, every taxi driver in the 5 municipalities must have a license to operate a taxi cab within the relevant municipality and comply with extensive rules of conduct promulgated by the municipality (for example, requirements for dealing with handicapped passengers, allowed fares and charges, anti-discrimination requirements and prohibitions on cell phone use).

### *Uber*

53.     Uber is an interstate transportation service that, in the relevant Ride-Hail Market, owns no taxis and pays none of the substantial capital costs or ongoing expenses required to operate legal taxi car businesses.  Uber offers UberX low-cost conveyance-for-hire vehicles to, inter alia, Greater Boston travelers. UberX is a cut-rate, unlicensed taxi service.

54.     Uber's transportation system communicates with customers through a free smart phone application ("app"). The Uber app gives consumers the ability to hail an UberX car that seats 3-4 passengers.  The user opens the Uber app, which displays: a map of the user's location (or designated pickup point); the available UberX cars at and around that location; and displays how long the user will have to wait for each UberX car.  After electronically hailed by the user, Uber's out-of-state computer system selects an UberX-affiliated car, displays the driver's name

and photograph on the user's smart phone, and sends a text message to the user with the driver's projected arrival time and cell phone number.

### *Uber's Unlawful Approach to Competition*

55.     Uber's business plan and activity illegally undermines critical safety provisions of the municipal Taxi Rules. Uber's UberX transportation system preys parasitically on established taxi services without paying for them and without obeying the laws designed to protect taxi passengers.  Uber owns no cars, no medallions, no licenses and no radio associations.  It induces its drivers or "partners" to illegally substitute Uber's computerized dispatching system for the legal dispatching system in each respective municipality.  In doing so, Uber knowingly induces its drivers to violate the Taxi Rules.

56.     Uber illegally competes with taxis in the 5 municipalities. Uber violates nearly all substantive Taxi Rules by: misleading its customers, forcing drivers who sign up with Uber to violate licensing laws, and discriminating unlawfully against handicapped and elderly users of public transportation.

57.     Uber undermines the existing taxi market by having unregulated UberX cars function as cabs.  The Cities of Malden, Somerville, Medford, Everett, and Boston all require that all taxis have a license or medallion and set a limit on the number thereof issued in each respective municipality.  Uber violates this legal limit—and public safety—by signing up an unregulated and unaccountable legion of UberX vehicles (for example, Uber has over 20,000 cars in the City of Boston), and linking them to customers in direct competition with taxis and in direct violation of the Taxi Rules.

58.     Uber's campaign to attract taxi drivers is a carefully crafted plan to insert itself, at little or no cost and without legal authority, into the taxi infrastructure that has existed long

before Uber began offering its services.  Uber profits by taking parasitic advantage of a

transportation system in which all other players must comply with safety and consumer

protections rules established by state and city laws.

59.     The Taxi Rules produced a set of rules designed to meet the needs and protect the

rights of individuals who need a car and driver on short notice—i.e., a taxi.  Technological

advances have made taxi dispatching more efficient over the years; however, Uber's approach

ignores and defies all taxi regulations designed to protect consumers who suffer from disabilities,

or who live in less secure neighborhoods.

### *Uber's Illegal Operation of UberX Vehicles*

60.     Uber's business strategy is aimed directly at undermining the existing legal

protections consumers receive under the Taxi Rules.

61.      In early 2013, Uber began promoting UberX, known as "the Low Cost Uber," as

the economical substitute for all other Uber vehicles.

62.     UberX is a cut-rate version of Uber Black Cars and SUVs.  In early 2013, Uber's

promotional material told every owner of a Prius, Camry, Altima, Taurus or Fusion (2006 or

later) with a Massachusetts Driver's License and a commercial insurance policy that he/she

could become an Uber vehicle simply by demonstrating "city knowledge and professionalism"

and completing a one-hour "on-boarding session."  Equipment does not need to meet any of

standards set forth in the Taxi Rules.  Drivers did not need to pass any of the criminal record or

driving record standards for Malden, Somerville, Medford, Everett, and Boston taxi drivers, and

did not need to comply with the Taxi Rules that protect riders and neighborhoods against

discrimination.  UberX-affiliated cars are assigned by a set of out of state computers with no

real- time connection to the Malden, Somerville, Medford, Everett, and Boston Police

Departments and no ability to respond to public safety emergencies.

63.    By non-compliance with municipal regulations, UberX is able to and does charge lower rates than licensed cabs.

64.    In 2014, Uber's marketing approach was designed to convince consumers to perceive UberX vehicles as the inexpensive alternative to taxis.  But Uber's fleet of UberX vehicles is, in practice, an unlicensed—and dangerous—group of taxis. Uber's own CEO, Travis Kalanick, has referred to the practice of unlicensed vehicles operating for hire as "regulatory arbitrage" and their operations as unlicensed taxis as constituting a "criminal misdemeanor."[2] UberX vehicles are hailed by, inter alia, a smart phone App, assigned to customers through the same Uber computer system, and have fares determined by Uber's computers.  UberX vehicles function as roving conveyances for hire in Greater Boston, and are assigned in response to an "electronic hail" just as quickly as a taxi.  Uber itself agrees that its affiliated autos function as taxis, claiming to New York taxi regulators that the Uber system is a "virtual hail" equivalent to standing on a street corner and flagging a cab.

