# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Malden Transportation, Inc., et. al., | C.A. No. 1:16-cv-12538-NMG |
| Plaintiffs, | consolidated with: |
| v. | C.A. No. 1:16-cv-12651-NMG |
| | C.A. No. 1:17-cv-10142-NMG |
| Uber Technologies, Inc., and Rasier, LLC, | C.A. No. 1:17-cv-10180-NMG |
| | C.A. No. 1:17-cv-10316-NMG |
| Defendants. | C.A. No. 1:17-cv-10598-NMG |
| | C.A. No. 1:17-cv-10586-NMG |

| | |
|---|---|
| Anoush Cab, Inc., et. al, | |
| Plaintiffs, | |
| v. | C.A. No. 1:17-cv-10142-NMG |
| Uber Technologies, Inc., and Rasier, LLC, | |
| Defendant. | |

## ANOUSH PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Anoush Plaintiffs ("Plaintiffs") respectfully submit the following preliminary proposed findings of fact and conclusions of law in accordance with the Court's order. ECF No. 607. Plaintiffs will supplement these proposed findings and conclusions following the close of evidence.

Plaintiffs have alleged that Defendants Uber Technologies, Inc. and Rasier LLC (collectively, "Uber") engaged in, aided and abetted, and conspired to engage in, unfair practices and competition in violation of G.L. c. 93A §11 and the common law. Uber did so by providing unlicensed vehicles

for hire in Boston from June 4, 2013 through August 4, 2016 in violation of City of Boston Ordinance 16-15.05 and Boston Police Department Hackney Carriage Rule 403, and state licensing regulations, 540 C.M.R. 2.05, and engaging in other unfair competition as described herein. Plaintiffs allege that Uber's misconduct caused them loss of profits and losses in the value of their taxi medallions during this period.

Plaintiffs expect the evidence at trial in this matter will support the following findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

1.  The relevant period in this lawsuit is June 4, 2013 through August 4, 2016 (the "Unlawful Conduct Period").

2.  Plaintiffs are owners of 362 taxi medallions in the City of Boston.

## I. EVIDENCE REGARDING UBER'S LIABILITY

### A. The Boston Vehicle for Hire Market

3.  The taxi industry in Boston is highly regulated.

4.  The City of Boston has traditionally regulated taxis under a set of municipal rules, ordinances and regulations, for which the police commissioner has the exclusive authority to regulate hackney carriages.

5.  In 2008, the Boston Police Department issued the Hackney Carriage Rules and Flat Rate Handbook ("Rule 403"), which regulates hackney carriage fares, medallions and hackney licenses, among other things.

6.  Rule 403 defines a "hackney carriage" as "a vehicle used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston."

7.  Rule 403 incorporates a previously promulgated Vehicle for Hire Ordinance, City of

Boston Ordinance 16-15.05 (the "Boston Ordinance"),[1] which provides in relevant part, *id.*:

> no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner…. Anyone found in violation of this subsection shall be punished by fine of not more than five hundred ($500.00) dollars for each violation.

8.     Rule 403 sets forth the maximum rates that medallion owners can charge drivers to lease medallions and vehicles.

9.     Rule 403 sets forth the meter rates and fares that must be charged by vehicles for hire.  Drivers could not charge more or less than the mandated rates.

10.     Rule 403 establishes various vehicle and driver requirements for vehicles for hire, including the requirement that the vehicle have a taxi medallion and be driven by a licensed hackney carriage driver, requirements with respect to vehicle age and equipment, and requirements with respect to membership in a radio dispatch association.

11.     It is undisputed that Uber did not require its ridesharing drivers on the UberX platform to meet the requirements set forth in the Boston Rules. Uber did not comply with the Boston Rules.

12.     The Boston Police Department Hackney Unit is responsible for the oversight and enforcement of the Boston Rules.

13.     There are a limited number of vehicles for hire that could operate in the City of Boston. During the Unlawful Conduct Period, there were only 1,825 licensed medallion taxis in Boston and approximately 6,000 licensed hackney drivers.

**B.     Uber Knew That Ridesharing Was Illegal Under the Boston Ordinance Prior to its Entry into the Boston Vehicle for Hire Market, and that its Unlawful Entry into the Market Gave It Competitive Advantages.**

---

[1] Rule 403 and the Boston Ordinance are referred to herein as the "Boston Rules".

14.     Uber first entered the Boston area market in 2011 with its UberBlack service, which was a livery car service that used licensed livery drivers with licensed livery vehicles.

15.     In 2012, Uber launched its UberTaxi service in Boston. The UberTaxi service allowed users of the Uber smartphone app to request a ride from a medallioned taxi driven by a licensed taxi driver.

16.     In January 2013, Uber looked to expand its operations in Boston, and members of Uber's Boston office, including its General Manager at the time, Michael Pao, were tasked with evaluating the possibility of launching another service either in the form of a ridesharing service or a licensed livery service.

17.     The Uber Boston team created a powerpoint to compare the two potential options. The powerpoint, entitled "Low Cost Uber: Ridesharing v. UberX" (the "Low Cost Uber Powerpoint") reflects that Uber had determined that "[i]n order to make Ride Sharing legal, the pickup can't be considered 'for hire.'" In contrast, the Uber Boston team determined that an Uber service that used licensed livery drivers with commercial livery vehicles was "Legal in Boston" and that service could be "launch[ed] legally" in Boston.

18.     In February 2013, Uber introduced its original UberX service, which required the use of licensed livery vehicles with licensed livery drivers.

19.     On March 15, 2013, Sidecar entered the Boston market with a ridesharing service that used non-commercially licensed drivers with private vehicles to transport passengers for a fee.

20.     That same day, Mr. Pao emailed Uber' Chief Executive Officer, Travis Kalanick, and other Uber executives about the Sidecar launch, and wrote that "[i]n Boston, the regulation clearly outlines that 'for hire' private vehicles cannot do pickup, and police may arrest and fine violators."

21.     In the spring of 2013, Uber developed concerns about its ability to recruit drivers for this original UberX service and was disappointed that the UberX livery service was growing slower

than Uber had hoped it would.

22.    In an April 12, 2013 White Paper, Uber CEO Travis Kalanick explained some of the advantages of a peer-to-peer ridesharing model over Uber's existing livery model.

23.    In the White Paper Mr. Kalanick states that "Uber refrained from participating in this technology sector - known as ridesharing - due to regulatory risk that ridesharing drivers may be subject to fines or criminal misdemeanors for participating in non-licensed transportation for compensation."

24.    In the white paper, Mr. Kalanick writes that "With Uber's approach, our partners have to buy cars, purchase commercial insurance, and spend thousands of dollars in order to get commercially licensed after going through mounds of red tape.

25.    In the white paper, Mr. Kalanick writes, that "In the ridesharing model, a driver can walk into their offices and be up and running in 24 hours, no extra commercial insurance, no thousands of dollars in fees to get licensed, and without months of wading through bureaucratic red tape."

26.    In the whitepaper Mr. Kalanick states "given existing regulations, the Lyft/Sidecar approach is quite aggressive."

27.    In the whitepaper, Mr. Kalanick states that the bet SideCar and Lyft were making was a bet "Regulators for the most part will be unable to act or enforce in time to stop them before they have a critical mass of consumer support."

28.    Mr. Kalanick writes that "with such strong regulatory language against the 'ridesharing' approach, Uber restrained from competing with Lyft and Sidecar in the non-licensed transportation space for over a year."

29.    Uber announced its new ridesharing policy in the white paper. And under this new policy, "if a competitor is operating for 30 days without direct enforcement against transportation

providers, then Uber will interpret that as 'tacit approval' of ridesharing activity." Uber considered citations to be enforcement activity.

30.     On May 23, 2013, Meghan Joyce, who was succeeded Mr. Pao as Uber's General Manager for Boston, emailed Nick Mathews, Uber's marketing manager, to ask about Uber's prior research into the "Boston/MA P2P regs" and asked him to send her the research.

31.     Mr. Mathews responded to Ms. Joyce that he would find the PowerPoint he had prepared, but "[t]here was one law in particular that defines for hire ride providers and pretty clearly states [ridesharing/P2P's] illegality." Mr. Mathews then sent Ms. Joyce the Low Cost Uber Powerpoint that discussed the illegality of ridesharing in Massachusetts.

32.     On May 27, 2013, Uber learned that Lyft was planning to launch on May 31, 2013. Ms. Joyce wrote to her Boston team that "we're going to be moving even faster than expected on p2p."

33.     On May 28, 2013, Matthew Marra, Uber's senior operations manager in Boston, circulated to the Uber Boston Operations team, including Ms. Joyce, a draft of Frequently Asked Questions that UberX P2P drivers might encounter; the first question was "Is P2P legal in the state of Massachusetts?," to which Mr. Marra answered by setting forth the language of the Boston Ordinance.

34.     Ms. Joyce admitted that she was aware of the Boston Ordinance before Uber launched UberX P2P in Boston.  She admitted that she knew that a violation of the Boston Ordinance was punishable by a $500 fine or even arrest.

35.     On May 29, 2013, Mr. Pao emailed other Uber team members, including Ms. Joyce, to inform them that Uber had started to contract with drivers, which Uber referred to as "partners",[2] to drive for its UberX P2P ridesharing service.  In his email, Mr. Pao admitted that "[t]his will be the

---

[2] Uber drivers or partners are referred to herein interchangeably.

first time that Uber launches P2P/ridesharing in a market where we do not have formal or tacit approval from regulators."

36.     On June 4, 2013, Uber launched its ridesharing service in the Boston area – referred to internally as UberX P2P and known to consumers today as UberX.  For its UberX P2P service, Uber partnered with non-commercially licensed drivers who drove private vehicles without medallions or taxi licenses to transport passengers for hire in Boston. UberX P2P drivers were connected to riders for the purpose of transporting the riders from one point to another for a fee paid to Uber, via Uber's smart phone application. This was an unfair method of competition.

37.     The Boston Rules applied to Uber's ridesharing services. The Uber P2P services did not comply with and violated the Boston Rules.  This was an unfair method of competition.

38.     "Uber acted with reckless disregard for the City's Taxi Rules." ECF No. 554 at 9. This was an egregiously unfair method of competition.

39.     Uber decided to launch UberX P2P in Boston despite knowing that Uber and its drivers would be violating the law.  Uber engaged in this method of competition in violation of a known legal duty not to do so.  Uber's use of this method of competition was egregious and willful. Uber's decision to launch the UberX P2P service in Boston despite its illegality was part of Uber's corporate policy and practice of disregarding relevant laws to force its entry into heavily and comprehensively regulated markets.

40.     Uber's non-compliance with local vehicle for hire laws was not limited to Boston. Uber knew that its Uber X product was "wicked illegal" in Cambridge as well.

41.     Uber's disdain for compliance with these laws was expressed by Mr. Kalanick in an email about a Cambridge Licensing Board hearing in in 2013 when he stated: "I don't give a f*** what Cambridge does."

42.     Uber has offered no evidence that any lawyer advised it that its ridesharing

7

operations did not violate the the Boston Ordinance.  In fact, Uber has waived any advice of counsel defense in this matter.

43.     Uber's violation of Boston Ordinance was not the result of a good faith mistake or any good faith mistaken misunderstanding of the law.  Uber's violations of Boston's vehicle for hire laws were egregious and willful.

**C.      Uber Knew that the Police Enforced the Boston Ordinance Against UberX P2P Drivers.**

44.     Shortly after Uber launched UberX P2P in the Boston area, starting in July 2013, Boston Police Department Hackney officers and Massachusetts State Police troopers began issuing $500 citations to UberX P2P drivers for violating the Boston Ordinance by illegally providing rides for hire through the Uber X P2P service.

45.     Ms. Joyce first learned that police had cited an Uber driver just one month after Uber launched its UberX P2P ridesharing service in Boston.  Ms. Joyce notified her supervisor Rachel Holt about the citation and told her: "as the ticket states: 'OPERATOR OMAR IN HIS PRIVATE VEHICLE ... OBSERVED ILLEGALLY PICKING UP FARE AT ABOVE.'"

46.     During the Unlawful Conduct Period, Boston and state police issued hundreds of citations to UberX P2P drivers for violating the Boston Ordinance, as well as state regulations and laws, including 540 C.M.R 2.05.

47.     Uber carefully tracked the citations issued by police to UberX P2P drivers, including tracking which laws were cited and the names and/or badge numbers of the officers issuing the citations.

48.     Uber employee Robert Hoyt worked on maintaining and updating the spreadsheet to keep track of the citations being issued to UberX P2P drivers in Boston.

**D.    Uber's Lack of Candor in Communications with Drivers about Uber's Legality and Citations Enabled Uber to Compete Unfairly with Plaintiffs.**

49.     Uber did not warn prospective or operating UberX P2P drivers they were violating the Boston Ordinance.

50.     After receiving tickets, numerous Uber drivers expressed their concern about Uber's lack of candor.  Uber drivers asked whether they were engaging in an illegal activity and wanted to know why Uber had not brought the Boston Ordinance to their attention.

51.     Uber told drivers that UberX P2P was legal, despite acknowledging otherwise internally.  Uber developed a standard "not illegal, so sorry for the confusion" speech to allay driver concerns.

52.     Uber told drivers that UberX P2P was legal in order to maximize the number of UberX P2P drivers on the road. In fact, in many of his communications with drivers about citations, Robert Hoyt provided drivers with Uber's uniform canned response to UberX P2P drivers telling them that Uber would pay their citation, that Uber was a legal service, and encouraging the drivers to keep driving for UberX P2P.  For example, Uber told drivers that it would reimburse them for the citations and that "**Uber is a legal service that will continue to operate.  I am hoping that you will continue to partner with us, and not let a small minority group of officials discourage you.**"

53.     Uber did not inform drivers about the Boston Ordinance; nor did Uber inform drivers that they may be ticketed for violating the Boston ordinance.  These non-disclosures and misleading statement to prospective and operating drivers about the Boston Rules and police ticketing were unfair methods of competition with the plaintiffs to recruit and retain drivers. These unfair methods of competition were egregious and willful.

### E.     Uber Undermined Law Enforcement By Reimbursing Drivers for the Citations Which Enabled Uber to Compete Unfairly.

54.     Uber reimbursed drivers for the citations.  It did so even though its agreement with its drivers required the drivers to pay for all fines incurred. Uber reimbursed its drivers for the citations because Uber was concerned about its ability to recruit and retain drivers if they had to pay the citations themselves.

55.     Uber paid the citations because "[a]n appeal could threaten our credibility" and "could bring more attention to Uber than we want."

56.     Uber undermined police enforcement of the Boston Rules by paying citations issued to the drivers for violating the Boston Rules. Uber's payments of the fines encouraged and supported the cited drivers to continue to violate the Boston Rules. Uber's payment of the fines aided and abetted drivers to unfairly compete with hackney licensed drivers who were driving medallioned taxicabs leased from the plaintiffs.

57.     A purpose of authorizing and imposing fines was to deter all non-Hackney licensees from violating the Boston Rules.  Uber's payments of drivers' fines for violating the Boston Rules undermined the intended general deterrence purpose of fines imposed on non-Hackney licensed drivers. Uber never disclosed to government officials that it was paying the tickets. Uber's payment of fines for violations of the Boston Rules was an unfair method of competing with the Plaintiffs to recruit and retain drivers. This unfair method of competition was egregious and unfair and Uber engaged in this method of competition willfully.

