UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MALDEN TRANSPORTATION, INC. et al,

        Plaintiffs,

v.

UBER TECHNOLOGIES, INC. and
RASIER, LLC,

        Defendants.

C.A. No.  1:16-cv-12538-NMG

consolidated with:
C.A. No. 1:16-cv-12651-NMG;
C.A. No. 1:17-cv-10142-NMG;
C.A. No. 1:17-cv-10180-NMG;
C.A. No. 1:17-cv-10316-NMG;
C.A. No. 1:17-cv-10598-NMG; and
C.A. No. 1:17-cv-10586-NMG

**MEMORANDUM OF DEFENDANTS UBER TECHNOLOGIES, INC.
AND RASIER, LLC IN SUPPORT OF
RULE 52(c) MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

## INTRODUCTION

Plaintiffs have presented their entire affirmative case.  Far from meeting their burden of proving that Uber acted "egregiously," the evidence confirms that Uber launched and operated UberX ridesharing in good faith, even amidst regulatory uncertainty, encouraged again and again by the words and actions of City and State officials.  In the totality of relevant circumstances, which began even *before* UberX's launch in June 2013 and continued through passage of the 2016 TNC Act, Uber acted reasonably, seeking and following guidance from high-ranking City decisionmakers, who wanted competition in the market.   It is undisputed that Uber understood and relied upon this information in launching and operating UberX.

While dismissal is warranted based on Plaintiffs' failure to prove a Chapter 93A violation alone, Plaintiffs' claims also fail because they have not met their burden to prove but-for and proximate causation as required under black-letter First Circuit law.  It is clear that medallion prices began to fall just after Mayor Walsh announced the Taxi Advisory Committee in 2014, as he followed a recommendation of the City's Nelson/Nygaard report, which itself was the City's response to the *Boston Globe*'s Spotlight series.  Events unfolded from there, including the State regulations adopted on January 2, 2015, which approved continued operation of TNCs, while giving government officials breathing room to work on crafting the TNC Act.  Yet Plaintiffs' damages expert assumes without foundation that Uber caused the governments' actions that allowed ridesharing to continue.  Nor have Plaintiffs proven reasonably ascertainable damages.

Uber respectfully requests that the Court enter judgment in its favor.

## ARGUMENT

### I.     The Legal Standard Under Rule 52(c) Is Proof by Preponderance of the Evidence

Under Federal Rule 52(c) the Court, as trier of fact, weighs the evidence presented and "'decide[s] for itself where the preponderance lies.'" *Morales Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004) (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2573.1 (2d ed. 1994)).   "A court *must* grant a motion for judgment on the record where . . . the court determines that the preponderance of evidence goes against the plaintiff's claim." *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 156-57 (D. Mass. 2013) (emphasis added) (internal quotations and citation omitted).   The Court does *not* consider evidence in a light most favorable to the non-moving party, but rather makes credibility determinations and weighs evidence just as it would at the conclusion of a bench trial.   *Rullan*, 378 F.3d at 59; *Patrick*, 985 F. Supp. 2d at 157.[1]

### II.    Plaintiffs Have Not Established a Violation of Chapter 93A

#### A.     Uber's Conduct Was Not Unfair Because Uber Did Not Act Egregiously

To prove a violation of Chapter 93A, Plaintiffs must prove that Uber's conduct was "egregious" and "reprehensible" in light of the totality of information that Uber had at the time and the circumstances it faced.   FOF/COL ¶¶ 314-322 and cases there cited.[2]   This is a high bar, particularly in a business-to-business case, *id.*, and Plaintiffs have failed to meet it.

In April 2013, before UberX entered the Boston market, the *Boston Globe* Spotlight series exposed how the Tutunjian family's taxi business exploited drivers while providing poor service

---

[1]   Thus, the procedure under Rule 52(c) differs from the more commonly used standard under Rules 12(b)(6), 50 and 56.

[2]   Unless otherwise indicated, citations herein are to Dkt. 608, Interim Proposed Findings of Fact and Conclusions of Law of Defendants Uber Technologies, Inc. and Rasier, LLC ("FOF/COL").