65.    From early 2013 to the present, all UberX vehicles have been subject to the Taxi Rules under Malden, Somerville, Medford, Everett, and Boston regulations.  As a result, Uber-affiliated vehicles are not permitted to operate without a taxi license and a driver who is licensed pursuant to the relevant municipality.  For example, the City of Boston's ordinance is clear:

> In the City of Boston, no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner.

---

[2] http://money.cnn.com/video/technology/2013/07/24/t-bst-uber-lyft.fortune/index.html.

2A93594

*See* City of Boston Code 16-15.05: Vehicle for Hire Ordinance (Appendix I to Rule 403)[3].

66.     Every UberX driver hailed electronically by an Uber customer in Malden,

Somerville, Medford, Everett, and Boston, under the provisions of the municipal ordinances

quoted above, must have a license.  As none of them do, all UberX services in Malden,

Somerville, Medford, Everett, and Boston are operating illegally.  This massive and illegal

operation puts the public and consumers at risk in many ways.

### *Risks of Uber's Illegal Operation of UberX*

67.     The Taxi Rules protect the public from dangerous vehicles by requiring that all

taxis be inspected to ensure they meet specific Taxi Rules standards for age, condition,

equipment, lack of damage and cleanliness.[4]  Uber ignores these requirements entirely and

operates illegally with its affiliated UberX cars. UberX represents to the public and its customers

that it inspects all of its fleet.  On information and belief, Uber superficially may inspect these

vehicles when the owner first signs up.  Uber, however, does not have a regular program of

rechecking vehicle condition and licensing.

68.     The Taxi Rules protect the public from dangerous cab drivers by requiring license

applicants to meet certain criteria before applying for a license. For example, the City of Boston

requires an applicant to:

1.     be twenty-one (21) years of age or older;

2.     pass a standard examination demonstrating the ability to speak, read, write
       and understand the English Language;

---

[3] Similar regulations exist in Malden, Somerville, Everett, and Medford. *See* The Code of the City of Malden, Massachusetts Section 6.27.2.1 and 6.27.5; The Code of Ordinances, City of Somerville, Massachusetts Art. II Sec. 13-36. City Council Rule 76(A) (Everett); Revised Ordinances, City of Medford, Massachusetts, 2001, C. 90, Art. II, § 90-45.

[4] For example, the City of Boston enacted standards embodied at Rule 403, Section 3: Vehicles, while the City of Malden enacted The Code of the City of Malden, Massachusetts Section 6.27.3, the City of Somerville enacted The Code of Ordinances, City of Somerville, Massachusetts Art. I Sec. 13-19; the City of Everett enacted City Council Rule 76 (A), and the City of Medford enacted Revised Ordinances, City of Medford, Massachusetts, 2001, C. 90, Art. II, § 90-50.

3.      participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

4.      have an original Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers;

5.      not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;

6.      have a valid Massachusetts Driver's License;

7.      have had a Driver's License in the United States for at least two (2) years;

8.      not have been adjudged a Habitual Traffic Offender, as defined by Massachusetts General Law Chapter 90, Section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

9.      not have any outstanding or unresolved driving infractions which could result in the applicants Driver's License being suspended or revoked in any jurisdiction;

10.     not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within past five (5) years;

11.     not have more than four (4) violations of the Traffic Laws and/or At-Fault Accidents as, defined by Chapter 211 of the Code of Massachusetts Regulations Section 134 or an equivalent department in the last three (3) years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

12.     not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under Massachusetts General Law Chapter 90 section 24D within the past five (5) years or the equivalent in any jurisdiction;

13.     not have any felony convictions within the last five (5) years in any jurisdiction;

14.     not have any drug convictions in the last five (5) years in any jurisdiction;

15.     not have any dispositions for a criminal offense, in any jurisdiction, that would result in the denial of a license, including admissions to sufficient facts or continuance of an offense without resolution, unless the circumstances of such incident are reviewed by the Inspector of Carriages as

to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

16.   not be required to register as a sex offender in any jurisdiction; and

17.   not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

Rule 403, Section 2 (III)

69.   Uber violates the Taxi Rules by signing up UberX drivers who have not met the minimal requirements set forth by the Taxi Rules.  Uber does not assure its customers that these drivers could meet any of the requirements of the Taxi Rules. According to Uber, anyone can drive an Uber-affiliated UberX car in Greater Boston as long as they have a conventional Driver's License and insurance.  Uber's complete list of the standards it applies in selecting drivers is as follows:

Uber driver-partners must:

- be at least 21 years old
- have at least one year of driving experience in the U.S.
- have at least 3 years of driving experience if under 23
- use an eligible 4-door vehicle (must be 2001* or later)
- vehicle must seat 4 passenger seats (not including the driver)
- consent to and pass a background screening
- use an iPhone 5 or newer, or an Android device running 4.0 or newer

In order to complete the signup process and start taking trips, please upload:

- your valid Driver's License
- proof of valid vehicle registration
- proof of insurance for the vehicle listed on your account (your name must be on the insurance document)
- your banking information

(https://help.uber.com/h/ec5c2be3-e3db-4389-a18b-10db2279b082) (compare with

¶68).