58.     Uber ultimately was paying up to $20,000 a week on citations and paid over $250,000 for citations during the Unlawful Conduct Period. The persistence, volume and effectiveness of Uber's payment of drivers' fines to encourage ongoing law violations and to undermine police enforcement efforts was an egregious and willful unfair method of competition.

### F.    Uber Grew Increasingly Alarmed and Concerned about Citations.

59.    I reject the testimony of Ms. Joyce that the citations were "occasional" and "felt like a small number." Various internal emails reveal that Uber had a growing concern and alarm about the issuance of citations by police and directly contradict this testimony.

60.    By October 2013, Mrs. Joyce wrote: "Boston … police have been giving us a bit of trouble … pulling drivers over and … ticketing for illegal vehicle for hire."

61.    By January 2014, Uber was expressing dismay internally about drivers "getting more tickets every day".

62.    By April 2014, Uber's leadership team reported that the ticketing was "out of control."

63.    By July, 2014, the volume of citations was "depressingly large," and had reached a "crisis point."

64.    Uber enlisted a lobbyist to try and get the citations to stop.

65.    While Uber witnesses testified at trial that the hundreds of citations were only a small percentage of total Uber trips during the relevant period, Ms. Joyce admitted at trial that, during the relevant period, Uber vehicles did not have any identifying markers on them and used regular vehicles, which were not easy to spot.

### G.    Uber Was Informed by Drivers who Received Tickets that P2P Was Illegal under the Boston Ordinance.

66.    Uber drivers who were ticketed repeatedly told Uber's Boston leadership of the police department's position that UberX P2P was illegal in Boston. Uber's Boston leadership was told by drivers that Boston police officers were handing out a copy of the Boston Ordinance with the $500 citations.

67.    One driver, Robert DeRosa, informed Uber:

I spoke with Sgt. Fleming today at the BPD Hackney Unit and he said unequivocally that a driver of a vehicle which is registered as a passenger vehicle and who is carrying a passenger for a fee in that vehicle is in violation of the law and is subject to a five hundred dollar fine.

68.     There are hundreds of communications in the record between Uber and its drivers putting Uber on notices that its P2P operations violated the Boston Ordinance.

**H.     Uber Knew that Police Viewed UberX P2P to Be Illegal under the Boston Ordinance.**

69.     William Evans was the police commissioner in Boston throughout most of the Unlawful Conduct Period.

70.     During Commissioner Evan's tenure, the leaders of the Boston Police Department Hackney Unit were Captain James Gaughan and Lieutenant Thomas Lema.

71.     Uber considered Commissioner Evans to be a known opponent of Uber. In February, 2014, Ms. Joyce heard an interview by Commission Evans in which he described Uber as a service "not licensed by the city" and considered them to be "gypsy cabs."

72.     Ms. Joyce attended a Boston City Council hearing on December 1, 2014, and admitted that she was in attendance for the entire hearing.

73.      In testimony before the Boston City Council on December 1, 2014, Lieutenant Lema and Captain Gaughan of the Boston Police Hackney Unit agreed that Uber was "openly flaunting the law," "shouldn't be operating," that Boston Police were issuing $500 citations to Uber drivers, and that the Boston police were stepping up enforcement.

74.     During the same hearing, Christopher English, the Mayor's liaison to the taxi advisory committee, testified that: "I imagine will be the primary topic of discussion at today's hearing is the City of Boston vehicle for-hire ordinance. Under the language of this ordinance it is illegal to operate any vehicle for-hire without a license issued by the police commissioner."

75.     Uber also met with Massachusetts State Police who told Uber's Boston leadership

12

that it "wouldn't relent w/ the $500 tix until there is a legislative change."

## I. Uber Knew that Its Conduct Violated Massachusetts State Regulations as well as The Boston Ordinance.

76.     Uber's conduct also violated 540 C.M.R. 2:05, as it was in effect in 2013 (the "Massachusetts Regulation").

77.     Under the Massachusetts Regulation, in effect at the time UberX P2P launched, any "vehicle which is designed to carry fifteen or fewer passengers, including the driver, and carries passengers for hire … which vehicle is not required to obtain a taxicab license" must be licensed and registered as a livery vehicle.  Uber did not requirement its P2P vehicles to have livery licenses.

78.     During the Unlawful Conduct Period, Uber drivers also received citations for violating the Massachusetts Regulation.

79.     Uber recognized that its ridesharing product violated the Massachusetts Regulation. As a result, Uber lobbied to get the Massachusetts regulation amended to allow for ridesharing.

## J. Uber Continued to Believe that Ridesharing was Illegal in Boston Even after the Passage of the Amendments to the State Regulations in January, 2015.

80.     The Massachusetts Regulation was amended in January, 2015.

81.     Uber internally recognized that the amendment to the Massachusetts Regulations did not have any legal effect and that they required enacted legislation to become effective.  In an email written in January, 2015, Nicholas Zabriskie, an Uber public policy associate wrote: ""We're not publicly promoting this part, but at present DPU does not have statutory authority to regulate us. Likewise, legislation needs to pass for the regs to be at all enforceable."

82.     Five months later, Uber's policy team continued to recognize that anyone other than a licensed hackney carriage could not provide vehicles for hire.  In a June, 2015, presentation by Uber's policy team, Nicholas Zabriskie, a policy associate, wrote:

83.     Massachusetts has very limited statewide jurisdiction over transportation services

84.     State law provides authority for municipalities to regulate transportation services

85.     State RMV regulations recognize municipalities' jurisdiction to license and regulate both taxicabs and livery vehicles.

86.     Currently, anyone other than a licensed taxicab is prohibited from offering "vehicle for hire [services] for the purpose of transporting, soliciting and or picking up a passenger or passengers.

**K.     Uber Unfairly Competed by Misrepresenting the Cost of Its Services to Rides and Flooding the Market with Unlicensed Vehicles.**

87.     Uber competed with the Plaintiffs' taxi drivers for riders.

88.     In the email announcing the launch, Uber states that "uberx is our low cost option – faster better, and cheaper than a taxi."  Contrary to the statement, Uber's internal document shows that UberX wasn't cheaper than a taxi at that time.

89.     In the email, Ms. Joyce stated that nothing is going to change from the rider's perspective "except for more cars on the road and shorter wait times!"

90.     Ms. Joyce admitted that Uber was able to cut wait times for riders by putting more drivers and cars on the road.  Ms. Joyce further admitted that Uber did not place any limits on the number of cars or drivers on the road.  By August, 2016, there were more than 20,000 Uber drivers in Boston.

91.     Uber knew that taxis could not respond competitively to this increase in supply, because there were a limited number of taxi medallions (1,825).

92.     Uber engaged in an unfair method of competition by flooding the market with unlicensed P2P vehicles, knowing that taxis could not respond.  Such conduct egregious and willfully unfair.

14

**L.**     **Uber's Fare Cutting below Boston's Mandated Taxi Rates Was an Unfair Method of Competition with Compliant Hackney Licensed Drivers and Vehicles.**

93.     Starting in October, 2013, Uber implemented price reductions to undercut taxi prices.  In October, 2013, Uber implemented a fare reduction which made Uber rates 30% below taxi rates.  In August, 2014, Uber implement a fare reduction which made Uber rates 40% below taxi rates.

94.     Meghan Joyce testified that Uber could have charged the same passenger fares mandated by the Boston Rules for hackney licensed taxis, but that it did not do so.

95.     Uber knew that taxis would not be able to reduce fares to match Uber's fares, because the regulations prohibited taxis from doing so.

96.     Uber's reduction of its passenger fares below the fares mandated for law-compliant taxis was an unfair method of competition. Fares below the law-compliant rates had the economic effect of decreasing passenger demand for compliant taxi transportation and, concomitantly, decreased the fare and tip revenues of Hackney-licensed drivers and vehicles.  The volume and persistence of this fare-undercutting method of competition was egregiously and willfully unfair.

**M.**     **Uber's Misleading Advertising of Driver's Hourly Earnings Was an Unlawful Method of Competition.**

97.     Uber competed with Plaintiffs for drivers, and recruited drivers at airport taxi pools and taxi stands.

98.     In the Fall of 2013, Uber was starved for driver applications and was having a difficult time recruiting drivers to its platform.  Although, Uber determined that its drivers would earn $13.71 per hour as "net partner profit," its advertisements misleadingly Uber stated that Uber drivers would earn $20-35/hr driving around Boston.

99.     This misleading advertising was an unfair method of competing with Plaintiffs to

recruit and retain drivers. This method was egregious and willful.

**N.       Uber Gained An Unfair Competitive Advantage From its Unlawful Conduct.**

100.    Uber's violations of the Boston Rules allowed it to gain unfair competitive advantages over Plaintiffs.  Uber did not consider its effects on taxis and knew that taxis were legally unable to respond competitively.

101.    Uber's CEO, Travis Kalanick, explained Uber's unfair competitive advantages as follows:

> The problem is that in cities around the world, taxis have been regulated in this crazy way where there's fixed supply and there's fixed price…*And what we do is we come from the outside and create…a marketplace around it that has flexible supply, flexible price*, it's constantly trying to find the equilibrium between supply and demand, *and you just eat it alive.*

102.    Uber exploited these unfair competitive advantages it gained from violating the law to the detriment of the Plaintiffs.

103.    The Boston Rules set the fares that vehicles for hire must charge, and Uber was able to set prices substantially below the legally mandated fares for its UberX P2P ride for hire service, making its prices between 30-40% cheaper that Boston taxi fares, knowing taxis could not adjust their fares to compete with Uber and its drivers.

104.    Uber set the prices that drivers on the UberX P2P platform had to charge for rides to passengers. Uber required the drivers to charge the price set by Uber, and drivers had no say in the price charged to riders. Drivers were not allowed by Uber to charge more or less than the price that Uber set for the rides provided.

105.    Uber knew that taxi drivers could not adjust their fares to compete because "taxi drivers are beholden to the prices, price structure that the City of Boston has set up for its taxi system, so those drivers don't have a specific choice in the matter."

106. Uber used drivers who were not licensed under the Boston Rules, and who did not comply with the municipal background checks, which included a fingerprinting requirement. Internally document show that Uber would have lost 60% of its driver supply, if Uber had implemented a fingerprinting requirement.

107. Uber recognized that "[in the ridesharing model], a driver can walk into their offices and be up and running in 24 hours, no extra commercial insurance, no thousands of dollars in fees to get licensed, and without months of wading through bureaucratic red tape."

108. Uber did not comply with the various requirements for vehicles under the Boston Rules, and Uber admits its non-compliance gave it an advantage in recruiting drivers. Uber recognized that Boston's "high taxi rates and medallion scheme create[d] a massive opportunity" for Uber "because of the astronomical fees in the medallion system."

109. Uber did not require its drivers to own or lease a medallion or otherwise abide by the restrictions of the medallion system or otherwise obtain the required licenses.

110. The principal cost of compliance with the Boston Rules, which were avoided by Uber and it UberX P2P driver partners, was the cost of leasing a medallion. On a yearly basis, the cost of leasing a medallion without a vehicle is up to $26,000 per year and the cost of membership in a radio association is approximately $3,000 per year.

111. Uber and its drivers avoided the costs and fees required in order to comply with the applicable vehicle for hire laws and regulations, including the cost of convering a passenger vehicle into a vehicle which complies with Rule 403. Under Rule 403, vehicles for hire also cannot be more than six years old and vehicles must have certain specified equipment. As a result, at least every six years, an owner must pay the vehicle set-up costs, would be approximately $3,664, which if spread out over the course of six years, would result in an annual cost of $610 per year.

112. The Boston Rules also limited the number of vehicles for hire that could operate in

17

the City of Boston. During the Unlawful Conduct Period, there were only 1,825 licensed medallion taxis in Boston. The Boston taxi industry is a regulated monopoly, and the limits set on the number of vehicles is designed to protect licensed industry participants from competition.

113.    By not complying with the Boston Rules, Uber flooded the market with UberX P2P vehicles with over 25,000 UberX P2P drivers by the end of the Unlawful Conduct Period.  This enabled Uber to reduce wait times compared to taxis.

**O.    The TNC Act**

114.    On August 5, 2016, the Massachusetts legislature enacted the Transportation Network Companies Act (the "TNC Act"). G.L. c. 159A ½.  ECF No. 554 at 3.

115.    The TNC Act preempts municipalities from regulating TNCs through local municipal rules and vests regulatory jurisdiction in the Massachusetts Department of Public Utilities and the Massachusetts Port Authority, effective August 5, 2016. G.L. c. 159A ½, § 10. *Id.*

**P.    Uber's Contention That it Acted in Good Faith.**[3]

116.    With overwhelming evidence that Uber recklessly disregarded the Boston Rules with its UberX P2P service, Uber contends that it should avoid liability because it acted in good faith based on informal conversations and statements involving government officials.

117.    Uber admits that there is no writing from any official in the City of Boston stating that the Boston Ordinance did not apply to Uber or its drivers, or that the City of Boston would not enforce the Boston Ordinance against Uber or its drivers.

118.    In support of its assertion that it acted in good faith, Uber offered testimony by Uber employees about a March 15, 2013 phone call between Michael Pao and Mark Cohen, the City of

---

[3] In addition to claiming that it acted in good faith in reliance on informal conversations and statements involving government officials, Uber also asserted a permitted practices defense, pursuant to G.L. c. 93A, § 3.  This Court granted summary judgment to Plaintiffs on that defense prior to trial. ECF No. 554.

Boston's former director of licensing, and two phone calls between Uber's former public policy director, Corey Owens, and Mayor Menino's Chief of Staff, Mitchell Weiss, on May 30 and 31, 2013. Uber also offered testimony of an amendment to 540 C.M.R. § 2.05 in January 2015.  Uber has also argued that statements in the media by some government officials lead it to believe that UberX P2P was allowed and could operate in the City of Boston.

119.    The Court finds that it was not reasonable, based on the totality of the circumstances, for Uber to have relied on these statements made publicly by government officials that Uber claims to have relied on.

a.    <u>Michael Pao's Conversation with Mark Cohen on March 15, 2013</u>

120.    Mr. Pao's conversation with Mr. Cohen allegedly occurred on March 15, 2013, which was the same day that Sidecar launched its ridesharing service in Boston.

121.    Mr. Pao did not recall any details of his conversation with Mr. Cohen.  Mr. Pao acknowledged that he received no writing from Mr. Cohen about the conversation.

122.    An email Mr. Pao sent to Uber executives on that same day summarizing his call with Mr. Cohen writes that Mr. Cohen said he was not sure what the police department would be doing in response to ridesharing companies, such as Sidecar, and that Mr. Pao's personal belief at the time was that "[t]here's almost no chance that he's going to enforce on Sidecar in the short term."

123.    Mr. Pao did not take anything Mr. Cohen said to him on March 15, 2013, to be a basis for launching its UberX P2P because on May 29, 2013, Mr. Pao wrote to others at Uber that they had started contracting with drivers for the UberX P2P ridesharing service and that "[t]his will be the first time that Uber launches P2P/ridesharing in a market where we do not have formal or tacit approval from regulators."

124.    I find that this conversation, as represented in Mr. Pao's email, did not give Uber a

good faith basis to believe that UberX P2P did not violate the Boston Ordinance.

                     b.   <u>Corey Owens' Conversations with Mitch Weiss on May 30 and 31, 2013</u>

125.    Mr. Owen's conversations with Mr. Weiss allegedly took place on May 30, 2013 and May 31, 2013. Ms. Joyce did not participate in the conversation.

126.    Mr. Owens had no memory of his calls with Mr. Weiss on May 30 and 31, 2013. Mr. Owens admitted that he received no writing from Mr. Weiss about the conversation.