2

to riders.  *Id.* ¶ 17; Joyce (Day 1) at 167-69.  Shortly thereafter, in response to the Spotlight series, the City commissioned what became the Nelson/Nygaard Report.  *Id.* ¶ 102; TX 87.  All of this occurred in the context of evolving ridesharing technology and regulatory uncertainty in jurisdictions across the country.  FOF/COL ¶¶ 31-46.  Recognizing those circumstances, Uber publicly announced its worldwide corporate policy for entering new markets in a "White Paper" published on the Internet.  *Id.* ¶¶ 47-51.

Thereafter, in accordance with that policy, Uber observed that for two months, the Boston Taxi Rules were not enforced against its competitor Sidecar.  *Id.* ¶¶ 70-72, 74.  When Uber learned that Lyft also was about to launch, Uber went multiple times to the Mayor's office to confirm that what it had observed indeed represented City policy.  *Id.* ¶¶ 74-89.  Uber understood from the Mayor's top aide that ridesharing was allowed, *id.* ¶¶ 90-96, and, following Lyft's launch, Uber became the *third* ridesharing service in Boston on June 4, 2013.  *Id.* ¶ 97.  The evidence is undisputed that Uber invited the City to contact it if the City's interpretation or application of the law were to change.  Indeed, if at any time the City had told Uber it would not allow ridesharing, Uber would have shut down UberX.  *Id.* ¶¶ 47-51, 73-96.

After launch, Uber remained in constant contact with City officials—*none* of whom told Uber that City policy had changed, or that UberX should cease operations.  *Id.* ¶¶ 102-120, 132-166, 183-188.  Because Uber was operating openly and was in frequent contact and working with public officials, Uber continued to understand, based on the totality of what it saw and heard— including express, and often written, private and public statements—that its ridesharing product was welcome in Boston.  *Id.* ¶¶ 102-120, 132-166, 183-188.  In October 2013, the City's Nelson/Nygaard Report confirmed Uber's understanding that ridesharing was "not regulated" and

raised issues with the Taxi Rules, including "inconsistency in enforce[ement]," lack of "clarity," and that they were "out of date." *Id.* ¶¶ 106-110.

The atmosphere of cooperation continued through 2014, when Mayor Walsh invited Uber and Lyft to join the Taxi Advisory Committee he created in response to the Report to recommend "new regulations" for TNCs. The Mayor's public statements reaffirmed the City's welcome of ridesharing. *Id.* ¶¶ 111-120. In late 2014, Governor Patrick began formal rulemaking procedures for proposed statewide TNC regulations. MassDOT adopted those regulations on the first business day of 2015, further affirming that P2P ridesharing was allowed in the Commonwealth. *Id.* ¶¶ 142-155. In light of these regulations, Governor Baker and Mayor Walsh announced that while they worked together on a new statute, TNCs could "continue operating." *Id.* ¶¶ 156-162. The regulations, the press releases, and notices issued by DPU pursuant to the regulations, confirmed Uber's good faith understanding that it was allowed to operate in Boston. *Id.* ¶¶ 142-165.

Throughout 2015, government officials continued to support ridesharing. For example, the City formally and publicly reaffirmed in this Court that it "has *not* enforced Rule 403 against TNCs," explaining that "the public's interest is served by a for-hire transportation market full of choices. That market includes . . . TNCs." *Id.* ¶¶ 121-131. In 2016, the TNC Act passed by overwhelming margins in the House and Senate and became law, permanently authorizing ridesharing.

During the entire 2013-2016 period, Uber's operations continued unchanged as Uber understood based on the totality of circumstances that it was welcome to operate. Every major event proved the company right. Far from being shunned or ordered to shut down, Uber's ridesharing became part of Boston's transportation system, embraced by consumers and government officials, and expressly welcomed by the highest officials in the City and State.

4

Plaintiffs' evidence that Uber drivers received 497 citations (including 277 for violation of the Taxi Rules), *id*. ¶ 174; TX 6526; TX 6527, shows neither consistent enforcement nor egregious conduct.  These tickets represented less than two one-thousandths of one percent (0.002%) of over 25 million trips during this period.  TX 724, TX 6526.   Again, as before launch, Uber reached out to the City.  Uber reasonably understood, from extensive contacts with top City and BPD officials, that the citations were given in error or in violation of City policy.  FOF/COL ¶¶ 173-189.  Uber heard the Mayor himself say on the radio in May 2014 that such tickets were contrary to City policy, which was consistent with Uber's prior understanding.  *Id.* ¶¶ 111-113, 177.