70.   Uber has a "Rating System" that purports to provide a quality control measure for

their drivers:

> After each trip taken on the Uber platform, riders are given the opportunity to rate their driver. This 5 star rating system creates accountability and provides real-time data to the Uber team. Due to the immediate nature of the ratings, Uber is able to maintain a consistent and quality service offering
>
> (https://newsroom.uber.com/canada/what-makes-us-uber/)

71.     Uber's alleged method of ensuring it has "quality" drivers, however, consists of a five-star "rating system" by which Uber riders can choose to rate their driver immediately after the ride.  Uber claims that if a driver dips below a certain star rating, Uber will "no longer do business with" that driver.  Uber does not tell its customers that every driver receives a five star rating just for signing up with Uber.  On information and belief, (i) a driver only drops below a "Five Star" rating if dissatisfied customers take the time to post negative reviews, and (ii) Uber continues to use drivers even after they have received multiple negative reviews.

72.     Uber's true stance on driver safety is revealed in the waiver it forces every customer to execute when they first register as an Uber user.  Uber refuses to take responsibility for anything relating to the "reliability, timeliness, quality, suitability, or availability of the services or any services or goods requested through the use" of their services.  Neither does Uber make any guarantees with respect to "the quality, suitability, safety or ability of third party providers." See https://www.uber.com/legal/terms/us/.

### *Uber Discriminates Against Disabled, Elderly and Riders Without Credit Cards and Smartphones*

73.     The Taxi Rules require that every licensed taxi company in Boston, for example, must be part of a Radio Association, if they have more than 3 cabs.  The Taxi Rules include multiple provisions that protect disabled and elderly riders against discrimination.

74.     The Taxi Rules mandate that taxis cannot discriminate against any potential

passengers.  For example, the City of Boston Rules state that:

> A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex, religion, disability, sexual orientation, national origin, or location of the passenger's pick-up or destination in any circumstance.

*See* Rule 403, Section 5(II)(p)

75.     Uber-affiliated drivers can unlawfully ignore this requirement without any adverse consequences.

76.     Malden, Somerville, Medford, Everett, and Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers, or include elderly discounts, and Boston Taxi Industry Elderly Program (BTIEP) coupons, which allow customers who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates. *See* Rule 403, Section 9(II)(b).  Uber drivers cannot accept cash, coupons or vouchers.  All payments are charged automatically to the customer's preauthorized credit card.  Uber's credit-card-only payment system discriminates against individuals without credit cards, and discriminates unlawfully against elderly, handicapped, disabled and cancer patients, who have the legal right to use BTIEP coupons to pay for taxi trips.

### *Uber Charges Illegal Fares*

77.     The Taxi Rules protect consumers by establishing stable, uniform fares.  Charges for trips within each respective municipality and to nearby suburbs ("Meter Rate Communities") must be displayed on a city-inspected and sealed taximeter that calculates the fare based on time and distance.  For example, trips to more distant towns are set by the Flat Rate Handbook in the City of Boston. See Rule 403, Section 10(II)(c).

78.     UberX does not obey these fare limits.  Instead, Uber charges a flat rate plus additional charges per-mile or per-minute, depending on the vehicle's speed.  This unlawful

variation in taxi rates violates the Taxi Rules' policy in favor of uniform, non-discriminatory charges for taxi service.

79.     Uber's illegal fares for UberX become even more exploitative in times of high demand.  During these periods, Uber imposes "surge pricing," a multiple of its base fare structure.  Surge pricing is an additional unlawful method by which UberX cars unfairly compete against licensed taxis because licensed taxis cannot charge more than the rates prescribed by the Taxi Rules.

### *Uber Operates an Illegal Dispatching Service*

80.     As stated above, Boston requires that every taxi join a Radio Association if they operate more than 3 cabs.  Each Association must have a membership of at least forty cabs in the City of Boston.  Approved Radio Associations are legally required to provide a broad range of services to assist the police and protect consumers.  Each Association is required to make taxis available to the elderly and handicapped passengers.  In Boston, these services include:

i. Twenty-Four (24) Hour Dispatch Capabilities;
ii. Two-Way Radio and Dispatch Service [amended by ix, below];
iii. Wheelchair Accessible Vehicle (WAV) Availability;
iv. Elderly Discount Re-imbursement Services;
v. Call/Dispatch Record Keeping and Reporting;
vi. Lost Or Found Property Reporting Procedures; and
vii. Dispatch services shall include record keeping that specifies:
    (1)   the total number of calls for service;
    (2)   the time and location of each request;
    (3)   the Medallion number of the cab dispatched; and
    (4)   the time and location of WAV's dispatched.
viii. Global Positioning System tracking devices are mandatory and all Hackney Carriages shall be equipped with a GPS system approved by the Inspector of Carriages which shall allow the Inspector of Carriages and Medallion Owner to ascertain the whereabouts, activities and fare data of each vehicle via the internet at all times. Said system shall store such information in a retrievable form for 365 days. The association must provide the Inspector of Carriages with the user name and password necessary to access said system. Such information shall be searchable for the following data.
    •   Date, time, and location of passenger pick-up and drop-off

- Trip duration measured in time and mileage
- Trip number
- Itemized fare (tolls, surcharges, and tip amount for card payments)
- Payment type (Cash, Credit, Debit, Student ID, Voucher)
- Last four (4) digits of customer credit/debit, etc. account number
- Hackney Medallion number
- Hackney Driver's License number
- Status codes
- Date and time of taxicab dispatch
- "Breadcrumb trail" GPS-based location data. (real-time and historical)

ix. GPS enhanced dispatch services which enable the radio association to dispatch the Boston Licensed Taxi which can arrive at the location most quickly. Said system shall be equipped with a panic button utilized by the driver which will automatically notify the dispatcher of an emergency and the vehicle's location.