127.    A May 30, 2013, email from Mr. Owens to Uber executives, including Uber's CEO Travis Kalanick, and Uber's Boston team reveals that Mr. Weiss did not tell Uber to proceed with launching its UberX P2P ridesharing service. The email says that while Mr. Weiss's initial reaction was for Uber to "just launch", after further discussion, Mr. Weiss had an "AHA moment" and said he would have to "talk to my colleagues who supervise hackney, figure out what they're going to do, and I'll call you back."

128.    This version of events is confirmed by an email the next day, on May 31, 2013, from Ms. Joyce to CEO Travis Kalanick in which she reported that Mr. Owens had spoken with Mr. Weiss and that Mr. Weiss was "going to discuss the issue with Boston hackney colleagues re enforcement and get back to us ASAP."

129.    Mr. Owens and Mr. Weiss allegedly spoke by phone on the afternoon of May 31, 2013. On that call, Mr. Weiss informed Mr. Owens that there was an "ongoing review of how technology solutions like Lyft/Sidecar/Uber fit into the existing regime." Mr. Owens responded by telling Mr. Weiss that "[i]n the interim, we will continue exploring various business models for the Boston market".

130.    I find that this conversation, as represented in Mr. Owens' emails, did not give Uber a good faith basis to believe that UberX P2P did not violate the Boston Ordinance.

131.    Mr. Owens even testified that he had no reason to believe that Mr. Weiss had any

authority to waive compliance with the Boston Ordinance.  Ms. Joyce also admitted that she knew the Chief of Staff for the Mayor could not give Uber permission to break the law. They even recognized that the Mayor himself could not give Uber permission to break the law.

132.    That Uber did not in fact rely in good faith upon these interactions with government officials is further reflected by the fact that, in December 2014, more than a year after Uber contends that Boston regulators lead Uber to believe it could UberX P2P ridesharing service did not violate the Boston Ordinance, Uber's Director of Public Policy for the East Coast, Colin Tooze, wrote "currently, anyone other than a licensed taxicab is prohibited from offering 'vehicle for hire [services].'"

c.   The Amendment to 540 C.M.R. § 2.05 in January 2015

133.    The Court does not find credible Uber's contention that the Massachusetts Department of Transportation's amendment to 540 CMR 2.05 in January 2015 provided Uber with a good faith basis to believe that its UberX P2P service did not violate the Boston Ordinance during the Unlawful Conduct Period after January 16, 2015.

134.    Prior to the amendment to 540 CMR 2.05, Uber drivers were cited for violating 540 CMR 2:05 and were given $35 tickets from Massachusetts State Troopers, who set up roadblocks to catch illegal UberX P2P drivers.

135.    While Uber pointed at trial to a few press releases that it claims gave the impression that Uber was allowed to continue to operate in light of the amendments to the regulation, other evidence paints a very different picture of Uber's beliefs at the time.

136.    An internal email from Nicholas Zabriskie to Ms. Joyce and others admits that Uber knew the amended regulations to 540 CMR 2.05 did not have any legal effect and that they required enacted legislation to become effective.  Five month later, in June, 2015, Mr. Zabriskie circulated a PowerPoint acknowledging that anyone other than a licensed hackney carriage could not provide

vehicles for hire.

137.    The evidence also shows that DOT recognized that the 2015 amendment to 540 C.M.R. § 2.05 did not pre-empt local vehicle for hire laws and was ineffective absent enabling legislation.   No such legislation was passed until the TNC Act on August 5, 2016.

138.    Thus, the Court finds that the amendment to 540 C.M.R. § 2.05 in January 2015, on its face, says nothing about the Boston Ordinance and could not have provided Uber with a good faith basis to believe its conduct was not in direct violation of the law.

### d.   Uber's Reliance on Public Statements by Some Government Officials

139.    Uber has also argued that it acted in good faith based on a number of public statements made by government officials in the media and in court filings, as well as Uber being allowed to participate in Mayor Walsh's Taxi Advisory Committee as grounds for their belief that UberX P2P was allowed to operate and not in violation of the law.

140.    The Court finds that the evidence does not support Uber's contention.

141.    Uber points to a statement by Mayor Walsh during a WGBH radio interview suggesting that police should not be ticketing UberX P2P drivers, but the statements by Mayor Walsh did not indicate that UberX P2P was legal and only indicated that police could not stop and ticket someone just "for being an Uber".  This interview did not speak to whether police could still ticket UberX P2P drivers for operating as an illegal vehicle for hire in violation of Boston Ordinance 16-15.05. The Court notes that Uber had other legal services operating in the City at this time, including its licensed livery services UberBlack and its UberX livery service.

142.    On the other hand, Ms. Joyce admitted during her testimony that Uber was aware of a radio interview of Police Commissioner Williams Evans as well as testimony by Captain James Gaughan and Lieutenant Thomas Lema before the Boston City Council in which they unequivocally stated that UberX P2P was in violation of the law and confirmed that the issuance of citations was

proper. This explains why Ms. Joyce admitted at trial that Commissioner Evans was viewed as a known opponent of Uber and that the leaders of the hackney unit were not fans of ridesharing.

143.    Although Ms. Joyce testified that she also had conversations with Mayor Martin Walsh's Chief of Staff, Dan Koh, she admitted that he did not give Uber any assurance that UberX P2P was authorized under the Boston Ordinance.  Internal emails also show that, despite speaking with Mr. Koh, that Uber did not believe the City was going to do anything to stop the issuance of citations by police to UberX P2P drivers. The evidence further shows that despite hounding Mr. Koh the ticketing continued.

144.    While Uber claimed that its participation in the Mayor's Taxi Advisory Committee lead them to believe UberX P2P was allowed, internal emails demonstrate that Uber had real concerns with the Taxi Advisory Committee as a "tri-weekly firing squad on Uber," including the head of the Committee, Chris English's circulation of the Boston Ordinance and discussions during the Committee meetings regarding UberX P2P's violation of the ordinance.

## II.  <u>EVIDENCE ESTABLISHING CAUSATION.</u>

145.    The evidence shows that the influx of unlicensed UberX P2P drivers who provided rides for hire as Ubers' driver partners at prices significantly below taxi prices resulted in the loss of millions of taxi rides, and severely damaged the Plaintiffs' businesses.

146.    Plaintiffs are 34 corporations formed under Massachusetts law between 1971 and 2009 that are in the business of owning and leasing medallions and taxicabs to licensed hackney carriage drivers in the City of Boston.

147.    Plaintiffs presented testimony from medallion lenders and from experts about the harm caused by Uber's unlawful practices. The Anoush Plaintiffs' experts provided testimony that based on their expert analyses the unlawful operation of UberX P2P ridesharing in the Boston area was a substantial contributing factor to the decline in Plaintiffs' leasing revenues and medallion

values.

A.     **Evidence from Medallion Lenders About the Impact of Uber on the Taxi Business and Taxi Medallion Values**

148.     Contemporaneous evidence from medallion lenders reveals the impact of UberX P2P on the taxi business and taxi medallion values during the Unlawful Conduct Period.

149.     Prior to June 4, 2013, there was an active market for taxi medallions in Boston. 551 medallions were bought and sold between January 11, 2000 and June 4, 2013.  Medallion prices peaked in the first quarter of 2014 at around $700,000.

150.     Credit policy documents produced by medallion lenders document the disruption to the taxi industry caused by Uber: namely, how Uber was able to compete by charging less than the legally mandated taxi rates and by avoiding the costs of compliance with the hackney rules, how taxi ridership plummeted, how Uber decreased taxi profitability, how Uber permanently affected the income stream to taxis, how the market for medallions stopped function and buyers and sellers could no longer obtain financing.  As one lender explain: "we are in an unknown bear market due to the headwinds created by Uber and no bank is lending to this industry unless they have other non-taxi collateral pledged."

B.     **Testimony of John Weeden Regarding Causation.**

151.     Plaintiffs presented the testimony of John Weeden, who is an accountant and lawyer with over 18 years of experience performing accounting work and advising Plaintiffs.

152.     Mr. Weeden testified that Uber's alleged illegal conduct was a substantial contributing factor of and caused declines in taxi ridership, taxi utilization, and Plaintiffs' leasing revenue and profits during the Unlawful Conduct Period.

153.     Mr. Weeden's testimony described how, pursuant to Boston Hackney Carriage Rule 403, medallion owners could lease or shift out their medallions and/or vehicles to one or more

licensed taxi drivers and that Rule 403 sets forth the maximum rates that medallion owners can charge drivers to lease medallions and vehicles.  Mr. Weeden also testified as to the vehicle and driver requirements required by Rule 403 for vehicles for hire in Boston, including the required meter rates and fares that must be charged by vehicles for hire.

154.    Mr. Weeden testified that Uber and its drivers avoided these restrictions of Rule 403 and the economic costs of compliance with Rule 403, which made it both easier and possible for Uber to attract a large pool of drivers with vehicles, and to grow its supply of drivers and vehicles in a short period of time.

155.    By not complying with Rule 403, Uber charged less than the fares licensed taxis were required to charge during low or ordinary periods, and higher prices than the fares licensed taxis were required to charge during high demand periods.  This enabled Uber to compete in a way that taxis, including Plaintiffs, could not.  As a result, between 2012 and 2016, Plaintiffs lost over 300 taxi drivers.

156.    As UberX P2P ridership increased during the Unlawful Conduct Period the number of taxi rides in Boston plummeted:



157.    Using meter data for Plaintiffs, Mr. Weeden testified that, consistent with the the

city-wide trend, ridership in Plaintiffs' taxis decreased markedly in 2014 and thereafter. Mr. Weeden testified that as taxi ridership levels decreased, Plaintiffs' taxi leasing followed. The evidence shows that Plaintiffs started to experience a revenue impact from UberX P2P in 2014 with a marked decrease in 2015 and 2016.

158.    Mr. Weeden testified that other than the entry of UberX P2P and other ridesharing services in the market, he was unaware of any other factors which could have caused the decline in leasing revenues.  In other words, Mr. Weeden's testimony supports a finding that Uber's operation of UberX P2P in Boston during the Unlawful Conduct Period caused the decreased leasing revenues of Plaintiffs.

159.    The Court finds Mr. Weeden's testimony to be credible and supported by the evidence.

### C.    Testimony of Dr. Michael Williams Regarding Causation

160.    Plaintiffs also presented the testimony of Dr Michael Williams, an economist who specializes in antitrust, industrial organization and regulation, who performed a regression analysis that predicted but-for medallion prices and leasing revenues in the absence of the operation of UberX P2P during the Unlawful Conduct Period. Dr. Williams testified that the price of a taxi medallion is determined by its anticipated discounted cash flows and that cash flows from medallions are primarily derived from lease payments a medallion owner receives from taxi drivers. He further testified that lease payments, in turn, depend on taxi drivers' willingness to pay to lease a taxi with a medallion.

161.    Dr. Williams testified that the existence of UberX P2P in Boston created a substitute for taxi services, which likely reduced taxi drivers' willingness to lease a taxi with a medallion in at least two ways.

162.    First, the requirement to have a medallion to provide for-hire vehicle services in

26

Boston constrains the number of for-hire vehicles and creates a market for medallions. Dr. Williams explained how Uber's unlicensed UberX P2P service created an alternative avenue for entering the for-hire vehicle market without a medallion, which (all else equal) would be expected to reduce the number of drivers willing to lease a taxi with a medallion.

163.    Second, UberX P2P significantly expanded the supply of vehicles for hire and the increase in the supply of vehicles for hire in turn reduced demand for taxi services and the expected amount that a taxi driver could earn from leasing and driving a medallioned, licensed taxi. Dr. Williams explained how as Uber's Boston operation of UberX P2P became more significant over time, declines in taxi driver revenues and medallion owners' leasing revenues occurred.

164.    As the number of UberX P2P riders increased between 2013 and 2016, annual taxi cab rides in Boston decreased with annual taxi rides in Boston decreased. Dr. Williams observed similar declines in taxi ridership for Plaintiffs.

165.    Dr. Williams also testified that the only area in Boston where ridership did not decline during the Unlawful Conduct Period was at Logan Airport, where Uber had been prevented from operating until February 2017. He further testified that once Uber began operating its UberX P2P service at Logan Airport that taxi ridership began to decline.  He explained that the data presents a natural experiment, which shows that the cause of the decline was Uber and other ridesharing services, and not other factors.

166.    Dr. Williams also testified about the declines in leasing revenues of the Plaintiffs.

167.    Following Uber's introduction of UberX P2P into the Boston market in June 2013, the values of taxi medallions declined precipitously as shown in the chart below:



168.   Dr. Williams testified that these effects from Uber's unlawful conduct would be considered permanent, structural changes in the market for medallions in Boston, and that the standard method for estimating the price effects of such structural changes is the regression analysis that he performed.

169.   Dr. Williams performed three different regression analyses, which he utilized to (1) estimate how medallion prices are affected by various supply and demand factors and (2) isolate the effects of a specific factor (in this case the effect of Uber's unlawful conduct during the Unlawful Conduct Period) on medallion prices. The regression analysis controlled for other major factors that may have affected medallion prices and leasing revenues. Dr. Williams' testimony establishes that the differences between the but-for and actual medallion prices,  taxi ridership and leasing revenues represent that which are attributable to Uber's operation of its unlawful UberX P2P service in the Boston market during the Unlawful Conduct Period. Dr. Williams testified that based upon his regression analysis the cause of the declines in taxi ridership, taxi leasing revenue and taxi medallion prices in Boston was competition from Uber's ridesharing services during the Unlawful Conduct Period.

170.   The Court finds the testimony of Dr. Williams to be credible and supported by the evidence.

### D.   Admissions By Defendants' Expert Laura Stamm Regarding Causation

171.   Defendants' expert, Laura Boothman Stamm, admitted that the availability of UberX P2P contributed to the decline in taxi ridership, which would result in lower taxi leasing revenues. She also admitted that the value of Boston taxi medallions went down as a result of Uber's P2P presence in the market during the Unlawful Conduct Period. She has concluded that one out of two UberX P2P rides would have gone to taxis if UberX P2P was not operating in the market.  She also admitted "Uber X P2P was a transportation alternative to taxis," "the increase in supply of alternatives to taxis [is] a permanent structural change in the market" and when there is a "permanent structural change, you would expect medallion values to be depressed permanently."

### E.   Evidence Rebutting Uber's Superseding and Intervening Cause Defense.

172.   Uber has asserted a defense that the passage of the TNC Act on August 5, 2016 was a superseding and intervening cause of any loss of medallion values for any medallion owner who still owned his or her medallion on or after August 5, 2016.

173.    In order to prevail on that defense, Uber had the burden of presenting evidence that the passage of the TNC Act was not foreseeable and had no relationship to Uber's misconduct during the Unlawful Conduct Period. The Court finds the evidence does not support Uber's defense that the TNC Act was a superseding and intervening cause of Plaintiffs' harm.

174.   Uber itself foresaw passage of the TNC Act because it actively participated in and influenced legislative developments in Massachusetts relating to that legislation throughout the Unlawful Conduct Period.

175.   Uber actively worked to achieve its goal of obtaining statewide regulation for TNCs, including by regularly communicating with the Governor's office and with legislators. In order to get the TNC Act passed, Uber leveraged hundreds of thousands of riders and drivers it obtained through its unlawful conduct to influence state legislators to pass the TNC Act.

29

176.     Among other things, Uber e-mailed petitions to its riders and drivers encouraging them to show their support for such legislation to their legislators. Uber also shared data with state legislators regarding the number of petition signatories, drivers and riders in the legislator's district. In the months leading up to the passage of the TNC Act, Uber conveyed this information to legislators through a "drip campaign" of emails and meetings.