Plaintiffs have failed to prove that a handful of alleged misstatements by Uber were in fact inaccurate or caused any material harm.  Uber's actions in contacting public officials, lobbying for regulations and legislation, and organizing legislative campaigns by drivers and riders are constitutionally protected under the First Amendment.  Liability cannot be imposed, including under state unfair competition laws, for speech and petitioning activities undertaken by a business seeking enactment of government policy changes.  *Id.* ¶¶ 373-375; *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138, 140, 144 (1961) (although defendants' lobbying campaign fell "far short of the ethical standards generally approved in this country" in seeking "to influence legislation and law enforcement practices," defendants were nevertheless immune under the First Amendment because "[t]he right of petition is one of the freedoms protected by the Bill of Rights"); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1078 (W.D. Wis. 2012) (collecting cases applying *Noerr* doctrine to non-antitrust claims).

5

**B.    Plaintiffs Failed to Meet Their Burden of Proving Uber Caused Their Claimed Losses in Any Reasonably Ascertainable Amount**

**i.    Plaintiffs Have Failed to Prove That Uber Caused Their Alleged Losses**

"A plaintiff's failure to establish both factual causation and proximate causation is fatal to her Chapter 93A claim." *LimoLiner, Inc. v. Dattco, Inc.*, 919 F.3d 86, 90 (1st Cir. 2019) (quoting *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016)).  Plaintiffs have failed to prove a causal connection between Uber's actions and Plaintiffs' alleged harm.  Ample evidence shows that medallion prices declined for reasons *other* than Uber's conduct, including, for example, (i) the evolving transportation landscape (indeed, drops in medallion prices coincided with government signals, including public statements and regulatory developments); (ii) consumer preference for ridesharing; (iii) poor service and poor working conditions at taxi companies; and (iv) negative impact of revelations in the Spotlight series about Plaintiffs' operations that discouraged both drivers and riders, and triggered the City's Nelson/Nygaard report, the formation of the Taxi Advisory Committee, and coordination with the State on new regulations.  FOF/COL ¶¶ 210-211, 217-221, 223-240.

With respect to lost profits, Mr. Weeden could not testify as to causation, FOF/COL ¶ 278; Weeden (Day 3) at 141, and to the extent that Dr. Williams did so, he ignored every other potential cause of reduced taxi ridership, instead assuming that those causes are somehow part and parcel of Uber's conduct.  FOF/COL ¶¶ 258-264, 271.

**ii.    Plaintiffs' Damages Models Are Flawed**

Plaintiffs rely on damages models proffered by Dr. Williams and Mr. Weeden to prove damages for medallion price declines and lost profits.  But Dr. Williams' models are fundamentally flawed, among other things, by his failure to disaggregate or properly account for confounding

6

causes of the observed declines. *Id.* ¶¶ 258-277.  Indeed, he admitted that he simply assumed that such effects—including officials' positive statements about ridesharing, adoption of regulations, the actions of other TNCs, and expansion of Uber's licensed products—were not independent of Uber's alleged improper conduct. *Id.*  Dr. Williams conceded that "medallion values could be affected by regulatory events" such as the "anticipation or an expectation that the TNC Act might be passed." Williams (Day 3) at 47.  Yet he continued to assume irrationally that no governmental signals (including all the public statements, governmental actions and regulatory events in evidence) and indeed, no TNCs or even the TNC Act would have existed in a world but-for UberX ridesharing.  Williams (Day 3) at 51-52, 59-60, 86, 92, 101-03.

Further, *all* of Dr. Williams' damages calculations—including his newly offered calculations—begin with the assumption, based on his flawed medallion price regression, that medallion values would have been $1 million on the eve of the TNC Act.  Williams (Day 3) at 78. Although Dr. Williams abandoned at trial his primary damages calculation based on the medallion price regression, the rest of his calculations remain fatally flawed and unreliable because the results of that defective regression are the starting point for all other calculations.  FOF/COL ¶¶ 250-275. Dr. Williams' lost profits regression, which relies on leasing revenues, fares no better, because it too is based on the unfounded assumption that the government signals, public statements, and regulatory events which preceded any significant revenue decline would not occur in a but-for world.  *Id.* ¶¶ 258-277.