*See* Rule 403, Section 7(I)(d).

81.     Only an approved Radio Association can dispatch taxis in Boston. Rule 403, Section 7.  Uber is not, and has never sought to be, an approved Radio Association.  Uber violates the law every time its computers cause an UberX car to be sent to an Uber customer in Boston.

82.     Uber benefits financially by enlisting UberX car owners who have no medallions, no licenses and are not members of a Radio Association.  By violating the licensing and Radio Association requirements, Uber unlawfully evades any investment in medallions, cars, Wheelchair Accessible Vehicles, registrations, insurance, dispatching equipment, protective partitions, taximeters, credit card machines, and other public safety and anti-discrimination requirements imposed by the Taxi Rules.  In violating the Taxi Rules with its affiliated UberX vehicles, Uber puts the public at risk for its own economic benefit.

A.      *Quality of Drivers*: The Taxi Rules require all drivers to hold a license to operate a taxi, which is only granted to applicants who meet the Taxi Rules' standards for testing, training, criminal record, driving record, drug use and sex offender status.  Taxi holders are held to an extensive set of rules, requiring them to (for example):

> > i.   not possess alcohol or permit open alcohol containers in their vehicle;
> > ii.  not talk on a cell phone;
> > iii. not smoke or permit smoking; and
> > iv.  not discriminate against potential customers based on race, sex, religion, disability, sexual orientation, national origin, pickup location or destination or intoxication.

*See* Rule 403, Section 5(II).

These rules are enforced by the Inspector of Carriages, who can conduct hearings on complaints and suspend or revoke a license.  In contrast, Uber does not require UberX drivers in Greater Boston to have anything more than a conventional Driver's License.

B.      *Quality of Owners*: Malden, Somerville, Medford, Everett, and Boston issue a limited number of licenses, and medallions and the municipalities review each medallion and license holder applicant for suitability. *See* Chapter 392 of the Acts of 1930; Rule 403, Section 2(II)(b)(i).  License or medallion owners can be required and must provide the Inspector of Carriages (in the case of the City of Boston) with the names of every individual and organization with an ownership interest in the medallion. Uber enlists as many UberX cars as it can, often dealing with individuals or small companies with a single car.  Uber knows virtually nothing about the financial stability, citizenship, litigation record, affiliations or control of the car owners that it describes as its "partners."

C.      *Quality of Cars*: UberX cars lack essential protections required by the Taxi Rules for all dispatched-on-demand transportation services in Malden, Somerville, Medford, Everett, and Boston. For example, in the City of Boston:

> i.   *Protective Partitions*: Rule 403 mandates that all Boston cabs have a
> > protective barrier of metal and lexan between the front and back seats. Rule
> > 403 Section (3)(III)(c)(iii).  These barriers not only protect drivers from
> > assault and theft; they also prevent drunk or drugged passengers from

20

interfering with the driver and causing accidents.  Uber's marketing touts the capacity of its UberX vehicles that increases the risk that boisterous passengers will distract the driver—or worse.  UberX vehicles have no partitions, thereby putting drivers at risk and undermining a critical public safety program of the City of Boston.

ii. <u>GPS *Tracking and Panic Buttons*</u>: Every Boston cab must be equipped with an Inspector-approved GPS system that gives the Boston Police: internet access, both in real time and for a year after any trip, to the location of every cab; the pick-up and drop-off points; how the passenger paid, and the exact route followed.  Every cab must also be equipped with a panic button that automatically sends the dispatcher an emergency signal and the location of the cab.  UberX vehicles have no such approved equipment.

iii. *Taximeters and Flat Rates*: The fare for every Boston taxi trip is set by an inspected and sealed taximeter or the Flat Rate Handbook, thereby ensuring that every customer pays the same rate.  UberX do not comply with these legally-mandated maximum rates.  Fares are set by Uber's proprietary algorithm.  Uber also uses "surge" pricing "during times of high demand." Uber takes advantage of this price gouging to increase prices on roughly 40% of Uber trips.

*See* https://www.bostonglobe.com/metro/2016/01/04/surge-pricing-charged-for-percent-uber-trips-new-year-eve/kJaQaEv1ImAISMnSV7EjeM/story.html.

### *Uber Unfairly Competes With Licensed Cabs That Comply With the Taxi Rules*

83.     UberX directly competes with taxis operating in Malden, Somerville, Medford,

21

Everett, and Boston.

84.     Taxis operating in Malden, Somerville, Medford, Everett, and Boston must comply with regulations that: protect the public from harm; prohibit discrimination against the disabled, the elderly, and set maximum fares to protect the consumer.  To comply with these regulations, cabs must invest in equipment, training and licenses, charge only prescribed fares, and serve all areas.  In contrast, UberX vehicles ignore the Taxi Rules and require consumers to use a credit card.