177.     Plaintiffs presented the testimony of Professor Guy Holburn who analyzed the effect of Uber's political mobilization of its riders and drivers in Massachusetts during the Unlawful Conduct Period, when Uber sought to influence the outcome of multiple state and city legislative proposals to regulate the ridesharing industry.

178.     Professor Holburn testified that he analyzed discovery from this case and publicly available sources, as well as his own independent research into Uber's political mobilization strategies, and he concluded that there was substantial evidence that stakeholder mobilization has been an essential part of Uber's approach to influencing legislators' decisions about ridesharing industry regulation.

179.     Professor Holburn testified that Uber's approach to ridesharing was to enter the market before laws or regulations were passed or amended explicitly to render Uber's operation legal, then to build support among elected policy-makers for ridesharing regulations that would impose few restrictions on Uber's operating practices, while neutralizing opposition from hostile politicians with more extensive regulatory proposals. Professor Holburn testified as to how Uber's internal documents describe this core element of its Massachusetts policy strategy.

180.     Professor Holburn testified that, in the absence of political pressure coming from Uber's riders and drivers which Uber had amassed through the alleged unlawful conduct, Uber would have found it more difficult to achieve favorable legislative change, which took the form of the TNC Act passed on August 5, 2016. Professor Holburn described how his analysis showed that

if Uber had not engaged in the alleged unlawful conduct during the Unlawful Conduct Period, it would not have had the substantial stakeholder base of riders and drivers that it used to influence regulators and other government officials that resulted in the passage of the TNC Act.

181.    Professor Holburn further testified that he has researched similar efforts that Uber has undertaken in other markets which it has entered prior to the creation of regulatory frameworks specifically governing TNCs, and how Uber used the driver and rider constituencies it developed therein to exert political pressure for favorable regulations.

182.    As in those other jurisdictions, Professor Holburn explained how Uber deployed considerable resources to organize its stakeholder base for political objectives in Massachusetts, the effectiveness of which increased as its business in Massachusetts grew in terms of the number of riders and drivers utilizing Uber. Professor Holburn also explained how the evidence shows that Uber strategically targeted powerful legislators such as committee members and leaders in the State House and Senate, and timed its stakeholder events to coincide with legislative debates over proposed ridesharing regulations.

183.    The Court finds the testimony of Professor Holburn to be credible and supported by the evidence.

### III. EVIDENCE REGARDING PLAINTIFFS' DAMAGES

184.    The evidence shows that as a result of Uber's unlawful conduct the Plaintiffs have suffered significant damages. Plaintiffs presented the testimony of John Weeden and Dr. Michael Williams with respect to damages.

#### A.    Testimony of John Weeden Regarding Plaintiffs' Damages

185.    Mr. Weeden testified that Plaintiffs began to experience a decrease in leasing revenues in 2014. Using the but-for leasing revenues as determined by the regression analysis of Dr. Williams, Mr. Weeden testified that he then forecasted other revenues, expenses and EBITDA, for

the period from January 1, 2014 and July, 2016, based upon his experience and understanding of the Plaintiffs' business operations and financial statements. Mr. Weeden testified that, based on his expert analysis, he determined that Plaintiffs lost $10,777,855 in profits as a result of Uber's illegal conduct during the Unlawful Conduct Period.

186.    The Court finds Mr. Weeden's testimony to be credible and supported by the evidence.

**B.    Testimony of Dr. Michael Williams Regarding Plaintiffs' Damages**

187.    Dr. Williams testified that, having used his regression analysis to demonstrate that differences between medallion prices and leasing revenues were attributable to Uber's unlawful conduct, he proceeded to calculate Plaintiffs' losses caused by Uber's conduct.

188.    Dr. Williams testified that he calculated the loss per medallion based on the difference between the actual medallion transaction prices and the but-for prices he had calculated. He then multiplied that difference by the 362 medallions owned by Plaintiffs to reach a total loss figure.

189.    Dr. Williams explained that, as a financial asset, the price of a taxi medallion is determined by its anticipated discounted cash flows, which depend in large part on leasing revenues. He testified that his damages analysis based on the leasing revenue regression only captures the portion of the losses attributable to Uber's unlawful conduct.

190.    Dr. Williams testified that he calculated the difference between the but-for medallion price and actual medallion price per medallion to be $742,792.  To disaggregate the effect of Uber's ridesharing competition from other factors, including the anticipation of regulatory changes, Dr. Williams used his leasing revenue regression. After removing the effects of these other factors, Dr. Williams explained that his calculation yielded losses per medallion of $422,273 per medallion based on contemporaneous revenue effects.

191.     Dr. Williams then reduced this amount by 18.8% to reflect the share of the market attributable to licensed UberX livery services and Lyft's ridesharing services. Dr. Williams then used this analysis to calculate the damages incurred by the Anoush Plaintiffs to be $342,607 per medallion, which multiplied by Plaintiffs' 362 medallions results in partial damages incurred by Plaintiffs based on contemporaneous revenue effects attributable to Uber of $124,023,734.

192.     The Court finds Dr. Williams testimony to be credible and supported by the evidence.

## IV.  **EVIDENCE REGARDING UBER'S RES JUDICATA DEFENSE.**[4]

193.     Uber argued a defense of res judicata, contending that Plaintiffs' claims were released in connection with an earlier lawsuit before this Court between Uber and EJT Management Inc. ("EJT") and Boston Cab Dispatch - C.A. No. 13-cv-10769-NMG ("Boston Cab Litigation").

194.     Uber did not raise its defense of res judicata in its answer, motion to dismiss, initial disclosures or any discovery responses.

195.     The first time that Uber mentioned a possible res judicata defense in this action was on December 31, 2018, which was over a month after the close of discovery.

196.     Uber has presented no evidence that it notified Plaintiffs that it intended to assert a res judicata defense prior to December 31, 2018.   Thus, I find that the defense was not timely raised and has been waived.

197.     In any event, I reject the defense on the merits.

198.     Plaintiffs were not parties to the Boston Cab Litigation. On March 6, 2015, this Court denied a motion to amend to add Plaintiffs as parties to that action. Uber opposed the motion to amend to add Plaintiffs as parties in the Boston Cab Litigation on the grounds that the addition of 34 new plaintiffs would "dramatically alter the scope and nature of this action."

---

[4] Plaintiffs continue to maintain that the res judicata defense was been waived.

199.    Uber denied the allegation in the Boston Cab Litigation that "EJT's management agreements with Boston medallion and taxi owners give it authority to seek legal protection of 370 medallion and taxi owners' rights against all forms of unfair competition and trademark infringement."  This Court never ruled on the merits of that allegation.

200.    On July 12, 2016, a Stipulation of Dismissal was filed by the named parties – EJT, Boston Cab and Uber - in the Boston Cab Litigation.  The Stipulation of Dismissal was expressly limited to "claims in this action."

201.    The Stipulation of Dismissal was filed pursuant to a Final Settlement Agreement and Confidentiality Agreement, which provided that "This release does not apply to any claims by entities or individuals other than the named Plaintiffs and their respective predecessors, successors and assigns."

202.    During the settlement negotiations, the parties in the Boston Cab Litigation agreed to carve out from the release the claims of anyone other than those of EJT, Boston Cab and their processors successors and assigns. On June 21, 2016, counsel for Uber revised the release language to remove ambiguities and redundancies "regarding the settlement not releasing claims other than by the named plaintiffs [Boston Cab and EJT] and their predecessors, successors and assigns."  On June 23, 2016, counsel for Boston Cab and EJT agreed to Uber's revision as being consistent with "the goal [which] was to make it clear that only EJT and Boston Cab were granting releases, and the current language accomplishes that."  In the redline drafts of the settlement agreement accompanying those emails, the phrase: "parents, subsidiaries, affiliates, related entities, agents, employees, administrators, attorneys, representatives of any kind, and all persons acting by, through, under or in concert with them, or any of them," are expressly stricken as releasing parties.

203.    EJT and Plaintiffs kept separate corporate books and records, acted pursuant to Written Consents of their shareholders/boards of directors, and filed annual reports with

Massachusetts Secretary of State.

204.    EJT and Plaintiffs maintained separate financial records, had separate bank accounts, and filed separate corporate tax returns. Plaintiffs' accountant kept separate trial balances for each of Plaintiffs and was responsible for allocating revenues and expenses to the correct corporation.

205.    The business interests of EJT and Plaintiffs' were not coextensive. EJT had business interests unrelated to Plaintiffs, including medallion lending to unrelated third parties, a suburban taxi business and parking operations.

206.    The relationship between EJT and Plaintiffs is governed by management agreements, which contain an integration clause, and defines the relationship between EJT and Plaintiffs as "independent contractors."

> Company and Manager shall be independent contractors, and nothing contained herein shall be deemed to create any franchise, fiduciary, agency (except as explicitly provided herein), partnership, joint venture, employment or special relationship between them.

207.    The management agreements state that EJT "is in the business of managing day-to-day-operations of taxicabs" and authorizes EJT "to manage the Taxis." Under the management agreements EJT will act as agent of the Plaintiffs only with respect to the rental, leasing and maintenance of the Taxis.

208.    The management agreements provide that EJT's duties shall include:

    a.  Collecting and accounting for all rental and lease fees from the rental and lease of Taxis and preparing and maintaining the books and records of Company;

    b.  Screening Taxi drivers for Company's vehicles and providing for training when necessary;

    c.  Arranging for dispatch services as needed for the Taxi drivers;

    d.  Providing additional services and all resources necessary to operate the Taxis;

    e.  Providing parking locations for the Vehicles during hours in which they are not

being operated and have not been rented or leased;

f.  Providing regular maintenance for the Vehicles but explicitly not including maintenance required following an insurable accident to a Vehicle;

g.  Providing marketing services for the Taxis;

h.  Providing new vehicles for the Company under the provisions of Section 4 below; and

i.  Taking all action and doing all things necessary and proper to carry out the duties of operating and managing the Taxis and to comply with applicable law.

209.  Under the management agreements, EJT "will pay for all costs associated with operating the Taxis and complying with applicable law; and  shall account to Company at least quarterly as to the income collected for Company pursuant to subsection (a)(i) above and the associated expenses incurred."

210.  As compensation for its services, each of Plaintiffs pays EJT a monthly fee per medallion managed.  All expenses paid by EJT on behalf of Plaintiffs are reimbursed by Plaintiffs in accordance with the terms of the management agreements.

211.  There is no corporate resolution authorizing EJT to file any lawsuits on behalf of Plaintiffs

212.  The Court finds that nothing in the management agreements authorized EJT to file any lawsuits on behalf of the Plaintiffs, as the Plaintiff's agent or otherwise.

### PROPOSED CONCLUSIONS OF LAW

### I.  UBER ENGAGED IN UNFAIR COMPETITION IN VIOLATION OF CHAPTER 93A

213.  A party bringing a claim pursuant to G.L. c. 93A, § 11 "must establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or

practice, as defined by G. L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 469 Mass. 813, 820 (2014).

214.     "Whether a particular set of acts is unfair or deceptive is a question of fact," but that the determination of "the boundaries of actionable conduct under Chapter 93A is a question of law." *Malden*, 286 F. Supp. at 273-74 (citing *Incase*, 488 F.3d at 56); *R.W. Granger & Sons v. J &S Insulation*, 435 Mass. 66, 73 (2001) ("ruling that conduct violates G. L. c. 93A is a legal, not a factual, determination").

215.     "[A] practice or act will be unfair under [Chapter 93A] if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 57 (1st Cir. 2007) (quoting *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457 (2004)).

216.     "The three-part test is disjunctive as opposed to conjunctive; any one factor under the circumstances may be sufficient to find a violation." *NRT New Eng., Inc. v. Moncure*, 2008 Mass. Super. LEXIS 340, *14 (Oct. 23, 2008).

217.     Based on the entirety of the evidence presented at trial, the Court finds that Uber acted with reckless disregard for the Boston Rules and acted egregiously in violation of c. 93A.

218.     The evidence establishes that UberX P2P drivers and vehicles operated without vehicle medallions or licensed hackney carriage drivers and that they were used for the conveyance of persons for hire from place to place.

219.     This Court previously found that if those facts are proven, then Uber violated the Boston Ordinance and Rule 403:

> [T]he regulatory scheme in this case 'is so clear on its face that no good faith doubt concerning its interpretation' is possible. Under the rubric of Rule 403, Uber is a corporation . . . having charge of a . . . private vehicle [that] offer[s] the vehicle for hire for the purpose of transporting . . . a passenger or passengers. Those vehicles were not, at the operative time, licensed as hackney carriages by the Police Commissioner. [T]here is no good faith doubt that Uber was (during the subject interlude and if the facts alleged are proved) engaged in unlawful behavior.

*Malden*, 286 F. Supp. 3d at 273, 276; *see Boston Taxi Owners Ass'n v. City of Boston*, 180 F. Supp. 3d 108, 119 (D. Mass. 2016) ("Rule 403's definition of 'hackney carriage' includes both taxicabs and TNC vehicles…."); ECF No. 554 at 10 ("there is no good faith dispute that Uber violated the Taxis Rules.").

220.   The evidence presented at trial has established that the UberX P2P service was subject to the Boston Rules and that Uber did not comply with those rules. Uber's unlicensed operations constitute an "unfair method of competition" within the meaning of Chapter 93A. *See also Katin*, 2009 U.S. Dist. LEXIS 31398, at *34–37 ("engaging in the unauthorized practice of law may constitute an 'unfair method of competition' within the meaning of Chapter 93A").

221.   Uber's unlicensed competition was egregious, immoral, unethical, oppressive, and/or unscrupulous, and gave Uber an unfair competitive advantage over taxi owners. Uber knew that it was taking the "regulatory risk that ridesharing drivers may be subject to fines or criminal misdemeanors for participating in non-licensed transportation for compensation." When it launched its UberX P2P service in the Boston area, its senior leadership was aware of the illegality of UberX P2P. For example, as discussed above, in March, 2013, Uber's Boston General Manager, Mr. Pao, emailed CEO Travis Kalanick with the language from the Boston Ordinance, stating: "In Boston, the regulation clearly outlines that 'for hire' private vehicles cannot do pickup, and police may arrest and fine violators." In May, 2013, Meghan Joyce, who succeeded Mr. Pao as Uber's Boston General Manager, was informed: "There was one law in particular that defines for hire ride providers and pretty clearly states [P2P's] illegality."

222.    The wealth of evidence reveals that Uber knew it would be violating the law and gaining unfair competitive advantages over taxi but continued with its operation of the UberX P2P service with a complete reckless disregard for the law.

223.    There is significant evidence that shortly after Uber launched its UberX P2P service, Boston police began to issue $500 tickets to UberX P2P drivers for violating the Boston Ordinance and other laws. Uber carefully kept track of the hundreds of citations on a massive spreadsheet.

224.    Uber did not warn drivers about the ticketing and reimbursed drivers for the citations they received, even though Uber's drivers were responsible for paying the tickets under their contracts. Uber paid the citations because "an appeal could threaten our credibility" and "could bring more attention to Uber than we want." By paying the tickets, Uber undermined the deterrent effect of the police enforcement of the Boston Ordinance on its drivers. *See Pimentel v. Los Angeles*, 2018 U.S. Dist. LEXIS 85054, *15-16 (C.D. Cal. May 21, 2018) ("well-established that monetary penalties provide a deterrent to unlawful conduct"); *Towers v. Chicago*, 173 F.3d 619, 625-26 (7th Cir. 1999) ("City, in fixing the amount, was entitled to take into consideration that the ordinances must perform a deterrent function[]").