Combining two fatally flawed regression analyses does not yield a reliable outcome and, as Dr. Williams admitted, he has no learned authority to support this methodology.  *Id.* ¶¶ 274-277.  While on the stand, Dr. Williams offered yet another damages opinion, one he admitted he

had never thought about before, that added even more speculation on top of his two flawed regressions.  Williams (Day 3) at 123-26.

Mr. Weeden's lost profits calculations are equally unfounded and unreliable.  For example, Mr. Weeden relied on Dr. Williams' leasing revenue regression model without understanding or even reviewing it in any detail.  FOF/COL ¶¶ 278-280.  He simply subtracted actual leasing revenues from Dr. Williams' speculative and unreliable projected revenues, leading to speculative and unreliable results.  *Id.* ¶¶ 279-280.  Indeed, although Mr. Weeden purported to conduct a reasonableness check on Dr. Williams' model, his check assumes Plaintiffs would have achieved maximum revenue with all 362 medallions on the street 24/7 with one-hundred percent utilization at twelve hour shifts, which would have been all but impossible given that Plaintiffs have never in their history achieved full utilization and only a little over half of Plaintiffs' leases were for the most lucrative twelve hour shifts.  Weeden (Day 4) at 30-32.  Moreover, although Mr. Weeden admitted that a proper analysis of lost profits must consider various factors that may have deterred drivers from leasing cabs, his analysis did not consider the impact on leasing revenues of factors having nothing to do with Uber, such as driver satisfaction, or regulatory events including the formation of the Taxi Advisory Committee and the MassDOT regulations.  Weeden (Day 4) at 14-22.

## III.   Plaintiffs' Common Law Claims Fail

Plaintiffs' three common law claims—unfair competition, aiding and abetting, and conspiracy—are barred by the applicable three-year statute of limitations.  *Id.* ¶¶ 388-390.  In any event, Plaintiffs' unfair competition claim fails for the same reasons as Plaintiffs' Chapter 93A claim, *id.* ¶¶ 391-393, and also because Plaintiffs produced no evidence of consumer confusion.  *Id.* ¶¶ 394-397.  Plaintiffs' claims for aiding and abetting and conspiracy fail because Plaintiffs

have not proven that drivers on the Uber platform committed an underlying tort, since ridesharing was allowed by City policy and state regulations.  *Id.* ¶¶ 398-401.

## **CONCLUSION**

Uber respectfully requests that the Court enter judgment against Plaintiffs on all of their claims.

208881488 v1

Dated:  July 30, 2019

Respectfully submitted,

UBER TECHNOLOGIES, INC AND
RASIER, LLC

By Their Attorneys,

*/s/ Michael N. Sheetz*
Michael N. Sheetz (BBO #548776)
Luke T. Cadigan (BBO #561117)
Adam S. Gershenson (BBO #671296)
Timothy W. Cook (BBO# 688688)
Cooley LLP
500 Boylston Street
Boston, MA 02116
Tel.: (617) 937-2300
Fax: (617) 937-2400
msheetz@cooley.com
lcadigan@cooley.com
agershenson@cooley.com
tcook@cooley.com

Beatriz Mejia (*pro hac vice*)
Cooley LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Tel: (415) 693-2000
Fax: (415) 693-2222
mejiab@cooley.com

BOIES SCHILLER FLEXNER LLP
Karen Dunn (*pro hac vice*)
Meredith R. Dearborn (*pro hac vice*)
Stacey K. Grigsby (*pro hac vice*)
1401 New York Avenue, NW, 11th Floor
Washington, DC 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
kdunn@bsfllp.com
mdearborn@bsfllp.com
sgrigsby@bsfllp.com

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that on this 30th day of July, 2019, the foregoing document was filed through the ECF system and will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

/s/ Elizabeth M. Wright

Elizabeth M. Wright

11

208881488 v1