85.     On information and belief, many of the UberX vehicles also compete unfairly by unlawfully purchasing regular car insurance.  In Massachusetts, many taxis are insured through the assigned-risk CAR program established by M.G.L. c. 175, § 113H. The CAR program insurance charges premiums for taxis.  UberX vehicles that purchase regular car insurance compete unfairly by functioning as taxis while paying substantially lower insurance rates than taxis.  Uber and any affiliates who improperly obtain car service insurance are also putting customers at risk, as insurers may disclaim coverage for UberX vehicles that have not paid taxi insurance rates.

### *Uber's Anti-Competitive Conduct*

86.     In February 2013, when Uber launched UberX in Boston, it charged prices higher than taxicab rates but lower than UberBlack rates.  Uber promoted UberX as costing 40% lower than UberBlack.  In early 2013, UberX cost $5.00 for the base rate in the Greater Boston area.

87.     As demand for UberX increased between early 2013 and October 2013, Uber began offering free rides in Boston. *See* https://newsroom.uber.com/us-massachusetts/bosfreeuberxweek/.

88.     As demand further increased, Uber decreased the base rate for UberX services in the Boston area to $2.50, thereafter promoting that rides were "now 30% cheaper than a taxi!"

2A93594

and provided the following:

| | OLD RATES | NEW RATES |
|---|---|---|
| Base Fare | $5.00 | $2.50 |
| Per Minute (Below 11 MPH) | $0.60 | $0.40 |
| Per Mile (Above 11 MPH) | $2.60 | $2.05 |
| Minimum Fare | $10.00 | $4.00 |

(https://newsroom.uber.com/us-massachusetts/new-uberx-prices-now-30-cheaper-than-a-taxi/)

**SAMPLE FARES**

| | NEW uberX RATES | OLD uberX RATES | TAXI |
|---|---|---|---|
| Back Bay to Downtown | $8 | $10 | $11 |
| Logan Airport to Financial District | $18 | $24 | $27 |
| Cambridge to South End | $12 | $17 | $19 |

(https://newsroom.uber.com/us-massachusetts/new-uberx-prices-now-30-cheaper-than-a-taxi/).

89.     Upon information and belief, Uber lost money on each and every UberX ride provided in the Greater Boston Ride-Hail Market after offering free rides and subsequently reducing prices in October 2013.

90.     Upon information and belief, at the same time it lowered UberX rates in the Greater Boston Ride-Hail Market, Uber reduced its commission on each UberX ride to subsidize the income lost by UberX drivers due to the price cuts.

91.     Upon information and belief, Uber lost money on each and every UberX ride in

the Greater Boston Ride-Hail Market under this pricing structure.

92. In January 2014, Uber further reduced fares by 15-34%, advocating that "[o]n average across all Uber cities, UberX is 26% cheaper than a taxi," providing the following example:

| | uberX | Taxi |
|---|---|---|
| BOSTON<br>Beacon Hill to Harvard Square | $12.55 | $19.37 |

(https://newsroom.uber.com/situation/).

93. In April 2014, Uber restored its commission on UberX rides to 20 percent but did not return UberX prices to pre-January levels. This resulted in the drivers suffering a 15 percent reduction in income compared to the prior structure.

| | Old (uberX) | New (uberX) |
|---|---|---|
| Fare | $10.00 | $10.00 |
| Safe Rides Fee | -- | $1.00 |
| Total Rider Payment | $10.00 | $11.00 |
| Partner Earnings Description | 95% of $10.00 Fare | 80% of $10.00 Fare |
| Trip Partner Earnings | $9.50 | $8.00 |
| $1 per Trip (thru Aug 31st) | $0 | $1.00 |
| Total Partner Earnings | $9.50 | $9.00 |

(http://www.geekwire.com/2014/uber-adds-1-safe-rides-fee-passengers/).

94. In June 2014, Uber further reduced UberX prices by 25 percent making it half the price of a taxi.

95. To publicize the drastic undercutting of the prices charged by the taxicab industry, Uber posted the following graphic:



(https://newsroom.uber.com/us-massachusetts/uberx-in-boston-just-got-even-cheaper/).

96.     Upon information and belief, Uber paid its drivers more than Uber charged passengers under the new pricing program.  Though UberX passengers paid only 75 percent of the January 2014 rates due to the 25 percent price-reduction, Uber continued to pay UberX drivers 80 percent of the January 2014 rates – meaning Uber paid to the driver the entire amount collected from the passenger plus an additional 5 percent for each UberX ride.

97.     When Uber stopped subsidizing UberX drivers' income in the Greater Boston Ride-Hail Market in September 2014, Uber increased their commissions to a high of 25%.

98.     Upon information and belief, the June 2014 price cuts lowered UberX prices and Uber lost money on each and every UberX ride under the pricing structure implemented in June 2014.

99.     Upon information and belief, beginning in at least June 2014 and continuing through the present date, Uber has lost and continues to lose money on each and every UberX

ride provided in the Greater Boston Ride-Hail Market.

100.     Uber has been able to maintain its below-cost predatory pricing for its UberX

services in the Greater Boston Ride-Hail Market due to vast reserves of capital invested with the

expectation of reaping extraordinary future returns.

101.     In adopting this approach, Uber has deflated fares of UberX to prices below cost

in an effort to drive competitors of UberX (all taxis) from the market in the hope of recouping its

losses once Uber's competition has been destroyed. In fact, Uber has lost as much as $2 billion a

year via this overall plan to monopolize the Ride-Hail Market.  See

http://www.bizjournals.com/sanjose/news/2016/12/02/uber-fares-cover-less-than-half-of-ride-

costs-new.html?ana=twt.