225.    The evidence further shows that Uber not only paid hundreds of citations for its drivers but told the drivers that UberX P2P was legal, despite evidence revealing the opposite belief internally at Uber.

226.    Uber's paying of the citations demonstrates that Uber was aware that the police were enforcing the rules against Uber, and Uber knowingly disregarded and sought to impede that enforcement.

227.    Uber gained many unfair advantages by not complying with the rules enacted by municipal governments. Uber partnered with private drivers to avoid the "astronomical fees" of the medallion system. As Uber recognized, "in the ridesharing model, a driver can walk into their offices

and be up and running in 24 hours, no extra commercial insurance, no thousands of dollars in fees to get licensed, and without months of wading through bureaucratic red tape." In addition, in violation of the fare regulations, in order to siphon off riders Uber charged 30-40% less than the regulated taxi fares, except during periods of high rider demand, when Uber used "surge pricing." Uber knew that taxis were prohibited from responding competitively to market conditions by lowering or raising their fares and that ignoring such requirements gave Uber a significant competitive advantage.

228.    As the court held in *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 541 (11th Cir. 2015), "[i]t certainly does not require any great leap of logic to believe that a company that profits by declining to comply with government regulations enjoys an unfair advantage vis-à-vis its competitors who choose to obey the law." *Id.*; *see also Consumer Fin. Prot. Bureau v. Harper*, 2015 U.S. Dist. LEXIS 69126, at *16 (S.D. Fla. May 28, 2015) ("Falsifying or omitting material information on an application for a professional license creates an unfair advantage over other businesses that are in compliance with the law, offends established public policy, and is substantially injurious to consumers, as well as competitors, and is therefore a violation of [Florida's Deceptive and Unfair Trade Practices Act]"); *Joint Stock Co. v. Riviera Travel & Tours, Inc.*, 2014 U.S. Dist. LEXIS 87318, at *37–38 (C.D. Cal. June 25, 2014) (unauthorized manipulation of the reservation system, which allowed travel agency to sell airline tickets at prices which were unavailable to other travel agents who were operating lawfully, gave Riviera an unfair competitive advantage over its competitors and was an unfair business practice).

229.    Chapter 93A "hold[s] [businesses] to a 'standard of ***lawfulness***." *Malden*, 286 F. Supp. 3d at 273, 276 (quoting *J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 145 (D. Mass. 2005)) (emphasis in originals).

230.    "Competing as an unlicensed participant in a licensed market can constitute an unfair trade practice." *Malden*, 286 F. Supp. 3d at 273, 275, citing *A. B. & C. Motor Transp. Co. v. Dep't of Pub. Utils.*, 327 Mass. 550, 551–52 (1951) ("licensed carrier of passengers may restrain competition by an unlicensed carrier"); *Boston & M. R. R. v. Hart*, 254 Mass. 253, 254 (1926) (allowing suit against competitor which "had no licenses at any time for carrying on his business"); *Boston & M. R. R. v. Cate*, 254 Mass. 248, 250–52 (1926) (same); *N.Y, N.H. & H.R. Co. v. Deister*, 253 Mass. 178, 181 (1925) (allowing suit for "loss of revenue derived from patronage diverted by the defendant through his illegal conduct in operating buses without the licenses required by law").

231.    Judge Woodlock reached the same conclusion in another case when he sustained a claim by licensed real estate attorneys against real estate settlement providers who were not licensed to practice law. *Katin v. Nat'l Real Estate Info. Servs.*, 2009 U.S. Dist. LEXIS 31398, *34–37 (D. Mass. Mar. 31, 2009). The Court held that: "plaintiffs' allegations that defendants adversely affected their competitive position in the market for conveyancing services by engaging in the unauthorized practice of law may constitute an 'unfair method of competition' within the meaning of Chapter 93A." *Id.* at *35-36.

232.    Uber's violation of the Boston Rules falls within the penumbra of a common law, statutory, or other established concept of unfairness that c. 93A's prohibition of unfair competition is designed to remedy. *Malden*, 286 F. Supp. 3d at 274. Laws and regulations establishing eligibility to compete in regulated industries, such as the licensing provisions in the Boston Rules,[5] are common.

> One who engages in a business or profession in violation of a legislative enactment which prohibits persons from engaging therein, either absolutely or without a prescribed permission, is subject to liability to another who is engaged in the business or profession in conformity with the enactment if … (a) one of the

---

[5] *See Boston Neighborhood Taxi Ass'n v. Dep't of Public Util.*, 410 Mass. 686, 687-88 (1991) (fixing the maximum number of medallions to be issued by statute); *Town Taxi, Inc. v. Police Comm'r of Boston*, 377 Mass. 576, 582, 585 (1979) (taxi industry is statutorily created regulated monopoly).

purposes of the enactment is to protect the other against unauthorized competition, and (b) the enactment does not negative such liability."

Restatement of the Law Torts § 710; *see also Smalley Transp. Co. v. Moed's Transfer Co.*, 373 So. 2d 55, 57 (Fla. Dist. Ct. App. 1979) (money damages are available under common law to one who is damaged by the engagement in business of a competitor in violation of a statute).

233.   Uber's violations of the law also occurred on a massive scale and caused devastating injury to taxi owners, and more specifically, Plaintiffs. Uber's goal was to defeat the taxi industry. Uber succeeded. By the end of the Unlawful Conduct Period, there were tens of thousands of P2P drivers who were providing nearly 2.3 million P2P rides per month, while taxi ridership, taxi revenues and taxi medallion prices plummeted. The sheer magnitude of Uber's unlawful operation of for-hire vehicles strongly supports a finding that Uber competed unfairly and in violation of c. 93A.

## II. <u>GOOD FAITH IS NOT A DEFENSE TO UBER'S UNFAIR COMPETITION AND UNFAIR PRACTICES.</u>

234.   Uber's contention that it acted in good faith based on informal oral statements by government employees to justify its conduct provides no legal basis for avoiding liability under c. 93A and, in any event, is unreasonable as a matter of law.

235.   First, c. 93A, §11 does not require that a defendant act with any particular state of mind; instead, the statute focuses on the "acts," "practices" and "competition" themselves. Section 11 also permits multiple damages in the event of "a willful or knowing violation." The fact that Chapter 93A punishes "willful or knowing" violations by imposing a damages multiplier necessarily means that proof of "willful or knowing" conduct is not necessary to establish the unfairness of Uber's conduct. *Linthicum v. Archambault*, 379 Mass. 381, 387–88 (1979) (fact that "defendant's conduct was negligent rather than intentional" barred a claim for multiple damages under G.L. c.

93A § 11, but did **not** undermine a finding of unfairness). Thus, Uber's conduct can be unfair and violate G.L. c. 93A, §11, even if Uber had a "belief of entitlement" to engage in its conduct. *See Castricone v. Mical*, 74 Mass. App. Ct. 591, 600–01 & n.13 (2009); *see also Golber v. BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 260–61 (1999) (rejecting defendant's argument that "absent a finding of intentional or willful misconduct, there can be no c. 93A violation"); *Shipps v. Compass Group United States*, 14 Mass. L. Rep. 236 (2002) ("[A] defendant's action need not be intentional [to violate Chapter 93A]; negligence is not a valid defense.").

236.    Even if one accepts that Uber believed its conduct was legal, that fact would not negate liability even for multiple damages because "[t]he 'willful or knowing' requirement refers not to actual knowledge of the terms of the statute," but rather to the willfulness of defendant's conduct which "amount[s] to violation of the law." *Montanez v. Bagg*, 24 Mass. App. Ct. 954, 956 (1987). Because a "misunderstanding of the requirements of applicable law" provides no defense even to the imposition of multiple damages under Chapter 93A, *id.*, it necessary follows that a misunderstanding of law provides no defense to liability under the statute.

237.    While the Court concludes Uber's claim of good faith cannot as a matter of law relieve it of liability under c. 93A, even if such a defense was available to Uber it has failed to present any credible evidence to support its argument in this regard.

238.    First, Uber has presented no evidence that any lawyer advised the company that its ridesharing services were allowed under the Boston Ordinance.  Indeed, it disclaims any reliance on the advice of counsel.

239.    Second, the evidence clearly shows that Uber believed that ridesharing was illegal and not allowed under the Boston Ordinance.

240.    Third, the evidence makes clear that any reliance by Uber on Mr. Pao's conversation with Mr. Cohen in March 2013 and the conversations between Mr. Owens and Mr. Weiss in May

2013 was not reasonable and could not support any finding of good faith. There is overwhelming evidence that Uber knew and discussed internally that its UberX P2P ridesharing service violated the Boston Rules. The evidence of these conversations between Uber and government officials does nothing to undermine that internal analysis by Uber. In fact, the evidence makes clear that Uber did not receive any assurances, implicit or explicit, from either Mr. Cohen or Mr. Weiss during these conversations nor would it have been reasonable for Uber to have relied on any such assurances under the circumstances.

241.     In Massachusetts … one relies at his peril on representations by a government official concerning legal requirements…. Particularly where misstatements about the effect of applicable rules and regulations relied upon are oral, reliance on them may not be regarded as reasonable." *Harrington v. Fall River Housing Auth.*, 27 Mass. App. Ct. 301, 309–10 (1989) (citing *Heckler v. Community Health Servs., Inc.*, 467 U.S. 51, 65 (1984)); *see also A P East, Inc. v. Board of Assessors*, 40 Mass. App. Ct. 912, 913–14 (1996); *Mass. Bay Transp. Auth. v. Boston & Main Corp.*, 2017 Mass. Super. LEXIS 152, at 12–13 (Super. Ct. Aug. 18, 2017).

242.     Fourth, Uber's own internal acknowledgement that its conduct violated the law coupled with the consistent issuance of hundreds of citations by police to UberX P2P drivers, undermines any contention by Uber that its dealings with government officials provided a reasonable basis for Uber to have operated its UberX P2P service in Boston.

243.     The totality of the evidence reveals that Uber recognized it would be violating the Boston Rules, sought an end around the rules through back channels with Mr. Cohen and Mr. Weiss and were told, at best, that Boston was still analyzing the situation. This evidence demonstrates that Uber realized what it was doing was wrong, which is evidenced by internal communications and the payment of hundreds of citations. Ultimately, Uber determined that the value to the company of growing mass consumer support for the UberX P2P service so that it could subsequently influence a

favorable change in the laws outweighed the legal risks. Uber made the "bet" that "regulators for the most part will be unable to act or enforce in time to stop them before they have a critical mass of consumer support."

244.    In addition, the post-launch interactions between Uber and government officials do not insulate Uber from its knowing violation of the Boston Ordinance. There is not a single writing from any government official indicating that UberX P2P did not violate the Boston Ordinance, and Uber officials acknowledged that no government official had the authority to waive compliance with the law.

### III. UBER ENGAGED IN COMMON LAW UNFAIR COMPETITION

245.    The evidence also establishes that Uber engaged in unfair competition under the common law. This Court previously sustained Plaintiffs' claim for common law unfair competition based upon the same conduct alleged with respect to Plaintiffs' c. 93A claim. *Malden*, 286 F. Supp. 3d at 276, 278. Because Plaintiffs' common law allegations are now fully supported the detailed evidentiary record (most importantly, that Uber operated or assisted in the operation of for-hire vehicles and that neither Uber nor its P2P drivers obtained proper licenses or medallions to operate such vehicles), Plaintiffs have established Uber's liability for unfair competition under the common law for the same reasons as described above with respect to the c. 93A claim.

246.    "One who engages in a business or profession in violation of a legislative enactment which prohibits persons from engaging therein, either absolutely or without a prescribed permission, is subject to liability to another who is engaged in the business or profession in conformity with the enactment if … (a) one of the purposes of the enactment is to protect the other against unauthorized competition, and (b) the enactment does not negative such liability." Restatement of the Law Torts §710. *See also Smalley Transp. Co. v. Moed's Transfer Co.*, 373 So. 2d 55, 57 (Fla. Dist. Ct. App. 1979) (money damages are available under common law to one who is damaged by the

engagement in business of a competitor in violation of a statute).

247.    The taxi industry is a highly regulated industry. *See Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 323 (2015) ("businesses operating under the regime of Rule 403 may be described aptly as members of a highly regulated industry"). During the period at issue in this case, it was considered a "regulated monopoly," created by statute. *Town Taxi, Inc. v. Police Comm'r of Boston*, 377 Mass. 576, 582 (1979).  By law, the Police Commissioner of the City of Boston is authorized to limit the number of licenses.  *Id.* at 585.  Throughout the period at issue in this case, the legal limit on the number of licenses was 1,825.  I find that one of the purposes of establishing such limits on the number of licenses, is to protect licensed medallion owners from unlicensed competition. See also *Everett Town Taxi, Inc. v. Board of Aldermen*, 366 Mass. 534, 538 (1974) (general rule that a business did did not have standing to sue a competitor for engaging in business competition does not apply "to competitors in a regulated industry" such as the taxi industry).[6]

248.    Plaintiffs' common law claim is supported by a long line of Massachusetts authority, which provides competitors relief in response to "competition by an unlicensed carrier." *A. B. & C. Motor Transp. Co. v. Dep't of Pub. Utils.*, 327 Mass. 550, 551–52 (1951) ("licensed carrier of passengers may restrain competition by an unlicensed carrier"); *Boston & M. R. R. v. Hart*, 254 Mass. 253, 254 (1926) (allowing suit by competitor which "had no licenses at any time for carrying on his business in any of the cities or towns through which his busses run"); *Boston & M.R.R. v. Cate*, 254 Mass. 248, 250–52 (1926) (allowing suit by licensed railway against defendant which "operat[ed] motor vehicles

---

[6] *Massachusetts Soc. Of Optometrists v. Waddick*, 340 Mass. 481 (1960) is inapposite.  In *Waddick*, the court sustained the dismissal of a case, by registered optometrists who, without proof of damage, sought an injunction against the illegal practice of optometry by persons who are not registered and are not physicians or surgeons.  The court denied the request for an injunction, because there was no evidence of damage, contrasting its holding in *McMurdo v. Getter*, 298 Mass. 363, 364 (1937).  The court further found that the statutory scheme in question was not designed to protect the plaintiff from competition, unlike the statutory scheme governing taxis.

. . . for the carriage of passengers for hire" without license and in violation of city ordinances); *N.Y, N.H. & H.R. Co. v. Deister*, 253 Mass. 178, 181 (1925) (allowing suit by railroad operator because "agreed facts disclose … the loss of revenue derived from patronage diverted by the defendant through his illegal conduct in operating buses without the licenses required by law").

249.     These cases stand for the proposition that with respect to Plaintiffs' common law claim for unfair competition, Uber's unlicensed competition, itself provides a basis for finding Uber liable without more, since one of the purposes of the licensing scheme is to protect taxi owners from unauthorized competition. Nevertheless, as detailed above, the evidence at trial establishes much more unfair competitive conduct by Uber.

## IV. **UBER IS LIABLE FOR AIDING AND ABETTING UNFAIR COMPETITION**

250.     "[U]nder Massachusetts law liability for aiding and abetting a tort attaches where: (1) the defendant provides substantial assistance or encouragement to the other party; and (2) the defendant has unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions." *Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 79 Mass. App. Ct. 473, 486-87 (2011) (quoting *Austin v. Bradley, Barry & Tarlow, P.C.*, 836 F. Supp. 36, 40 (D. Mass. 1993)).