102.     Uber's intent to monopolize the Greater Boston Ride-Hail Market and injure

competitors has been made clear through the statements of its Chief Executive Officer Travis

Kalanick and Uber's advertising that highlights its unilateral price war in the Greater Boston

Ride-Hail Market.

103.     Supported by billions of dollars in venture capital, allowing it to operate at

enormous losses due to below-cost pricing, Uber's plan is to drive all Plaintiffs' cab companies

out of business.  Uber has a dominant share in the Ride-Hail Market. Uber has captured more

than 80 percent of the Ride-Hail Market.  Left unchecked, Uber is likely to succeed in

establishing complete domination of the market by forcing out all competitors through its

predatory pricing practices. Once its competitors have been removed and free of the constraints

of competition, Uber will be free to implement unfettered price increases for its services, and

consumers will be left with no choice but to pay the prices – however exorbitant – demanded by

Uber.

2A93594

104.    As a result of Uber's unfair competition and antitrust activity above, Plaintiffs have lost, inter alia, substantial profits as a result of lost fares to Uber, and substantial devaluation of its assets (medallions/licenses), and will continue to suffer damages unless Uber's conduct is restrained.

### *Constitutionality of "An Act Regulating Transportation Network Companies"*

105.    On August 5, 2016, the Commonwealth of Massachusetts enacted Chapter 187 of the Acts of 2016, An Act Regulating Transportation Network Companies ("TNC Law").

106.    The TNC Law violates the due process provisions of the Fourteenth Amendment to the Constitution of the United States.

107.    The Equal Protection clause of the Fourteenth Amendment "requires that all persons similarly situated… be treated alike".

108.    The Plaintiffs and TNCs (including Uber) are similarly situated and accordingly must be treated alike.

109.    For example, the Plaintiffs and TNCs are both "hackney carriages" as the term is defined by Rule 402 § 1(I)(b) Rule 403.  Both are designed to be used for the convenience of persons for hire from place to place within the Cities of Malden, Somerville, Medford, Everett, and Boston.

110.    Taxis are low cost on demand ride hail ground transportation services that seat 3-4 passengers.

111.    The primary function of a taxi is, upon being hailed, to transport a person for low cost from one point to another.

112.    The function of the TNCs (including Uber) is identical.

113.    Plaintiffs' taxis may be hailed by a smartphone app.

2A93594

114.   TNCs' cars may be hailed by a smartphone app.

115.   Rides with taxis may be requested and initiated through an app in the same manner to rides with TNCs.  For example, one TNC app, Uber, allows consumers to use the same platform to initiate a ride with either a TNC vehicle or a traditional taxi cab.

116.   Given the clear similarities between taxi cabs and TNCs they are similarly situated for the purposes of being treated alike under the Equal Protection clause of the Fourteenth Amendment.

117.   The Commonwealth's disparate treatment of taxi cab operators and TNCs via the TNC Law is not rationally related to any legitimate government objective.

118.   For example, the TNC Law allows TNCs to operate with little oversight while continuing to subject licensed taxi cab owners and drivers to stringent and substantial economic regulations.

119.   The TNC Law allows TNCs to use practically any vehicle and charge any fare, while requiring taxicab medallion owners and drivers to use specific vehicles and charge set rates.

120.   A TNC driver using a tablet or cellular telephone app may pick up a rider using the driver's private vehicle and charge practically any price Uber chooses.  If a taxicab driver, using a similar app picks up that same rider, the taxicab driver must be in an approved vehicle and must charge the passenger no more or less than the city-approved rate.  This irrational economic disparity via the TNC Law violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

121.   The TNC Law is fashioned and drafted in an arbitrary and capricious manner, and will cause economic harm to the current taxicab owners.

2A93594

122.     The Massachusetts legislature has given cities and towns authority to regulate for hire vehicles that convey people from place to place.

123.     Pursuant to M.G.L. c. 40, § 22, "a city or town may make ordinances or bylaws, or the board or aldermen or the selectmen or town council may make rules and orders, for the regulation of carriages and vehicles used therein." See M.G.L. c. 40 § 22.

124.     The Massachusetts legislature provided the City of Boston with exclusive authority to regulate all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston." See Massachusetts Session Laws of 1930, Chapter 392.

125.     These laws directly conflict with the TNC Law which contains a preemption section, which reads as follows:

> Section 10. Except where expressly set forth in this chapter, no municipality or other local or state entity, except the Massachusetts Port Authority, may: (i) impose a tax on or require any additional license for a transportation network company, a transportation network driver or a vehicle used by a transportation network driver where the tax or license relate to facilitating or providing pre-arranged rides; (ii) require any additional license for a transportation network company or transportation network driver; or (iii) subject a transportation network company to the municipality's or other local or state entity's rates or other requirements, including but not limited to operational requirements; provided, however, that a municipality or other local or state entity may regulate the traffic flow and traffic patterns to ensure public safety and convenience.

126.     The Cities of Malden, Somerville, Medford, Everett, and Boston issue a fixed number of taxi licenses or taxi medallions.  A taxicab cannot be operated in these municipalities without ownership of one of the city-issued taxi licenses or medallions.