251.     Here, the evidence shows that Uber provided "substantial assistance" to UberX P2P drivers to operate unlicensed P2P vehicles by developing and maintaining the app that enabled that conduct which Uber knew drivers were using to provide vehicles for-hire, and by reimbursing drivers for their citations to keep as many drivers as possible out on the road. As this Court held earlier in the case:

> If this Court were to find that Uber did not have control over its drivers, then its business model would consist of aiding and abetting the "private vehicle[s]" drivers, none of which was licensed as a hackney carriage by the Police Commissioner. Under either reading, there is "no good faith doubt" that Uber was (during the subject interlude and if the facts alleged are proved) engaged in unlawful behavior.

*Malden*, 286 F. Supp. 3d at 276; *Nova Assignments, Inc. v. Kunian*, 77 Mass. App. Ct. 34, 43 (2010) ("Con-duct that comprises aiding and abetting may come within the ambit of c. 93A."). The evidence at trial confirms that earlier ruling.

252.    Uber is liable to Plaintiffs for aiding and abetting the unfair competition committed by UberX P2P drivers.

## V.  UBER IS LIABLE FOR CONSPIRACY TO ENGAGE IN UNFAIR COMPETITION

253.    Two types of civil conspiracy exist under Massachusetts law. *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998). The first type requires "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act" and "proof of some tortious act in furtherance of the agreement." *Aetna Casualty Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994).

254.    Here, I find that Uber had an agreement with its P2P drivers under which they operated unlicensed for-hire vehicles, and it substantially assisted its P2P drivers by providing them access to Uber's platform through Uber's smartphone application and collecting the fares paid by the riders.  That was, in fact, the entire purpose of the relationship between Uber and its drivers. Such conduct is more than sufficient to establish the requisite tortious act to advance the conspiracy. *Kurker*, 44 Mass. App. Ct. at 189.

255.    When the Court denied Uber's motion to dismiss, it expressly affirmed the adequacy of Plaintiffs' allegations of conspiracy based on the same facts that are now established. See Malden, 286 F. Supp. 3d at 280–81. Because those allegations have now been supported by the facts, Plaintiffs are entitled on their conspiracy claim.

256.    There is a second type of conspiracy under Massachusetts law in which "a plaintiff need not allege an underlying tort, because the mere force of numbers acting in unison to injure a

plaintiff constitutes a wrong." *Sexual Minorities Uganda v. Lively*, 960 F.Supp.2d 304, 333 (D. Mass. 2013). In this regard, Plaintiffs need only establish that Uber and the Uber P2P drivers' conduct, through sheer force of numbers, injured Plaintiffs in a way that they would not have been able to accomplish individually. *Id.* at 333-34; *Levesque v. Ojala*, 2005 Mass. Super. LEXIS 646, *77-78 (Dec. 8, 2005).

257.    That is precisely what happened here. Uber flooded the market with thousands of unlicensed Uber P2P drivers in furtherance of its scheme: By August 2016, Uber had nearly 30,000 P2P drivers in the Boston area, who completed roughly 2.3 million P2P trips per month.  Uber and its drivers "added force due to combination," resulting in an "injury [that] is greater specifically because of the combined force." *Sexual Minorities Uganda*, 960 F. Supp. 2d at 334; see also Willeett v. Herrick, 242 Mass. 471, 477-8 (1922) (sustaining conspiracy claims where "injury to the plaintiffs' business … resulted from the power exercised by the combination of the defendants.").

258.    The evidence at trial supports the conclusion that Uber is liable for conspiracy to engage in unfair competition.

## VI.  <u>UBER'S UNLAWFUL CONDUCT HAS CAUSED PLAINTIFFS SIGNIFICANT DAMAGES.</u>

259.    Because this Court finds that Uber is liable to Plaintiffs pursuant to G.L. c. 93A, §§ 2, 11, for violations of the common law, and for aiding and abetting and conspiracy, Plaintiffs are entitled to recover for any loss of money or property attributable to Uber's misconduct.

260.    The First Circuit has explained the relevant tort principles of factual and proximate causation, which are also applicable under Massachusetts law, as follows: "Under tort causation principles, an actor may be held liable for harm to another person if the actor's misconduct was a factual cause of the harm, see Restatement (Third) of Torts § 26 (2010), and the harm resulted from the risks that made the conduct wrongful in the first place, meaning that it was a reasonably

foreseeable consequence of the misconduct, see id. § 29." *Drumgold v. Callahan*, 707 F.3d 28, 48-49 (1st Cir. 2013).

261.     As a matter of law, it is not a defense to point to another factual cause of a plaintiff's harm, so long as the defendant's wrongful conduct was a factual cause of the harm. The First Circuit has explained the relevant tort principles, which also apply under Massachusetts law, as follows:

> In turn, misconduct is considered a factual cause of harm in two mutually exclusive situations. The first is where the harm would not have occurred but for the misconduct. See [Restatement (Third) of Torts] § 26. This rule is sometimes called the "but for" causation principle. See id. § 26 cmt. b. The second scenario is where the harm was brought about concurrently by the misconduct and an unrelated force, each of which would have been sufficient by itself to trigger the harm. See id. § 27. In that circumstance, the actor's misconduct was not a necessary condition for the harm, since the harm would have occurred in its absence due to the concurrent force. See id. § 27 cmt. a. Nevertheless, the misconduct is regarded as a factual cause of the harm for policy reasons, since the actor should not escape liability merely because of the fortuitous operation of another force that also would have produced the harm on its own. See Dan B. Dobbs et al., The Law of Torts § 189 (2d ed. 2011) ("It would be a windfall [if the actor] were to escape liability for the harm merely because another [force] was also sufficient to cause the same harm."); W. Page Keeton et al., Prosser and Keeton on Torts § 41 (5th ed. 1984). We refer to this rule as the concurrent causation principle.

*Drumgold*, 707 F.3d 28 at 48-49.

262.     Massachusetts tort law has long followed these principles of factual causation, although the cases typically use the traditional "substantial factor" language. *See, e.g., Donovan v. Philip Morris, Inc.*, 268 F.R.D. 1, 14 n. 8 (D. Mass. 2010) ("Massachusetts courts use a substantial factor test, instead of a but-for cause test, in cases in which there were two or more causal events sufficient to bring about the plaintiffs' harm."); *Matsuyama v. Birnbaum*, 452 Mass. 1, 30-31 & n. 47 (2008) (noting the "'substantial contributing factor' test is useful in cases in which damage has multiple causes" and explaining the test's "primary function was to permit the factfinder to decide that factual cause existed when there were overdetermined causes – each of two separate causal chains

sufficient to bring about the plaintiff's harm, thereby rendering neither a but-for cause."); *Hannon v. Callera*, No. 14-P-1061, 2015 Mass. App. Unpub. LEXIS 746, at *5-6 (July 7, 2015) ("The substantial contributing factor instruction is normally given when there are multiple causes or tortfeasors."); *Or v. Edwards*, 62 Mass. App. Ct. 475, 485 (2004) (holding defendant landlord's negligence in entrusting an unfit custodian with apartment passkeys "was a substantial causative factor" in bringing about the death of plaintiff tenant's daughter, thereby establishing "factual cause").

263.    Thus, Plaintiffs must establish that Uber's unlawful conduct caused Plaintiffs' harm. However, the Plaintiffs do not have to prove that Defendants' unfair competition was the only or even the predominant cause of their injuries. The Plaintiffs are not required to exclude every other possibility of cause for their harm except that of the unfair competition of the Defendants.

264.    Uber does not credibly dispute that during the Unlawful Conduct Period its UberX P2P services caused some losses to Plaintiffs in the form of lost revenue and lost medallion value, as reflected in the dramatic drops in taxi ridership and medallion values during the Unlawful Conduct Period. *Katin v. National Real Estate Info. Servs.*, 2009 U.S. Dist. LEXIS 31398, at *25 (D. Mass. Mar. 31, 2009) (loss of money or property supported by the fact that "the presence of defendants' allegedly unlawful business...had an adverse economic impact on the plaintiffs"); *Boston Cab Dispatch v. Uber Techs., Inc.,* 2015 U.S. Dist. LEXIS 8508, at *9-10 (D. Mass. Jan. 28, 2015) ("[C]ommon economic sense suggests that Uber's expansion of its car service business would have a high likelihood of affecting the revenue of all Boston medallioned taxis….").

265.    I find, based upon the preponderance of the evidence, that Plaintiffs have proven that Uber's unlawful competition in violation of c. 93A and the common law, and its aiding and abetting and conspiracy with its drivers to engage in such violations of c. 93A, and the common law,

was the legal and factual cause of Plaintiffs' loss of profits and loss of medallion values.[7]

266.     As long as the Plaintiffs presented evidence that provides a reasonable basis for a damages calculation, that is all the law requires. Mathematical precision is not required. *See Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 777 (1986) ("In the case of business torts an element of uncertainty in the assessment of damages is not a bar to their recovery…. An award of damages can stand on less than substantial evidence…particularly [in] the case of business torts, where the critical focus is on the wrongfulness of the defendant's conduct.") (internal quotations omitted); *Astro-Med, Inc. v. Nihon Kohden Am., Inc.,* 591 F.3d 1, 19 (1st Cir. 2009) ("Astro-Med is not required to prove its damages 'with mathematical precision.' 'All that is required is a reasonable basis of computation and the best evidence obtainable.'")(citations omitted); *Cadillac/Oldsmobile/Nissan Ctr., Inc. v. GMC,* 391 F.3d 304, (1st Cir. 2004) ("The Massachusetts cases are clear that damages under unfair competition statutes need not be proved with mathematical certainty.").

---

[7]In its summary judgment ruling, this Court already rejected Defendants' arguments that Plaintiffs' claims of reduced medallion value represents economic injury that is recoverable under c. 93A, and that economic damages are recoverable under c. 93A, *Cummings v. HPG Int'l, Inc.,* 244 F.3d 16, 26, n.3 (1st Cir. 2001). The parties' experts agree that the structural change in the transportation-for-hire market was permanent and, as a result, the depression in medallion values was not temporary or speculative. Therefore, the Court finds that Plaintiffs may recover for any loss of value they established during the Unlawful Conduct Period. *See* ECF No. 554 at 12. The Court also rejected Defendants' argument that the economic loss rule should apply to Plaintiffs' 93A claim. *See* ECF No. 554 at 12; *Pedersen v. Hart Ins. Agency, Inc.,* 717 F. 2011 U.S. Dist. LEXIS 120321, *8 (D. Mass. Oct. 13, 2011) (J. Gorton) (economic loss doctrine does not "bar plaintiffs' Chapter 93A claim") citing *Cummings v. HPG Int'l, Inc.,* 244 F.3d 16, 26 n.3 (1st Cir. 2001) ("Massachusetts courts have generally held that the economic loss doctrine does not bar recovery in actions brought under Chapter 93A"); *Oliver v. Bank of Am., N.A.,* 2013 U.S. Dist. LEXIS 97548, *16-17 (D. Mass. June 17, 2013) ("Although the economic loss doctrine precludes recovery of purely economic losses in tort and strict liability actions, economic losses are recoverable under chapter 93A…."); *Katin v. Nat'l Real Estate Info. Servs.,* 2009 U.S. Dist. LEXIS 31398, at *36 (D. Mass. Mar. 31, 2009) (sustaining c. 93A claims where plaintiffs allegedly suffered "economic injury" caused by unlicensed competition); *Grossman v. Waltham Chem. Co.,* 14 Mass. App. Ct. 932, 934 (1982) (economic "damages incurred by the plaintiff were 'direct results of the [defendant's] wrong.'"); Michael Gilleran, The Law of Chapter 93A, 52 Mass. Practice § 11.6 n. 1 (2018) ("Actual damages under 93A include direct economic damages.").

267.    I find that Plaintiffs have proven with reasonable certainty that they have lost profits as a direct and foreseeable result of Uber's unlawful conduct in the amount of $10,777,855.

268.    I find that Plaintiffs have proven with reasonable certainty that they have suffered a loss of medallion values as a direct and foreseeable result of Uber's unlawful conduct equal to $342,607 per Boston medallion or $124,023,734.

## VII. **THE TNC ACT WAS NOT A SUPERSEDING AND INTERVENING CAUSE OF PLAINTIFFS' HARM.**

269.    The Court recognizes that there are two different tests articulated in the case law regarding a defendant's superseding and intervening cause defense.  One test is articulated by the Massachusetts Supreme Judicial Court in *Kiribati Seafood Co., LLC v. Dechert LLP*, 478 Mass. 111, 120 (2017), while the First Circuit has articulated a similar test in *Springer v. Seaman*, 821 F.2d 871, 877 (1987), *abrogated on other gounds by*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).

270.    Plaintiffs have argued that this case, which is based on diversity, is governed by Massachusetts law and therefore Uber's superseding and intervening cause defense is subject to the test set forth by the Supreme Judicial Court in *Kiribati*, while this Court noted in its summary judgment decision, ECF No. 554 at 19-20, that the First Circuit's decision in *Springer* is the governing test.

271.    Irrespective of which test is ultimately applied, the Court concludes that Uber has failed to establish that the TNC Act was a superseding and intervening cause.

272.    Under either test, Uber bears the burden of proving that the TNC Act was a superseding and intervening cause. *See, e.g., Kiribati*, 478 Mass. at 120; *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Litig.)*, 712 F.3d 21, 45 (1st Cir. 2013) ("the burden of proving an 'intervening cause' -- something which snaps the 'causal chain' (that is, operates as a 'superseding cause,' wiping out the defendant's liability) that connects the wrongful act to the

defendant's injury -- is on the defendant.") (quoting *BCS Servs. v.Heartwood 88, LLC,* 637 F.3d 750, 757 (7th Cir. 2011)); *Napier v. F/V Deesie, Inc.,* 454 F.3d 61, 68-69 (1st Cir. 2006) (defendant "can escape liability in the face of proximate causation by proving the existence of an unforeseeable intervening cause."), citing *Grajales-Romero v. Am. Airlines, Inc.,* 194 F.3d 288, 296 (1st Cir. 1999).

> **a.   Uber Has Failed to Establish That the TNC Act Was a Superseding and Intervening Cause Under the *Kiribati* Test.**

273.   Massachusetts law provides that an intervening cause may "breaks the chain of causation, becoming a superseding cause that relieves the defendant of liability," only if the defendant satisfies its burden of proving that the intervening cause was "not reasonably foreseeable," and was "new and independent." *Kiribati,* 478 Mass. at 120.

274.   The Court finds that Uber has not carried its burden of establishing that the passage of the TNC Act was a superseding and intervening cause of the Plaintiffs' damages.  Rather, the substantial weight of the evidence demonstrates that the TNC Act was driven by Uber's coordinated efforts, which were only possible because of its unlawful conduct.

> **i.   An Intervening Event Can Be a Superseding Cause Only if it Was Not Reasonably Foreseeable and Was Independent of Defendants' Wrongdoing.**

275.   "If a series of events occur between the negligent conduct and the ultimate harm, the court must determine whether those intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm." *Kent v. Commonwealth,* 437 Mass. 312, 321 (2002). The SJC has held that to succeed on a superseding cause defense, the alleged superseding cause "(1) must have occurred after the original negligence; (2) cannot [be] the consequence of the … negligence; (3) created a result that would not otherwise have followed from the original negligence; and (4) was not reasonably foreseeable." *Kiribati,* 478 Mass. at 120. *See also Napier v. F/V Deesie, Inc.,* 454 F.3d 61, 68 (1st Cir.