127.     The TNC Law sets no limits on the number of Transportation Network Driver Certificates.

128.     Allowing for an unlimited number of TNCs creates public safety, traffic flow and congestion issues for the Commonwealth.

2A93594

129.     The TNC Law does not require TNC drivers to obtain a license or to take any particular test in order to become a driver for a TNC.

130.     The TNC driver is issued a TNC Certificate after merely passing a background check, which includes information about their driving and criminal history.

131.     In contrast, every taxi driver must have a Hackney Carriage Driver's License or equivalent.

132.     Once licensed, taxi drivers must abide by a strict standard of rules that forbid drivers possessing alcohol in their vehicle, forbid drivers talking on a cellular telephone while driving, and forbid smoking and permitting smoking in their taxi.

133.     The TNC Law does not require TNCs to abide by the same rules.

134.     Current regulations for City of Boston taxis require that the taxis are inspected twice annually in addition to the regular vehicle inspection that occurs each year.

135.     Medallion owners must have taxis that meet strict requirements concerning vehicle age, installed equipment and overall look of the vehicle.

136.     In contrast, under the TNC Law, TNCs may use any vehicle model or age, and do not have to have particular equipment installed or design adhered prior to use (meter, partition, lettering etc.).

137.     TNCs may use removable decals and have no permanent markings on their vehicle to distinguish them from traditional vehicles.  Permanent taxi markings assist and protect consumers and increase public safety.  Removable decals provide no assurance that the particular vehicle is in fact a TNC, as someone could easily steal or borrow decals from a TNC driver and use them in nefarious ways to lure consumers into their vehicle.

138.     Taxis have a protective barrier (referred to as a partition) of metal and lexan

2A93594

between the front and back seats.  These barriers not only protect drivers from assault and theft, but also protect the driver from impaired passengers that may interfere with the driver's ability to operate the taxi thereby causing an accident.

139.    Under the TNC Law, TNCs have no such requirement.

140.    Every Boston taxi must be equipped with an Inspector approved GPS system that gives the Boston Police Department internet access, both in real time and for a year after any trip, to the location of every taxi, the pick-up and drop off points and how the passenger paid and the exact route followed.  Every taxi must also have a panic button.

141.    Under the TNC Law, TNCs do not have the same GPS or panic button requirements.

142.    Taxis have set meter rates that apply to all taxi rides, even when taxis accept passengers via a smartphone dispatch in an identical fashion as the TNCs.

143.    Under the TNC Law, TNCs may charge any rate, and to impose large surcharges during times of high demand (except during a state of emergency).

144.    Taxi owners are required to buy and operate expensive wheelchair accessible vehicles.

145.    Under the TNC Law, no such obligation extends to TNCs.

146.    Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers, and Boston Taxi Industry Elderly Program ("BTIEP") coupons. This regulation allows customers who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates.

147.    TNCs do not have this payment requirement, and most are forced through the TNC to accept only credit card payments through the Uber app.

148.   As a result of the TNC Law and its disparate treatment of taxi cabs and TNCs, the taxi cab industry is suffering substantial financial harm.

149.   A result of the Commonwealth's passage of the TNC Law, Plaintiffs have suffered an injury in fact that is (a) concrete, (b) actual, (c) fairly traceable to the Commonwealth's actions and is likely that such injury will be redressed by a favorable decision holding the TNC Law unconstitutional.

150.   Below are the financial differences between taxis and TNCs as a result of the disparate treatment by the TNC Law in the regulation of taxis and TNCs:

| ITEM | TAXIS | TNCs |
|---|---|---|
| Medallion Value | $335,000 – 700,000 | $0 |
| Vehicle Insurance | $5,000 – $10,000 | $400 – $1,000 |
| Vehicle Purchase | $20,000 - $30,000 | Vehicles 10 years old |
| Vehicle Setup (vinyl seats, vinyl floor, partition, emergency lights, lettering) | $2,000 | $0 |
| Tinted Glass Removal | $1,000 | $0 |
| Hackney License | $32 | $0 |
| Fingerprinting | $50 | $0 |
| Medallion Renewal | $100 | $0 |
| Meter Seal | $40 | $0 |
| BTEIP elderly handicapped | $150 | $0 |
| Radio Associations | $20 – $50/wk | $0 |
| Meter Rates | $2.60 base/ 0.40¢ per1/7 mile $2.80/mile $28 wait time/ Flat rate $3.20 | $2 Base rate/ $1.24 mile/ $1.15 service fee |
| Corporation Taxes | $456 | $0 |

151.   A favorable decision by this Court holding the TNC Law unconstitutional will redress Plaintiffs' injury.

152.   Should relief be ultimately granted in this case it would redress Plaintiffs'

complaint and both taxi cabs and TNCs would be treated equally in Malden, Somerville, Medford, Everett, and Boston, allowing the Plaintiffs to compete on a level playing field with TNCs and thus eliminate the disparate economic cost associated with servicing the public.

## COUNT I
### (UNFAIR COMPETITION IN VIOLATION OF M.G.L. c. 93A, § 11)

153.    Plaintiffs incorporate the allegations of Paragraphs 1-152 of this Complaint.

154.    By unlawfully operating its UberX transportation services without incurring the expense of compliance with Massachusetts and Boston, Malden, Medford, Everett and Somerville laws, as alleged above, Uber unfairly competes with Plaintiffs, in violation of M.G.L. c. 93A, § 11.