2006) ("An intervening cause is a new and independent cause of the harm which is neither anticipated nor reasonably foreseeable by the defendant: it must operate independently of and occur after the conclusion of the defendant's wrongful conduct.")

276.    In *Kiribati*, the plaintiff brought a malpractice claim against his law firm Dechert. *Id.* at 111-12. Kiribati alleged that Dechert negligently failed to provide a French court with evidence that the court deemed necessary for Kiribati to prevail. *Id.* at 112. The Superior Court granted summary judgment to Dechert on the grounds that it was legal error for the French court to require production of the evidence, and that the court's legal error was a superseding cause of the adverse decision and Kiribati's damages. *Id.* The SJC reversed. *Id.* at 124. The "fundamental flaw" with defendant's argument was that "a plaintiff's loss need not have only one proximate cause; there can be multiple concurrent causes." *Id.* at 120. Even if the French court "truly made an error of law, a reasonable finder of fact would conclude that there were two independent proximate causes of Kiribati's loss: Dechert's negligence in failing to furnish the court with proof of the consideration paid for the assignment and the court's error of law…." *Id.*

277.    For this reason, any impact of expectations about the passage of the TNC Act on medallion values during the Unlawful Conduct Period does not break the chain of causation. Ms. Stamm opined that expectations surrounding the passage of the TNC Act likely contributed to the decline of medallion values during the Unlawful Conduct Period. However, it is not a defense to liability to point to another factual cause of a plaintiff's harm, so long as Uber's wrongful conduct was **a** factual cause of the harm. *Drumgold v. Callahan,* 707 F.3d 28, 48-49 (1st Cir. 2013) ("[M]isconduct is considered a factual cause of harm…where the harm was brought about concurrently by the misconduct and an unrelated force, each of which would have been sufficient by itself to trigger the harm"); *see* Restatement (Third) of Torts § 26 and cmt. c and l (2010); *Donovan v. Philip Morris, Inc.*, 268 F.R.D. 1, 14 & n. 8 (D. Mass. 2010); *Matsuyama v. Birnbaum*, 452 Mass. 1, 30-31

& n. 47 (2008). And, as Ms. Stamm admitted, Uber's illegal operations were **_a_** cause of the harm, which is borne out by the evidence at trial that medallion values dropped substantially after UberX P2P illegally entered the market.

278.    Moreover, even if expectations about the passage of the TNC Act impacted medallion values during the Unlawful Conduct Period, which is not supported by the trial evidence, such expectations do not constitute a superseding and intervening cause, which as a matter of law must occur after the original misconduct. *Kiribati,* 478 Mass. at 120.

279.    The SJC in *Kiribati* further explained: "Nor is this flaw cured in the circumstances of this case by characterizing the judicial error as the superseding cause." *Id.* Where the intervening cause is reasonably foreseeable "the intervening cause is a 'concurring cause' that leaves the causal link between the defendant's negligence and the plaintiff's harm unbroken." *Id.* at 120-21. It is only where "the intervening event was of a type so extraordinary that it could not reasonably have been foreseen, that [the] new event is deemed to be the proximate cause of the injury and relieves a defendant of liability." *Delaney v. Reynolds,* 63 Mass. App. Ct. 239, 242 (2005); *see also Mullins v. Pine Manor College*, 389 Mass. 47, 62-63 (1983); *Addis v. Steele*, 38 Mass. App. Ct. 433, 436-38 (1995).

### ii.   <u>The Passage of the TNC Legislation Was Reasonably Forseeable.</u>

280.    The evidence at trial makes clear that Uber itself foresaw passage of the TNC Act because it actively participated in and influenced legislative developments in Massachusetts relating to that legislation throughout the Unlawful Conduct Period. Uber actively worked to achieve its goal of obtaining statewide regulation for TNCs, including by regularly communicating with the Governor's office and legislators. Furthermore, Uber has admitted and relies upon the fact that the passage of the TNC Act was foreseeable, by endorsing and offering Dr. Stamm's opinion that prior to passage of the Act there were market-wide expectations that Uber and other TNCs were likely, and eventually certain, to lawfully remain in Massachusetts. Thus, the evidence does not establish

that "the intervening event," i.e., the passage of the TNC Act, "was … so extraordinary that it could not reasonably have been foreseen." *Delaney*, 63 Mass. App. Ct. at 242.

### iii. The Passage of the TNC Act was Not Independent of Uber's Unlawful Conduct.

281.    The evidence also does not establish that the TNC Act was independent of Uber's unlawful conduct. To the contrary, the evidence reveals that Uber leveraged hundreds of thousands of riders and drivers it obtained through its unlawful conduct to influence state legislators to pass the TNC Act. As discussed above, Uber e-mailed petitions to its riders and drivers encouraging them to show their support for such legislation to their legislators. Uber also shared data with state legislators regarding the number of petition signatories, drivers and riders in the legislator's district. In the months leading up to the passage of the TNC Act, Uber conveyed this information to legislators through a "drip campaign" of emails and meetings.

282.    The evidence establishes that Uber used resources developed as the result of its unlawful activities during the Unlawful Conduct Period to influence the passage of the TNC Act. Uber would not have had the voluminous driver and rider resources which it used to help get the TNC Act passed if it had not already been unlawfully operating its P2P services in Massachusetts. Uber's own White Paper even discussed how entering markets illegally was a bet that regulators would not be able to act or enforce in time to stop them from accumulating a critical mass of consumer support. In the face of such evidence, Uber cannot meet its burden of showing the TNC Act was not independent of Uber's unlawful conduct.

283.    The evidence proves that its lobbying of Legislators and the Governor included misleading information about Uber drivers' hourly earnings.

### b. Uber Has Not Established the TNC Act Was a Superseding and Intervening Cause Under the *Springer* Test

284.    The First Circuit in *Springer* held "that an intervening cause rises to the level of a

superseding cause, thus destroying proximate cause in both negligence and intentional torts, as determined by the following factors:

> 1) the type of harm brought about, 2) the extraordinariness of the intervening force under the circumstances, 3) the causal relationship between the defendant's actions and the intervening force, 4) the role of a third person, 5) the third persons' liability to the plaintiff, and 6) the wrongfulness of the third person's conduct."

ECF No. 554 at 19, citing *Springer*, 821 F.2d at 877.

285.    The *Springer* court cited to the Restatement 2d of Torts, § 442, in support of the factors it articulates.  Section 442 of the Restatement provides:

> The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
>
> a.    the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> b.    the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> c.    the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> d.    the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> e.    the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; and
>
> f.    the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Springer*, 821 F.2d at 877 n.7, quoting Restat 2d of Torts, § 442 (2nd 1979).

286.    In *Springer*, a plaintiff postal carrier alleged that the defendant postal service had terminated his contract as a result of an improper investigation instigated by racially motivated misconduct of other postal employees. *Id.* at 876-79. The district court granted defendants summary

judgment on the grounds that the plaintiff's dismissal was independent of the defendants' actions, but the First Circuit disagreed and reversed, holding that defendants had "not shown that the investigation and termination decision were sufficiently independent of the individual defendants' discriminatory actions to constitute superseding causes … as a matter of law." *Id.* at 879. The First Circuit also noted that "the ultimate harm [Plaintiff] suffered… was precisely the end sought by the individual defendants and was certainly foreseeable from from their actions…." *Id.* at 877.

287.    As required by the First Circuit's *Springer* decision, to meet its burden, Uber would have to prove that the TNC Act was "sufficiently independent of the… defendants' [wrongful] actions to constitute superseding causes under the Restatement as a matter of law." *Springer,* 821 F.2d at 879. In *Springer*, even though the individual defendants were not the ones who made the termination decision at issue, the court held "that the termination decision was based on an investigation which was not independent of their actions." *Id.* at 877.

288.    Similarly, in *Wagenmann v. Adams*, 829 F.2d 196, 212-213 (1st Cir. 1987), the First Circuit held that where a defendant police officer took affirmative steps to influence bail set by the court clerk, the clerk's imposition of overly high bail was not a superseding cause of the plaintiffs' harm.  The First Circuit noted that where "the clerk was lawfully performing his job and … doing so in a non-culpable manner" and the defendant help to "shape, and exercise[ed] significant influence over, the bail decision" the resulting actions were entirely foreseeable and the clerk's actions therefore were not a superseding cause that excused the officer's liability.  *Id.*

289.    The First Circuit has held that a defendant "is responsible for those consequences attributable to reasonably foreseeable intervening forces." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 50-51 (2009). In that regard, "the intervention of a force which is a normal consequence of a situation created by the [defendant's] conduct is not a superseding cause of harm." Restatement (Second) of Torts §443 (1964).

290.    Here, Uber has not proven that the passage of the TNC Act "operate[d] independently of any situation created by the [defendant's wrongful conduct]." *Taylor v. Swartwout*, 445 F. Supp. 2d. 98, 105-06 (D. Mass. 2006). Because "the evidence, and all reasonable inferences derived therefrom, lead to only one conclusion," *id.* at 106 — that the enactment of the TNC Act was not independent of Uber's unlawful conduct — Uber's defense that the TNC Act was an intervening and superseding cause of Plaintiffs' lost medallion values is not supported by the evidence.

291.    The Court finds that the evidence supports the conclusion, under the *Springer* factors, that the TNC Act was not a superseding and intervening cause of Plaintiffs' harm.

292.    With respect to the first *Springer* factor, the TNC Act did not bring about a different kind of harm that otherwise would have resulted from Uber's unfair competition, and therefore, this factor supports a finding that the TNC Act was not a superseding and intervening cause of Plaintiffs' harm.  To the contrary, Plaintiffs' contend that Uber's unfair competition caused a loss in medallion values, which is the very same harm that Uber contends was caused by the passage of the TNC Act.  Therefore, this factor supports a finding that the TNC Act was not a superseding and intervening cause of Plaintiffs' harm.

293.    With respect to the second *Springer* factor, the Court finds that the passage of the TNC Act was not extraordinary in view of the circumstances existing at the time.  In fact, similar acts had been passed elsewhere and Uber's own experts acknowledge that the enactment of the TNC Act was foreseeable. This is particularly so given the considerable evidence of Uber's conduct to direct and influence legislative efforts.   Therefore, this factor supports a finding that the TNC Act was not a superseding and intervening cause of Plaintiffs' harm.

294.    With respect to the third *Springer* factor, as discussed above, the Court finds that the passage of the TNC Act was not independent of Uber's unlawful conduct.  There is considerable

evidence showing that the passage of the TNC Act was a result of Uber's actions, including its lobbying efforts which leveraged the thousands of riders and drivers amassed through its unlawful operation of the UberX P2P service. Therefore, this factor supports a finding that the TNC Act was not a superseding and intervening cause of Plaintiffs' harm

295.     With respect to the fourth *Springer* factor, the TNC Act was enacted by the Massachusetts legislature. Therefore, this factor does not support a finding that the TNC Act was a superseding and intervening cause of Plaintiffs' harm.

296.     With respect to the fifth *Springer* factor, the Massachusetts legislature's enactment of the TNC Act did not subject the legislature to any liability to Plaintiffs.  Therefore, this factor does not support a finding that the TNC Act was a superseding and intervening cause of Plaintiffs' harm.

297.     With respect to the sixth *Springer* factor, there was nothing wrongful with regard to the legislature's enactment of the TNC Act, and therefore, this factor does not support a finding that the TNC Act was a superseding and intervening cause of Plaintiffs' harm.

## VIII.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY RES JUDICATA

298.     Uber also argued that Plaintiffs' claims are barred by the doctrine of res judicata based on a stipulation of dismissal filed in connection with the settlement and dismissal of the Boston Cab Litigation.

### i.   The Court Finds Uber Has Waived Any Res Judicata Defense

299.     In its summary judgment ruling, this Court found that Uber's res judicata defense was tenuous at best given that it had not raised the defense in its answer, in its motion to dismiss, its initial disclosures or discovery responses.  ECF No. 554 at 20-21.

300.     "Res judicata is an affirmative defense that is usually deemed forfeit if not raised in the answer." *Indianapolis Life Ins. Co. v. Herman*, 204 Fed. Appx. 908, 910 (1st Cir. 2006); *Davignon v. Clemmey*, 322 F.3d 1, 15-16 (1st Cir. 2003) (defendant waived res judicata defense by failing to

include it answer).

301.     The Court finds that Plaintiffs did not provide adequate notice of its res judicata defense and therefore has waived that defense.

302.     The Court finds that Uber did not mention asserting a res judicata defense until December 31 2018.  This was two years after Plaintiffs filed their complaint and long after the close of fact discovery. While Uber argues that Plaintiffs were well aware of the prior Boston Cab Litigation, Uber was a party to the prior Boston Cab Litigation, and therefore itself was well aware of any purported defense and yet Uber never raised the defense until well after the conclusion of fact discovery.

### ii.   Uber Also Failed to Establish a Viable Res Judicata Defense

303.     Even if Uber had not waived its res judicata defense, the Court finds that Uber has failed to establish the defense on the merits at trial.

304.     In order to have established its res judicata defense, Uber bears the burden of proving "1) final judgment on the merits in an earlier action, 2) identity of the cause of action in both the earlier and later suits and 3) identity of parties or privies in the two suits."  ECF No. 554 at 21, citing *Havercombe v. Dep't of Educ. of Com. of P.R.*, 250 F.3d 1, 3 (1st Cir. 2001).

305.     Under both First Circuit and Massachusetts case law, res judicata and claim splitting defenses do not apply where the defendant agrees that some claims could be separately litigated. See *Liberty Mut. Ins. Co. v. Nat'l Consol. Warehouses, Inc.*, 34 Mass. App. Ct. 293, 297 (1993) ("exception to the rule [against claim splitting] exists…when a defendant expressly or impliedly 'acquiesces' to the splitting of the claim."); *Calderon Rosado v. General Electric Circuit Brakers, Inc.*, 805 F.2d 1085, 1087 (1st Cir. 1986) ("recognized exception to the general rule prohibiting claim splitting is that if the parties agree … to a plaintiff splitting his claim").

306.     Every circuit which has addressed this issue has refused to afford preclusive effect to

a stipulation of dismissal with prejudice where the parties to the settlement agreement underlying the dismissal reserved the claims at issue. *See U.S. ex rel. Radcliffe v. Purdue Pharma L.P.*, 737 F.3d 908, 914 (4th Cir. 2013) ("preclusive effect of a judgment enforcing a settlement agreement is determined by the intent of the parties as reflected by the terms of that agreement, and the Release did not bar anyone other than Mark Radcliffe from bringing suit against Purdue."); *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288-1291 (11th Cir. 2004) (refusing to apply res judicata where the scope of the release in the settlement agreement upon which dismissal of prior action was based did not touch upon claims at issue in subsequent action).

307.     Massachusetts law is the same. In *Liberty*, the court held that Liberty's claims as subrogee were not extinguished under the doctrine of res judicata by a stipulation of dismissal with prejudice filed in a case brought by its insured where "the parties to the settlement had taken pains to reserve Liberty's rights." 34 Mass. App. Ct. at 296. District courts in this circuit have similarly held that a stipulation of dismissal with prejudice did not preclude subsequent litigation of claims that parties agreed were unaffected by settlement. *See Topek, LLC v. W.H. Silverstein, Inc.*, 2014 U.S. Dist. LEXIS 36825, *13-15 (D.N.H. Mar. 20, 2014).