155.    Uber's unlawful competition has caused harm to Plaintiffs by diverting revenues that would otherwise be paid to taxis and by reducing the value of taxi medallions and such harm will continue unless and until such unlawful competition is enjoined.

## COUNT II
### (COMMON LAW UNFAIR COMPETITION)

156.    Plaintiffs incorporate the allegations of Paragraphs 1-152 of this Complaint.

157.    By unlawfully operating its UberX transportation services without incurring the expense of compliance with Massachusetts and Boston, Malden, Everett, Medford, and Somerville laws, as alleged above, Uber unfairly competes with the plaintiffs.

158.    Uber's unfair competition has caused harm to Plaintiffs by diverting revenues that would otherwise be paid to taxis and by reducing the value of taxi medallions and such harm will continue unless and until such unlawful competition is enjoined.

## COUNT III
### (ATTEMPTED MONOPOLIZATION - SHERMAN ANTITRUCT ACT, 15 U.S.C. § 2)

159.    Plaintiffs incorporate the allegations of Paragraphs 1-152 of this Complaint.

2A93594

160.    The purpose of the antitrust laws of the United States is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

161.    The Sherman Antitrust Act prohibits anticompetitive conduct carried out for the purpose of achieving monopoly power in any part of interstate or foreign trade or commerce.

162.    Through the actions described above, Uber has engaged in exclusionary conduct through below-cost pricing carried out with the specific intent of achieving monopoly power in the Greater Boston Ride-Hail Market and of obstructing, restraining and excluding competition.

163.    There is a dangerous probability that Uber will achieve its goal of obtaining monopoly power in the Greater Boston Ride-Hail Market if it continues to engage in the conduct described herein because Uber has sufficient market power to and actually does exclude its competitors through the use of below-cost pricing.

164.    Uber's anticompetitive conduct described herein violates the Sherman Antitrust Act, and the injuries caused by Uber's anticompetitive conduct are the type intended to be prevented by the Sherman Antitrust Act.

165.    As a direct and proximate result of Uber's attempt to achieve monopoly power through anticompetitive conduct, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.  Such damages will continue unless and until Defendants are enjoined.

## COUNT IV
### (ATTEMPT TO MONOPOLIZE UNDER M.G.L.A. c. 93 § 5)

166.    Plaintiffs incorporate the allegations of Paragraphs 1-152 of this Complaint.

167.    The purpose of the antitrust laws of the Commonwealth of Massachusetts is to

2A93594

preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

168.    Through the actions described above, Uber has engaged in exclusionary conduct through below-cost pricing carried out with the specific intent of achieving monopoly power in the Greater Boston Ride-Hail Market and of obstructing, restraining and excluding competition.

169.    There is a dangerous probability that Uber will achieve its goal of obtaining monopoly power in the Greater Boston Ride-Hail Market if it continues to engage in the conduct described herein because Uber has sufficient market power to and actually does exclude its competitors through the use of below-cost pricing.

170.    Uber's anticompetitive conduct described herein violates Chapter 93, and the injuries caused by Uber's anticompetitive conduct are the type intended to be prevented by Chapter 93.

171.    As a direct and proximate result of Uber's attempt to achieve monopoly power through anticompetitive conduct, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.  Such damages will continue unless and until Defendants are enjoined.

## COUNT V
### (DUE PROCESS/EQUAL PROTECTION)

172.    Plaintiffs incorporate the allegations of Paragraphs 1-152 of this Complaint.

173.    Plaintiffs and TNCs (Uber) are similarly situated under the Fourteenth Amendment to the Constitution of the United States.

174.    The TNC Laws' disparate treatment of taxi cab operators is not rationally related to a legitimate government objective.

2A93594

175.    Plaintiffs and TNCs must under the Fourteenth Amendment to the Constitution of the United Sates be treated equally.

176.    The TNC Law does not treat Plaintiffs and TNCs equally.

177.    The TNC Law violates the Fourteenth Amendment to the Constitution of the United States.

178.    The TNC Law is unconstitutional under the Fourteenth Amendment to the Constitution of the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

A.    enter judgment in favor of the Plaintiffs on all counts of the Complaint;

B.    declare the TNC Law unconstitutional, as being in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment to the Constitution of the United States;

C.    award Plaintiffs damages caused by Defendants' unfair competition;

D.    award Plaintiffs damages caused by Defendants violation of the Federal and State antitrust laws;

E.    award Plaintiffs treble damages, costs and attorney's fees;

F.    enjoin Defendants' unfair and antitrust conduct; and

G.    award Plaintiffs such other and further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts of the complaint so triable.

2A93594

Dated: December 16, 2016                    Respectfully submitted,


                                            */s/ Thomas C. O'Konski*
                                            Thomas C. O'Konski, BBO #378265
                                            Paul J. Hayes, BBO #227000
                                            Daniel McGonagle, BBO #690084
                                            **CESARI AND MCKENNA, LLP**
                                            88 Black Falcon Avenue
                                            Boston, MA 02210
                                            Tel: (617) 951-2500
                                            Fax: (617) 951-3927
                                            Email: tok@c-m.com
                                            Email: pjh@c-m.com
                                            Email: djm@c-m.com

                                            **ATTORNEYS FOR THE PLAINTIFFS**

2A93594