308.     Where the parties stipulate to dismissal based on a settlement agreement, the principles of res judicata only apply "to the matters specified in the settlement agreement, rather than the original complaint." *Norfolk*, 371 F.3d at 1288; See *Purdue*, 737 F.3d at 913. This is because a "judgment dismissing an action with prejudice based upon the parties' stipulation, unlike a judgment imposed at the end of an adversarial proceeding, receives its legitimating force from the fact that the parties consented to it." *Purdue*, 737 F.3d at 913; See *Norfolk*, 371 F.3d at 1288. In other words, "the preclusive effect of a judgment based on such an agreement can be no greater than the preclusive effect of the agreement itself." *Purdue*, 737 F.3d at 913.

309.     In "determining the res judicata effect of an order of dismissal based upon a

settlement agreement," courts "attempt to effectuate the parties' intent. The best evidence of that intent is, of course, the settlement agreement itself." *Norfolk*, 371 F.3d at 1289. Courts are careful not "to preclude a wider range of matters than those specified in the Agreement," as to do so "would frustrate the parties' expressed intent and bestow upon [the defendant] a windfall of immunity from litigation." Id. at 1291. When "the plain meaning of the agreement is clear, courts do not look beyond the four corners of the document." *Id.* at 1289. *See also Liberty*, 34 Mass. App. Ct. at 296 (applying "plain language of the release" which "leaves no room to dispute that the parties intended to preserve Liberty's claims").

310.    The evidence established that the Boston Cab Litigation was resolved and dismissed by way of a stipulation and settlement agreement between the named parties to that case. The Court finds that the settlement agreement entered into by the parties in the Boston Cab Litigation expressly preserved Plaintiffs' claims at issue in this case. The settlement agreement expressly provided that: "This release does not apply to any claims by entities or individuals other than the named Plaintiffs and their respective predecessors, successors and assigns." The only parties to the Boston Cab Litigation were Uber, Boston Cab and EJT. Plaintiffs were not a party to that litigation, and therefore, their claims were expressly preserved by the parties to that litigation. The evidence regarding the negotiations relating to the language in the settlement agreement release further support a finding that the Plaintiffs' claims were expressly and purposely excluded from the release in the Boston Cab Litigation. Thus, the Court finds that Uber's res judicata defense fails for that additional reason.

311.    Even if Uber had not waived its res judicata defense or expressly carved out Plaintiffs claims here from the settlement agreement in the Boston Cab Litigation, the Court finds that Uber still failed to carry its burden of establishing that its res judicata defense had merit at trial.

312.    The Supreme Court has stated there is a general "rule against nonparty preclusion":

> The application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court." Indicating the strength of that tradition, we have often repeated the general rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."

*Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008); *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 757 (1st Cir. 1994) ("caution[ing] the district courts to tread gingerly in applying res judicata to nonparties."); *Massachusetts Delivery Ass'n v. Coakley*, 671 F.3d 33, 46 n. 10 (1st Cir. 2012) (cautioning against "lumping together distinct parties for purposes of claim … preclusion"). In *Taylor*, the Supreme Court recognized six limited exceptions to the rule against non-party preclusion. *Taylor*, 553 U.S. at 893-95. The burden rests upon Uber in order to invoke non-party preclusion. *Id.* at 907.

313.    The Court concludes that Uber has failed to carry its burden that any *Taylor* exception applies here.

314.    The first two exceptions *Taylor* recognized are where a "person…agrees to be bound by the determination of issues in an action between others" or where there is a "pre-existing 'substantive legal relationship(s) between the person to be bound and a party to the judgment" such as "bailee and bailor, and assignee and assignor." *Id.* at 893-94. Uber has failed to offer any evidence of any agreement by Plaintiffs to be bound by the determination of the Boston Cab Litigation or the type of "substantive legal relationships" which could legally bind Plaintiffs by the judgment in that case.

315.    While Uber argues that Plaintiffs permitted EJT to represent them based on the allegation in the *Boston Cab* complaint - "EJT's management agreements with Boston medallion and taxi owners give it authority to seek legal protection of 370 medallion and taxi owners' rights against all forms of unfair competition and trademark infringement." - the terms of the management agreements between EJT and Plaintiffs contradict that allegation, and the allegation was specifically

denied by Uber in its answer in the Boston Cab Litigation. This Court never ruled on the merits of this unproven allegation. *See In re Kane,* 254 F.3d 325, 329 (1st Cir. 2001).

316.    The evidence establishes that the relationship between EJT and Plaintiffs is governed by integrated management agreements, which define the relationship between EJT and Plaintiffs as independent contractors and specifically disclaims any franchise, fiduciary, agency (except as explicitly provided herein), partnership, joint venture, employment or special relationship between the parties. Ultimately, the evidence establishes that nothing in the management agreements authorized EJT to file any lawsuits on behalf of Plaintiffs, and there is no corporate resolution authorizing EJT to file any lawsuit on behalf of Plaintiffs. *See Barr Inc. v. Studio One, Inc.*, 146 F. Supp. 3d 375, 384 (D. Mass. 2015) (contractual relationship was not the type of pre-existing relationship contemplated by *Taylor*); *Perez-Guzman v. Garcia*, 346 F.3d 229, 234-36 (1st Cir. 2003) (rejecting res judicata where political party was not authorized to sue on behalf of party member).

317.    The third *Taylor* exception provides that, "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [was] a party' to the suit," such as "properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries." *Taylor*, 553 U.S. at 894. For this exception to apply there has to be "either special procedures to protect the nonparties' interests or an understanding by the concerned parties that the first suit was brought in a representative capacity." *Id.* at 897-901.   The Court concludes that this exception does not apply. First, the management agreements disclaimed any fiduciary relationship between EJT and Plaintiffs. Second, EJT never filed the prior lawsuit as a representative suit on behalf of Plaintiffs. Indeed, Uber opposed the motion to add Plaintiffs as parties in the Boston Cab Litigation on the grounds that the addition of 34 new plaintiffs would "dramatically alter the scope and nature of this action."  That would not have been the case if EJT already was representing Plaintiffs. And this Court never ruled that EJT

66

could or did represent Plaintiffs in that action. Third, the medallions were owned by Plaintiffs, who where the real parties in interest with standing to recover losses in leasing revenue and medallion values. The evidence demonstrates that EJT had no legal interest in those medallions or claims.

318.    The fourth *Taylor* exception provides that a nonparty is bound by a judgment if they "assumed control" over the litigation in which that judgment was rendered. *Taylor*, 553 U.S. at 895. There is no evidence that Plaintiffs "call[ed] the shots" in the *Boston Cab* action; "theoretical" control is insufficient. *Gonzalez*, 27 F.3d at 758-59. Nothing in the management agreements gave EJT authority to file suit on behalf of Plaintiffs, *see Barr*, 146 F. Supp. 3d at 384 (no control where contract limited party's authority to act on behalf of non-party), and Plaintiffs never authorized EJT to sue on their behalves. *See Cahoon v. Shelton*, 2008 U.S. Dist. LEXIS 696, *13 (Jan. 4, 2008) (no control where "Plaintiffs did not give Hagenberg explicit permission to bring suit on their behalf through vote or bylaw."). The fact that Plaintiffs sought unsuccessfully to be added as plaintiffs further undermines a finding of their control. *See Gonzalez*, 27 F.3d at 759-60.

319.    Uber argued at trial that this Court should find that Plaintiffs controlled the Boston Cab Litigation, but the only evidence presented is that Plaintiffs are affiliates of EJT. But common ownership, officers, and directors is not enough to establish the requisite control for a res judicata defense. *See Amer. Renaissance Lines, Inc. v. Saxis S.S. Co.*, 502 F.2d 674, 678 (2d Cir. 1974) ("common ownership in and of itself is not a sufficient basis on which to deprive a corporation of a cause of action"); *cf. Boisvert v. McDonough*, 2019 Mass. App. Unpub. LEXIS 73, *3-4 (Jan. 29, 2019) (controlling shareholders not precluded from bringing suit by a prior judgment against the corporation because "corporation is a legal entity distinct from its shareholders.").

320.    While Uber also argued at trial that Plaintiffs and EJT are alter egos, the evidence at trial does not bare out that assertion. In fact, there was considerable evidence at trial that EJT and Plaintiffs are not alter egos, including:

- Under the management agreements, which were developed to protect and preserve the separate corporate identities of the various entities, EJT was an independent contractor, and an agent for Plaintiffs only to the extent "explicitly" set forth therein;

- EJT and Plaintiffs followed corporate formalities: they kept separate books and records, filed the necessary corporate documentation, and acted pursuant to Written Consents of their shareholders and boards of directors;

- There was no confused intermingling of assets: EJT and Plaintiffs maintained separate financial records, had separate bank accounts, and filed separate tax returns; their accountant kept separate trial balances for each of Plaintiffs and for EJT, and was responsible for allocating revenues and expenses to the correct corporation; and

- EJT had business interests unrelated to Plaintiffs, including medallion lending to unrelated third parties, a suburban taxi business which it managed, and parking space rentals.

321.    In sum, Uber has failed to adduce by a preponderance of the evidence at trial that any of the six *Taylor* exceptions to the rule against nonparty preclusion apply to the facts of this case. Therefore, the Court concludes that Uber's res judicata defense fails for that additional reason.

## IX.  PLAINTIFFS ARE ENTITLED TO AN AWARD OF MULTIPLE DAMAGES BECAUSE UBER'S VIOLATIONS OF CHAPTER 93A WERE WILLFUL AND KNOWING

322.    Chapter 93A, § 11 mandates an award of either double or treble damages where there has been either "willful" or "knowing" violations of the statute.  G.L. c. 93A, § 11 ("If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two.")

323.    A "knowing" state of mind exists where the defendant "is aware that it is practically certain that his conduct will cause such a result."  *Computer Sys. Eng'g., Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1374 (D. Mass. 1983); *see also St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold, Ins. Agency*, 427 Mass. 372, 376 (1998) (aware of double damage was proper where evidence showed that insurance agent made intentional misrepresentations on an insurance application).

324.    "[A] finding of 'willful' conduct within the meaning of c. 93A is satisfied where the defendant has acted recklessly," *Kattar v DeMoulas*, 433 Mass. 1, 16 (2000), i.e. where there is a "reckless disregard" as to whether the conduct was unfair or deceptive or would cause unfair or deceptive results. *Qantel*, 571 F. Supp. at 1375 (willfulness can be proven where the defendant was aware that he "made the representation without knowing whether it was true or false and with reckless disregard for whether it was true or false."); *Hyannis Anglers Club, Inc. v. Harris Warren Commercial Kitchens, LLC,* 91 Mass. App. Ct. 555, 562 (2017) (same); *see also  Still v. Comm'r of the Dep't of Employment & Training*, 423 Mass. 805, 812-13 (1996) ("[D]ecisions construing the multiple damages provisions of G.L. c. 93A have imposed such damages for 'willful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts.").

325.    As the Massachusetts Supreme Judicial Court has held:

> We have said that a finding of "willful" conduct within the meaning of c. 93A is satisfied where the defendant has acted recklessly. *See St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 377, 693 N.E.2d 669 (1998) (holding broker liable to insurer which issued policy based on material misinformation that broker with reckless disregard for truth placed on insurance application, where broker knew, or reasonably should have known, that disclosure of truth would have led insurer to reject application); *Briggs v. Carol Cars, Inc.*, 407 Mass. 391, 396-397, 553 N.E.2d 930 (1990) (concluding [***30]  misrepresentation of condition of car with reckless disregard of truth or falsity of statement constituted wilful violation of c. 93A). We have also stated that the term "willful" can be equated with reckless conduct. *See Still v. Commissioner of the Dep't of Employment & Training*, 423 Mass. 805, 812-813, 672 N.E.2d 105 (1996) ("Decisions construing the multiple damages provisions of G. L. c. 93A [1994 ed.] have imposed such damages for 'wilful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts").

*Kattar*, 433 Mass. at 16.

326.    As this Court found at summary judgment, "Uber acted with reckless disregard for the City's Taxi Rules." ECF No. 554 at 9.

327.    A plaintiff also may show willfulness through the defendant's continuing violations of Chapter 93A. *See Brown v. Le Clair*, 20 Mass. App. Ct. 976, 980 (1985) ("While each violation may

not in itself have been willful…where, as here, there were many continuing violations, some major and some minor, their cumulative effect…can be considered by the trial judge in determining whether [the] behavior was willful.").

328.    The evidence that Uber engaged in willful and knowing misconduct is overwhelming in this case.  It is supported by the Court's findings above that Uber was aware before it launched its UberX P2P service that it was illegal under the Boston Ordinance and that Uber made the conscious decision to launch the service in light of significant evidence that such actions were unlawful. The fact that Uber also carefully tracked the police department's issuance of hundreds of citations to drivers and consistently paid the citations in order to keep drivers on the road, telling them that UberX P2P was legal despite knowing otherwise, so that that it could build a critical mass of consumer support for its UberX P2P service to then force a legislative change that allowed the UberX P2P service to operate, is damning evidence that Uber knew, from low level employees all the way to its CEO, that it was violating the law and that its violations of the law would allow it to unfairly compete with lawful taxis.

329.    In light of this overwhelming evidence of Uber's unlawful conduct, this Court finds that Uber's violations of the law were done knowingly and willfully and therefore, pursuant to c. 93A, this Court awards Plaintiffs multiple damages with regard to their lost leasing revenue damages and lost medallion value damages.

## X.    PLAINTIFFS ARE ENTITLED TO THEIR COSTS AND REASONABLE ATTORNEYS' FEES.

330.    Pursuant to c. 93A, § 11, "[i]f the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."

331.    Because this Court finds that Uber violated G.L. c. 93A, §2, Plaintiffs are entitled to an award of reasonable attorneys' fees and costs in amounts to be determined by the Court upon further submissions of the parties establishing the amount of such costs and reasonable attorneys' fees.

## XI.   PLAINTIFFS ARE ENTITLED TO PRE-JUDGMENT INTEREST

332.    Plaintiffs are entitled to pre-judgment interest under G.L. c. 231, §6B from the date of the filing of the complaint on the forgoing lost profits and lost medallion value damage amounts. *See Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 41 F.3d 764, 774 (1st Cir. 1994) (" In diversity cases, state law must be applied in determining whether and how much pre-judgment interest should be awarded."); *Fratus v. Republic W. Ins. Co.*, 147 F.3d 25, 30 (1st Cir. 1998); *Doty v. Sewall*, 908 F.2d 1053, 1063 (1st Cir. 1990); *Mill Pond Assocs., Inc. v. E & B Giftware, Inc.*, 751 F. Supp. 299, 300 (D. Mass. 1990); *Tiverton Power Assocs. Ltd. Partnership v. Shaw Group, Inc.*, 376 F. Supp. 2d 21, 24 (D. Mass. 2005).

Dated: July 23, 2019

Respectfully submitted,

*/s/ Edward Haber*
Edward F. Haber (BBO# 215620)
Michelle H. Blauner (BBO# 549049)
Ian McLoughlin (BBO# 647203)
Adam M. Stewart (BBO# 661090)
Patrick J. Vallely (BBO# 663866)
Jonathan F. Dinerstein (BBO# 696004)
Shapiro Haber & Urmy LLP
Two Seaport Lane
Boston, MA 02210
Telephone:  (617) 439-3939
Facsimile:  (617) 439-0134
ehaber@shulaw.com
mblauner@shulaw.com
imcloughlin@shulaw.com
astewart@shulaw.com
pvallely@shulaw.com
jdinerstein@shulaw.com

**Counsel for the Anoush Plaintiffs**

## CERTIFICATE OF SERVICE

I, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 23, 2019.

*/s/ Edward F. Haber*
Edward F. Haber