**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| Malden Transportation, Inc., et al., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | |
| v. | |
| Uber Technologies, Inc. and Rasier, LLC, | |
| Defendants. | |

Civil Action No.
16-12538-NMG

consolidated with:
16-12651-NMG
17-10142-NMG
17-10180-NMG
17-10316-NMG
17-10598-NMG
17-10586-NMG

**MEMORANDUM OF DECISION**

GORTON, J.

This case involves a suit by the Anoush plaintiffs (taxi medallion holders in the Greater Boston) who allege that Uber Technologies, Inc. and Raiser, LLC (collectively "Uber" or "defendants") competed unfairly in the on-demand, ride-hail Boston transportation market in violation of M.G.L. Chapter 93A, § 11 and Massachusetts common law.[1]

The Court presided over a seven-day bench trial in late July, 2019, and early August, 2019, and now publishes its

---

[1]This decision pertains to the Anoush plaintiffs only as the remaining plaintiffs (except for a few outliers) in the other consolidated actions have entered into a stipulation of dismissal. See Docket No. 651.

- 1 -

findings of fact and conclusions of law pursuant to Fed. R. Civ.
P. 52(a).

## FINDINGS OF FACT

### I. Parties

1.    The Anoush plaintiffs ("plaintiffs" or "plaintiff
      corporations") are 34 corporations in the business of
      leasing City of Boston taxicabs (and medallions that
      authorize their use) to independent drivers.  All 34
      corporations are owned and operated by the Tutunjian
      family which collectively controls 362 medallions.[2]  The
      plaintiffs' taxicabs are branded under the name "Boston
      Cab."

2.    The plaintiff corporations do not have employees
      themselves but, pursuant to individual and identical
      management agreements with EJT Management, Inc. ("EJT"),
      EJT conducts most of their day-to-day business.  EJT is
      also owned by the Tutunjian family.

3.    Under the individual management agreements, EJT serves as
      an agent for the plaintiff corporations with respect to
      the collection of leasing revenue and the maintenance of
      leased taxicab vehicles for which it charges management

---

[2] Prior to the "conduct period," plaintiffs owned 372 medallions.
In 2014, they sold ten medallions for $700,000 apiece.
Plaintiffs allege damages only with respect to the 362
medallions currently owned.

fees.  It also pays taxes and bills for plaintiffs.  EJT
does not, however, own any of the medallions at issue.

4.   Boston Cab Dispatch, Inc. ("Dispatch"), also owned by the
Tutunjian family, is a radio association that provides
taxi dispatch services to its "membership."  The 34
corporate plaintiffs are all members and pay membership
fees to "Dispatch."

5.   Ed Tutunjian ("Mr. Tutunjian") was the controlling
shareholder of all 34 plaintiff corporations for most of
the period of alleged unlawful conduct, _i.e._, June 4,
2013, through August 4, 2016 ("the conduct period").  He
transferred his ownership interest in all the Tutunjian
entities (34 plaintiff corporations, EJT and Dispatch) to
his wife, Nancy Tutunjian, for no consideration in 2016.

6.   Mary Tarpy ("Ms. Tarpy"), the daughter of Ed and Nancy
Tutunjian, is the president, secretary and treasurer of
all 34 plaintiff corporations and is the president of EJT
and Dispatch.  She has managed the day-to-day operations
of the plaintiff corporations and EJT since mid-2013.  As
the corporate secretary, Ms. Tarpy is also responsible
for the corporate books and records of all plaintiff
corporations and EJT.

7.   John Weeden ("Mr. Weeden") serves as the accountant for
the plaintiff corporations.  While Mr. Weeden maintained

separate trial balances for each of the plaintiff
corporations, EJT would compile the daily leasing
transactions and corporate expenses (mostly transactions
with EJT) within a general ledger.

8.  In 2013, Dispatch and EJT sued Uber for unfair
competition.  That lawsuit was dismissed with prejudice
in July, 2016.

9.  Uber is a Delaware corporation with its principal offices
in San Francisco, California.  It is a technology company
that uses a mobile software application ("app") to match
up potential riders with drivers seeking customers for
prearranged transportation.

10.  Uber began providing transportation services in
Massachusetts in 2011, well before the launch of its
disputed ridesharing or peer-to-peer ("P2P") service,
UberX P2P.

11.  In October, 2011, Uber began a service called UberBLACK
in Boston which allowed consumers to use an app on their
phone to prearrange a ride in a livery vehicle with a
livery licensed driver.  In Fall 2012, Uber began
providing UberTAXI in Boston which allowed riders to
arrange traditional taxi rides from medallion-licensed
taxicabs through the Uber app.  In February, 2013, Uber
offered UberX Livery which allowed riders to request

- 4 -

rides from drivers with livery plates via the Uber app. UberX Livery fare rates were lower than UberBLACK which Uber considered a premium product.

12. Rasier, LLC ("Rasier") is a wholly owned subsidiary of Uber that operates as a transportation network company ("TNC") in Massachusetts. References to "Uber" operating as a TNC apply equally to Rasier.

## II. Chapter 93A Liability

### A. Regulatory Framework

13. Historically, the City of Boston has regulated taxis under a set of municipal rules, ordinances and regulations ("Taxi Rules") and the Boston Police Commissioner ("the Commissioner") has the authority to regulate hackney carriages and stands. The Commissioner may delegate his authority to the Inspector of Carriages, who is the Commander of the Hackney Carriage Unit ("HCU" or "Hackney Unit"). The Hackney Unit has approximately 12 assigned police officers but typically only two of those officers serve on the street during any one shift.

14. In 2008, the Commissioner issued the Hackney Carriage Rules and Flat Rate Handbook ("Rule 403"), which regulates hackney carriage fares, medallions and hackney licenses, among other things.

15. Rule 403 defines a "hackney carriage" as

> a vehicle used or designed to be used for the
> conveyance of persons for hire from place to place
> within the city of Boston. . . . Also known as a
> taxicab or taxi.

16. Rule 403 sets forth leasing and shift rates and taximeter rates.  It establishes various vehicle and driver requirements for hackney carriages, including that each vehicle have a taxi medallion, be driven by a licensed hackney carriage driver and bare evidence of membership in a radio dispatch association.

17. Rule 403 also recognizes Boston's Vehicle for Hire Ordinance ("the Boston Ordinance") which provides, in relevant part:

> no person, firm, or corporation driving or having
> charge of a taxicab or other private vehicle shall
> offer the vehicle for hire for the purposes of
> transporting, soliciting and/or picking up a passenger
> or passengers unless said person is licensed as a
> hackney driver and said vehicle is licensed as a
> hackney carriage by the Police Commissioner.

City of Boston Code 16-15.05: Vehicle for Hire Ordinance.

18. From 2007 to 2008, Captain Robert Ciccolo ("Captain Ciccolo") served as the Commander of the Hackney Unit. Captain Ciccolo credibly testified that under his command, the Hackney Unit issued tickets to unlicensed vehicles engaged in street hails (in violation of the Boston Ordinance), but not to vehicles conducting prearranged rides, regardless of whether the vehicles had livery plates.

19.  At some point, after Captain Ciccolo stepped down as
     Commander of the Hackney Unit and at the beginning of the
     conduct period, he informed the Commissioner (Ed Davis)
     and the Civilian Director of Hackney Licensing (Mark
     Cohen) of the Hackney Unit's policy of not enforcing Rule
     403 with respect to prearranged livery rides.

20.  In November, 2013, William Evans became Police
     Commissioner of the City of Boston.  He served as
     Commissioner until the end of the conduct period in
     August, 2016.

21.  Captain Steven McLaughlin ("Captain McLaughlin") served
     as Commander of the Hackney Unit from January, 2013, to
     May, 2014, under both Commissioners Davis and Evans.
     When he was Commander of the Hackney Unit, he instructed
     his officers not to ticket ridesharing vehicles unless
     they were involved in street hails.

**B. Nelson Nygaard Report**

22.  In 2013, the Boston Globe ran a series of articles on the
     Boston taxi industry.  Following that publication, Mayor
     Thomas Menino ("Mayor Menino") commissioned the
     Nelson/Nygaard Boston Taxi Consultant Report ("the
     Report").

23.  Although Uber declined to participate in the preparation
     of the Report, Captain McLaughlin, while Commander of the

Hackney Unit, asked the drafters of the Report to address
how the Hackney Unit should regulate ridesharing services
such as those provided by TNCs.

24. The Report, which was published in October, 2013 (four
months after Uber launched UberX P2P), concludes that
TNCs and livery vehicles are not regulated and do not
have a regulatory body providing oversight.  It further
recommended that the Mayor establish an independent Taxi
Advisory Committee ("TAC").

25. Senior management at Uber read the Report when it was
issued in October, 2013, and concluded that it affirmed
Uber's understanding that the Taxi Rules did not apply to
ridesharing.

**C. Ridesharing Competitors and UberX P2P**

26. In March, 2013, Sidecar, a competitor to Uber, began the
first P2P ridesharing program in Boston.  When that
happened, Michael Pao ("Mr. Pao"), the General Manager of
Uber in Boston at the time, informed Uber executives that
the Boston Ordinance prohibits "for hire" private vehicle
pickups.

27. Sometime thereafter, Mr. Pao told Uber's Head of Global
Public Policy, Corey Owens ("Mr. Owens"), that Mr. Cohen
(the Civilian Director of the Hackney Unit) had
purportedly stated that there was almost no chance that

the Taxi Rules would be enforced against Sidecar.  That
led senior Uber executives in Boston to believe that the
Taxi Rules would not likely be enforced against Uber.

28. In April, 2013, Uber publicly issued its national
corporate policy ("the White Paper") with respect to P2P
ridesharing in cities where regulatory enforcement was
ambiguous.  In the White Paper, Uber's then-CEO Travis
Kalanick stated:

> Uber will aggressively roll out ridesharing on its
> existing platform in any market where the regulators
> have given tacit approval. . . . If a competitor is
> operating for 30 days without direct enforcement
> against transportation providers, then Uber will
> interpret that as "tacit approval" of ridesharing
> activity.

29. That same month, Meghan Joyce ("Ms. Joyce") succeeded Mr.
Pao as Uber's Boston General Manager, a position she held
until early 2015, when she was then succeeded by Cathy
Zhou ("Ms. Zhou").

30. In May, 2013, Lyft, another Uber competitor began its P2P
ridesharing service in Boston.

31. Following Lyft's entry into the Boston market, Uber
accelerated its plan to launch its own P2P service, UberX
P2P, which is the disputed conduct at issue in this case.
During the week preceding its launch, Uber had several
intra-management communications relating to the Boston
Ordinance.  At that time, Ms. Joyce was familiar with the

Boston Ordinance and was specifically aware of the fact that violations could result in $500 fines.

32. While Uber maintains that throughout the conduct period the Taxi Rules did not apply to ridesharing, just before the launch of UberX P2P, Mr. Pao stated that "[t]his would be the first time Uber would be launching in a market without formal or tacit approval." Despite that initial statement from Mr. Pao, the Court finds that such understanding later changed based on a series of conversations that Uber management had with City officials.

33. On May 30, 2013, Mr. Owens, Uber's Head of Global Public Policy, emailed Mayor Menino's Chief of Staff, Mitchell Weiss ("Mr. Weiss"), a letter which was drafted, in part, by Ms. Joyce. In that letter, Uber stated that it was "eager to participate in this innovative model" but only "as long as regulators allow this type of transportation." He requested that the City keep Uber informed of any "changes to Boston's current policy of non-enforcement."

34. That same day Mr. Owens spoke with Mr. Weiss by telephone. Mr. Owens reported back to his Uber colleagues that Mr. Weiss said, "just launch."

35.  The following day, on May 31, 2013, Mr. Owens
     communicated with Mr. Weiss again and asked him to let
     Uber know if there were to be "any impending change to
     the City's interpretation or application of existing law
     in this area."

36.  Although Mr. Weiss did not testify, the Court finds that
     the City's lack of enforcement of the Taxi Rules against
     Uber competitors, public statements made after the launch
     and the testimony from hackney officers collectively
     corroborate Uber's understanding of their communications
     with City officials prior to the launch of UberX P2P.

37.  Uber launched UberX P2P on June 4, 2013.

**D. Requirements for UberX P2P Drivers**

38.  For P2P, Uber did not require its drivers to have a
     commercial hackney license, a commercial livery license
     or a hackney medallion.  Drivers on the so-called "P2P
     platform" could drive their personal vehicles with a
     personal driver's license and a valid license plate.
     Those drivers were, however, covered by Uber's umbrella
     commercial insurance policy while transporting riders.

39.  Uber's management knew that its UberX P2P ridesharing
     model would save Uber drivers thousands of dollars in
     fees in comparison to taxicab drivers.  At the time,
     plaintiffs estimated that the annual cost of leasing a

medallion in Boston was approximately $26,000, weekly
radio association fees ranged from $20 to $88 and one-
time retrofitting costs were around $3,600.  By avoiding
such fees, Uber expected its drivers to earn 30% more
income than a comparable taxicab driver.

40. Unlike taxis, which are subject to fixed taxi fare rates,
Uber set the variable prices for how much a customer
would be charged per ride.

41. Uber engaged in "surge pricing," whereby Uber would
charge more when customer demand was higher than driver
supply.  Unlike taxis, Uber was able to increase prices
during period of high demand and decrease them during
periods of low demand.

42. In October, 2013, Uber advertised to its customers that
UberX P2P in Boston was 30% cheaper than comparable taxi
rides.

**E. Ticketing and Government Interactions**

43. In July, 2013, Uber became aware that some of its drivers
were receiving citations from local law enforcement.
During the conduct period, out of the millions of Uber
trips, Uber drivers received 497 tickets, of which 277
cited the Boston Ordinance.  Most of those tickets were
issued between May, 2014, and December, 2014.  In 2015,

46 tickets were issued under the Boston Ordinance, but in 2016, only three tickets were issued.

44.   In response to inquiries from drivers about citations received, Uber employees never told the drivers that UberX P2P was illegal.  Rather, Robert Hoyt ("Mr. Hoyt"), an Uber employee who managed communications with the drivers, informed ticketed drivers that the officers were merely "misinformed" about Uber's commercial insurance policy and that he would submit the citations to Uber's legal team.  He would then input information about the citations in a spreadsheet which Uber's legal team could access.  Uber meticulously tracked its drivers' citations throughout the conduct period.

45.   Uber reimbursed drivers who received tickets for prearranged rides but did not reimburse any drivers who were cited for street hails.  It did so in order to retain drivers and to alleviate the cost and hassle of appealing the citations, although some drivers were successful in appealing citations on their own.

46.   In 2014, the volume of citations reached its peak and Uber internally expressed serious concern.  At the height of it, the Boston Police Department and the Massachusetts State Police were issuing tickets in the range of $500 to $20,000 per week.

47. In February, 2014, Commissioner Evans stated during a radio interview that Uber was an unlicensed service but later rescinded that comment.  In April, 2014, Ms. Joyce met with Massachusetts State Police officers overseeing Logan Airport who stated they would not relent on ticketing until there was a legislative change.  One month later, however, Mayor Marty Walsh ("Mayor Walsh") in response to a caller inquiry on a Boston radio program stated that the police, and the City, did not have jurisdiction over Uber.

48. Internal documents show that during 2014, Ms. Joyce was skeptical that the Mayor's Office was doing anything to stop the ticketing.  Uber management subsequently heard from one of its lobbyists that Dan Koh ("Mr. Koh"), Mayor Walsh's Chief of Staff, was "dumfounded" as to why Uber drivers were being ticketed.  Mr. Koh later requested that Uber provide him with information about the citations and Uber complied.

49. Ms. Joyce credibly testified that she had multiple conversations with Mr. Koh about the driver citations and she believed that Mr. Koh was in the process of stopping the issuance of citations.

**F. Taxi Advisory Committee**

50.  In July, 2014, Mayor Walsh, established the Taxi Advisory
     Committee ("TAC") to gather input from stakeholders in
     the transportation business to improve the taxi industry
     and to explore how the City of Boston might regulate
     other kinds of vehicles for hire.  TNCs, such as Uber and
     Lyft, were invited to participate, along with members of
     the taxi industry, Massachusetts State Police, the Boston
     Police Department Hackney Unit and other City of Boston
     officials.  Ms. Joyce participated on the TAC on behalf
     of Uber and eventually Ms. Zhou attended those meetings
     after she became General Manager.

51.  Although no City of Boston official ever told Uber that
     it was not allowed to operate in Boston, in November,
     2014, Ms. Joyce told her Uber colleagues that Chris
     English ("Mr. English"), the Chair of the TAC and policy
     advisor to the Mayor, made reference to the Taxi Rules
     during a conversation about how ridesharing may violate
     them.

52.  In December, 2014, Ms. Joyce testified at a Boston City
     Council hearing on ridesharing.  At that hearing, Ms.
     Joyce heard Mr. English reiterate that the goal of the
     TAC was to seek revisions to current regulations and to
     explore new regulations applicable to TNCs.  She also

heard testimony from Captain Gaughin and Lieutenant Lema,
officers in the Hackney Unit under Commissioner Evans,
about how Uber was flouting the law.

## G. BTOA Litigation

53.   In January, 2015, the Boston Taxi Owners Association
("BTOA") sued the City of Boston for its nonenforcement
of Rule 403.  In its opposition to BTOA's motion for
preliminary injunction, the City of Boston stated that it

> has not enforced Rule 403 against TNCs [and that] the
> public's interest is served by a for-hire
> transportation market full of choices.  That market
> includes licensed taxicabs as well as buses, the MBTA,
> jitney carriages, livery vehicles, and TNCs, among
> other types of transportation.

54.   This Court denied BTOA's motion for preliminary
injunction and Uber followed that litigation closely.

## H. Data Sharing Agreement

55.   In January, 2015, Uber entered into a data sharing
agreement with the City of Boston.  The agreement was
designed to give the City access to information about
rides for hire in Boston for the purposes of traffic
control and urban planning, recognizing that, at that
time, there were "tens of thousands of Uber rides on the
streets of Boston everyday."

## I. State Regulations

56. On January 2, 2015, the Massachusetts Department of
    Transportation ("MassDOT") issued final regulations with
    respect to TNCs, which took effect later that month.  The
    regulations amended 540 CMR § 2.05 to include a new
    category of vehicles, Personal Transportation Network
    Vehicles ("PTN Vehicles"), which are defined as

    > [a] private passenger motor vehicle that is used by a
    > Transportation Network Company.

    The regulations also state that the Massachusetts
    Department of Public Utilities ("DPU")

    > shall act as the licensing authority to which a
    > Transportation Network Company shall apply for a
    > certificate to provide TNC Services.

57. Following the issuance of the MassDOT regulations,
    Nicholas Zabriskie ("Mr. Zabriskie"), a public policy
    specialist at Uber, told Ms. Joyce that the "DPU does not
    have statutory authority to regulate us" and that
    legislation would still be needed for the regulations to
    be enforceable.  He later informed Ms. Zhou, that despite
    the state regulations, municipalities could still
    regulate Uber.

58. On February 4, 2015, Massachusetts Governor Charlie Baker
    ("Governor Baker") issued a press release directing the

DPU to issue public notice clarifying the status of TNCs in Massachusetts.   The press release stated that

> [t]he issuance permits TNC drivers to continue operating in the Commonwealth, while allowing the administration to begin discussions about a regulatory framework to ensure the enhanced safety of drivers and riders. . . . But, because a TNC licensing framework must be developed through legislation, the RMV regulations allow TNC drivers to use private vehicles for a six-month period, during which the Baker administration will develop a licensing framework.

59. Mayor Walsh was quoted, in that same press release, as stating that he would collaborate with Governor Baker on a comprehensive regulatory framework for TNCs and would share the City's TAC findings with respect to developing new city policies for TNCs.

60. Uber representatives understood from the press release that Mayor Walsh supported the Baker administration in the effort to create a state-wide regulatory framework for TNCs.

61. On February 6, 2015, the DPU issued a notice to Uber pursuant to the MassDOT regulations.   That notice, and three subsequent notices issued at six-month intervals, stated that the DPU would not issue TNC Certificates at that time.

62. On April 24, 2015, Governor Baker issued another press release with respect to the regulatory framework.   The

press release gave notice of a "Phase-In Period" during which the proposed

> legislation allows for a phase-in of the law to ensure current operations are not disrupted as the framework and regulations are developed and finalized.

63. Despite Governor Baker's announcement, Ms. Zhou attended a TAC hearing in May, 2015, after which she explained to her colleagues that Joel Barrerra of the Governor's Office made clear that the state legislation set minimum standards and did not preempt municipalities from further regulation.

64. On July 31, 2016, the Massachusetts legislature enacted the TNC Act which preempts municipalities from regulating TNCs and gives regulatory jurisdiction of TNCs to the DPU and the Massachusetts Port Authority.

65. Governor Baker signed the TNC Act into law on August 5, 2016, but it was not to apply retroactively.

**Although the Court concludes below that Uber is not liable to plaintiffs under Chapter 93A, it proceeds, nevertheless, to make findings of fact on causation and damages for the sake of completeness.**

**III. Causation**

**A. Taxi Ridership**

66. In 2012, there were approximately 14.6 million taxi rides completed in Boston.  By 2016, the number of taxi rides had decreased to just under 8 million.  From 2013 to 2016, the number of trips in taxicabs leased by

plaintiffs annually declined by 50% (from 3.2 million to 1.6 million).  Meanwhile, Uber had serviced approximately 29 million rides during that three-year period.

**B. Leasing Revenue**

67.  Plaintiffs' primary source of income is leasing revenue derived from the leasing of taxis and taxi medallions. Although plaintiffs' leasing revenue increased from 2013 to 2014, it decreased by 38% during the remainder of the conduct period (from $17.3 million in 2013, to $10.7 million in 2016).

68.  Although Mr. Weeden testified that, other than the entry of UberX P2P and other ridesharing services in the market, he was unaware of any other factors which could have caused such a dramatic decline in leasing revenues, he did not describe what other factors he examined and acknowledged that ridesharing services other than Uber entered the market during the conduct period.

69.  Dr. Michael Williams ("Dr. Williams"), plaintiffs' causation and damages expert, testified that his leasing revenue regression model isolated the specific effects of Uber's ridesharing business during the conduct period but he did not explain how he isolated those effects.

## C. Medallion Value

70. On June 4, 2013, the average price for taxi medallions in Boston, Massachusetts was $637,500 per medallion.  The highest price paid for a medallion was $700,000 in 2014. On August 4, 2016, the going price of Boston taxi medallions was approximately $250,000.

71. The Court finds that, as both damages experts essentially agreed:

   a. medallions are akin to assets, the value of which is equal to the anticipated cash flow that the asset can generate;

   b. the anticipated cash flow is based on the leasing revenues that can be generated by use of a medallioned taxi (which depends on the willingness of drivers to lease a taxi); and

   c. the value of the medallions can be affected by other factors such as historical information, interest rates and regulatory events.

## IV.  Damages

### A. Medallion Value

With respect to the regression models and certain adopted variables relied upon by Dr. Williams for his proposed calculation of damages, the Court finds as follows:

72.  Dr. Williams' **medallion regression model** is unreliable
     because:

     a. he conceded that medallion values can be affected by
        regulatory events and that his medallion regression
        model did not remove the effects of such events on the
        assumption they were not independent of the disputed
        conduct, thereby including Uber's lobbying activities
        as part of the disputed conduct; and

     b. Laura Stamm ("Ms. Stamm"), defendants' rebuttal
        expert, credibly criticized Dr. Williams' medallion
        regression model on the grounds that it generated
        inaccurate price predictions at the beginning of the
        conduct period.  Using data from the benchmark period
        (i.e., before the conduct period), she compared the
        actual medallion price on June 4, 2013 (approximately
        $637,000) to Dr. Williams' predicted medallion price
        (approximately $883,000).  The discrepancy of almost
        $250,000 in the benchmark period renders Dr. Williams'
        medallion regression model untenable.

73.  The Court finds that Dr. Williams' **leasing revenue
     regression model** is unreliable because:

     a. he failed to include taxi driver hourly wages as a
        variable in his model even though he conceded that
        drivers' wages and perceived economic health would

affect drivers' decisions to lease medallions and did not explain his omission;

b. Ms. Stamm credibly testified that the drastic change in predicted leasing revenues based on the addition of two variables (S&P 500 and taxi driver hourly wages) renders Dr. Williams' model invalid; and

c. Dr. Williams' trial testimony was inconsistent, in that, at one point, he testified that his leasing revenue regression model accounted for all other factors, including the impact of expectations that TNC legislation would be enacted, but later conceded that his model did not account for anticipated regulatory development because the impact of such regulations is part of the disputed conduct.

74. Even if the Court were to credit Dr. Williams' two flawed regression models, it finds that the method by which he attempted to disaggregate the damages attributable to Uber is invalid for the following reasons:

a. at trial, Dr. Williams testified, for the first time, that plaintiffs' damages as a result of the decline in medallion value was $124 million. Previously, he had calculated the same damages at $248 million but he did not explain the reason for the dramatic reduction;

b. notwithstanding the shortcomings of his regression models, Dr. Williams' prediction that the medallion price in the "but-for" world would reach nearly $1 million assumes that the enactment of the TNC Act resulted from Uber's conduct;

c. Dr. Williams' reduction of the alleged damages to account for Lyft's 18.8% market share as of August 4, 2016, does not resolve the issue that his "but-for world" assumes growth in taxi ridership but not competitive responses by either UberX Livery or Lyft;

d. Dr. Williams did not explain how his ratio analysis, by which he divided the percentage reduction from his leasing revenue model (42.5%) by the percentage reduction from his medallion regression model (74.7%) to calculate the percentage of damages attributable to Uber per medallion (56.9%), actually disaggregated damages; and

e. he used only the leasing revenue data from the period of July, 2015, to July, 2016, to calculate damages, despite having the leasing revenue data for the entire conduct period.

**B. Lost Profits**

75. Because Mr. Weeden calculated lost profits by relying on the but-for leasing revenues from Dr. Williams' discredited leasing regression model, the Court finds Mr. Weeden's lost profits analysis unreliable as well.

76. The Court further finds that Mr. Weeden's "reasonableness" check on Dr. Williams' leasing regression model is invalid.  Mr. Weeden unrealistically assumed that plaintiffs' medallions would be leased 24 hours per day, 7 days per week, with 100% utilization in 12-hour shifts.  He then summarily described "economic factors" that aligned with Dr. Williams' predicted leasing revenues without identifying what those factors were.  Finally, Mr. Weeden testified that he considered a regulatory framework but did not describe the one he considered or its presumed effect.

## CONCLUSIONS OF LAW

**I. Chapter 93A Liability**

**A. Unfair Conduct**

1. To establish liability under Chapter 93A, commercial plaintiffs must prove 1) that defendants engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by M.G.L. c. 93A, §

2, or the regulations promulgated thereunder; 2) a loss
of money or property suffered as a result and 3) a causal
connection between the loss suffered and the defendants'
unfair or deceptive method, act or practice. Auto Flat
Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066,
1074-75 (2014).

2.   Contrary to plaintiffs' assertion, the fact that Uber did
not comply with the Taxi Rules during the conduct period
does not establish "unfair" conduct because an alleged
statutory violation is neither necessary nor sufficient
to prove a Chapter 93A claim. See Massachusetts Eye & Ear
Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69
(1st Cir. 2009).  Moreover, the Court reiterates its
summary judgment ruling that neither the Malden nor the
Katin decisions concludes that an unlicensed participant
necessarily commits an unfair trade practice. See Malden
Transportation, Inc. v. Uber Techs., Inc., 286 F. Supp.
3d 264, 274 (D. Mass. 2017); Katin v. Nat'l Real Estate
Info. Servs., Inc., No. CIV. A. 07-10882DPW, 2009 WL
929554, at *10 (D. Mass. Mar. 31, 2009) ("engaging in the
unauthorized practice of law may constitute an 'unfair
method of competition' within the meaning of Chapter
93A") (emphasis added).  Thus, plaintiffs' argument that

the violation of the Taxi Rules, alone, constitutes

unfair trade practice continues to be unavailing.

3.   Rather, to establish unfairness under Chapter 93A, § 11,

plaintiffs must prove that the alleged unlawful conduct

falls

> within at least the penumbra of some common-law,
> statutory, or other established concept of unfairness;
> is immoral, unethical, oppressive, or unscrupulous;
> and causes substantial injury to consumers [or
> business entities].

Exxon Mobil Corp. v. Attorney Gen., 94 N.E.3d 786, 792

(Mass. 2018); see also Manning v. Zuckerman, 444 N.E.2d

1262, 1264 (1983) (noting that "Section 11 provides a

private cause of action to a person who is engaged in

business and who suffers a loss as a result of an unfair

or deceptive act or practice by another person also

engaged in business") (internal quotations omitted).

Specifically, the challenged misconduct must rise to the

level of an

> extreme or egregious business wrong, commercial
> extortion, or similar level of rascality that raises
> an eyebrow of someone inured to the rough and tumble
> of the world of commerce.

Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802
F.3d 39, 54 (1st Cir. 2015) (citing Levings v. Forbes &
Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979)
(Kass, J.)).

4.   In making that unfairness determination under § 11,

courts consider the totality of the circumstances

(<u>Duclersaint</u> v. <u>Fed. Nat. Mortg. Ass'n</u>, 696 N.E.2d 536, 540 (Mass. 1998)), which includes the "nature of challenged conduct and [] the purpose and effect of that conduct" (<u>Peabody Essex Museum, Inc.</u>, 802 F.3d at 54), "the standard of the commercial marketplace" and "the equities between the parties, including what <u>both</u> parties knew or should have known." <u>Ahern</u> v. <u>Scholz</u>, 85 F.3d 774, 798 (1st Cir. 1996) (internal citations and quotations omitted).

5. Although the plaintiff corporations compete with Uber for riders in the for-hire vehicle industry, they have failed to prove that Uber, under the totality of the circumstances, committed an extreme or egregious wrong when they launched and continued to operate UberX P2P in Boston, Massachusetts throughout the conduct period.

6. Because the City did not inform Uber that it was forbidden from operating its ridesharing services and Uber entered the ridesharing market only after becoming aware of the operation of other ridesharing companies (such as Sidecar and Lyft) in Boston without consistent observance of the Taxi Rules, the Court concludes that Uber acted in accordance with the standard of the commercial marketplace. <u>See</u> <u>Ahern</u>, 85 F.3d at 798.

7.  By announcing its corporate policy of tacit regulatory
    approval and specifically informing Mayor Menino's Office
    about that new policy (to which the Mayor's Office
    responded, "just launch"), Uber avoided acting
    "unscrupulously" or with the level of "rascality"
    necessary to sustain a Chapter 93A claim.  In fact,
    Uber's attempt to clarify the regulatory applicability of
    the Taxi Rules with the City prior to the launch and
    thereafter was sufficiently transparent and consistent
    with the standard of the marketplace. See Cablevision of
    Bos., Inc. v. Pub. Improvement Comm'n of City of Bos.,
    184 F.3d 88, 94, 106 (1st Cir. 1999) (where the First
    Circuit dismissed a Chapter 93A claim when the City 1)
    postponed the implementation of a new policy, 2) informed
    defendant (plaintiff's competitor) that it could proceed
    with operations at its own risk and 3) subsequently
    approved defendant's conduct after the fact).

8.  That the City failed to take a definitive regulatory
    position publicly does not render Uber's response an
    "extreme or egregious business wrong." Peabody Essex
    Museum, Inc., 802 F.3d at 54.  In fact, when considering
    the equities of the parties, it is important to note that
    the taxi industry (which included the Tutunjian family)
    1) knew during the conduct period that the City was not

consistently enforcing the Taxi Rules with respect to

TNCs, 2) lobbied for consistent enforcement and 3) sued

the City in an effort to require it to enforce such rules

against TNCs. <u>See</u> <u>Ahern</u>, 85 F.3d at 798.

9. Accordingly, Uber's entry into the market was not

"unfair" or "unscrupulous" when Uber 1) was not the first

"unlawful" entrant, 2) thereafter competed in response to

changing marketplace conditions and 3) sought to inform

regulators that it intended to enter the market. <u>See</u>

<u>Boman</u> v. <u>Se. Med. Servs. Grp., No. 9501957</u>, 1998 WL

1182063, at *8, *13 (Mass. Super. Jan. 7, 1998) (finding

no Chapter 93A violation where defendants may have

violated state laws but did not act unfairly because they

competed in response to changing marketplace conditions

and industry uncertainties).

10. Beyond those initial discussions with City

representatives that preceded the launch, Uber continued

to operate in accordance with statements and actions of

government officials, such as:

a. the 2013 Report, which was endorsed by the City and

concluded that TNCs and livery vehicles are not

regulated and lack a regulatory body;

b. Mayor Walsh's public interview statements that the

City did not have jurisdiction over Uber;

c. Uber's inclusion as an important stakeholder on the TAC;

d. the City's position in a prior litigation that it was not enforcing Rule 403 against TNCs and that the public's interest is served by a diverse for-hire transportation market;

e. the City's data-sharing agreement with Uber whereby Uber provided some of its ridesharing information;

f. Governor Baker's two press releases, in which Mayor Walsh joined, that 1) announced an impending state regulatory framework with respect to TNCs, 2) stated that TNCs could continue to operate and 3) established a "Phase-in Period" before regulations were enacted; and

g. Certificates provided to Uber by the DPU which stated that it would not issue TNC Certificates at that time, consistent with Governor Baker's announcement of a "Phase-In Period."

11. Moreover, the continued interaction and ongoing working relationship between Uber management and City officials make it clear that the City was aware of Uber's P2P operations but chose not to prohibit it. See F.T.C. v. Abbott Labs., 853 F. Supp. 526, 536–37 (D.D.C. 1994) (refusing to find that defendants acted unfairly under

the Federal Trade Commission Act where the federal government looked into the situation at the time, decided not to act and allowed the open market to prevail).

12. To be clear, the Court does not conclude that Uber acted altruistically or in the best interest of the transportation industry as a whole. Uber internally recognized that the Boston Ordinance might apply to TNCs, knew that Uber drivers were receiving citations for violations of the Taxi Rules and failed to inform those drivers that they might be subject to fines. But even in that the regard, the totality of the circumstances demonstrates that the "significant concern" Uber expressed internally with respect to citations received was short-lived and relatively minor. Out of some 29 million Uber trips taken during the conduct period, 497 citations issued to Uber drivers represented a relatively insignificant violation of the Taxi Rules.

13. Moreover, during the peak period of the issuance of citations, Mayor Walsh publicly stated that the City lacked jurisdiction over Uber while Uber was simultaneously serving on the TAC in an effort to establish new regulations applicable to TNCs specifically. Subsequently, Uber reached out to Mayor Walsh's Chief of Staff, Dan Koh, who was genuinely

disturbed about the officers' continued ticketing of prearranged rides through the Uber platform, contrary to the understanding of the Mayor.  Consistent with the understanding that hackney officers were improperly ticketing Uber drivers, Uber reimbursed those who picked up passengers through prearrangement on the UberX platform.  Accordingly, the Court concludes that Uber did not reimburse driver citations to undermine law enforcement but rather to minimize driver liability.

**B. Good Faith**

14.  Although the parties have addressed the concept of "good faith" at trial and in their submitted pleadings and the Court here responds in kind, the term is not substantively relevant in this case because plaintiffs are not required to prove that Uber acted in bad faith to prevail on their claims of liability.  Rather, the parties have presented evidence of "good faith" (or the lack thereof) and the Court draws conclusions here for the purpose of determining whether Uber's conduct can be found to be "egregious" in light of the surrounding circumstances.

15.  Chapter 93A, § 2(a) provides that courts should be

> guided by the interpretations given by the Federal
> Trade Commission and the Federal Courts to section
> 5(a)(1) of the Federal Trade Commission Act.

16. Plaintiffs assert that, consistent with federal court interpretations of the Federal Trade Commission Act ("the FTC Act"), "good faith" is not a defense to "unfairness" liability under the FTC Act and, consequently, under Chapter 93A. That interpretation is, however, misleading because, although courts have rejected "good faith" defenses as to the <u>deceptive</u> prong of the FTC Act, they have not done so as to the unfairness prong (which is at issue here). <u>See, e.g.</u>, <u>F.T.C.</u> v. <u>Cyberspace.Com LLC</u>, 453 F.3d 1196, 1200, 1202 (9th Cir. 2006) (rejecting the defendant's claim that he reasonably believed he was not violating the FTC Act when he distributed solicitation checks that deceptively charged individuals); <u>Feil</u> v. <u>F.T.C.</u>, 285 F.2d 879, 896 (9th Cir. 1960) (finding that "[w]hether good or bad faith exists is not material, if the Commission finds that there is likelihood to <u>deceive</u>") (emphasis added); <u>F.T.C.</u> v. <u>Patriot Alcohol Testers, Inc.</u>, 798 F. Supp. 851, 855 (D. Mass. 1992) (rejecting a good faith defense when the FTC has proven the three elements of deceptive conduct: a representation, that is misleading and is material).

17. To the extent plaintiffs argue that defendants are liable to them based upon Uber's deception, an argument not

raised at summary judgment, plaintiffs have proffered insufficient evidence at trial to support such a claim.

18. Moreover, evidence offered by Uber that it acted consistently with government representations is not considered by the Court as a "state of mind" or "reliance" defense to unfairness, as plaintiffs assert. Rather, such evidence is considered pursuant to a totality-of-the-circumstances inquiry and thus the Court rejects plaintiffs' contention that Uber's "good faith" is an impermissible defense to a finding of unfairness. See Duclersaint, 696 N.E.2d at 540.

19. Uber's decision to enter the transportation market and continue to operate was informed by a totality of positive statements received from the City both before and during the conduct period. It leveraged regulatory ambiguity, its growing popularity among consumers, its ability to charge less than taxis and its knowledge that regulators would be reluctant to thwart the growth of a popular consumer product which afforded independent drivers better hourly wages. That strategy, while aggressive and disruptive to the for-hire transportation market, is competition consistent with the "rough and tumble of the world of commerce." Peabody Essex Museum, Inc., 802 F.3d at 54.

20.   Accordingly, based on the totality of the circumstances, the Court concludes that plaintiffs have not proved that defendants acted with the requisite, heightened standard of unfairness under § 11 of Chapter 93A and therefore defendants are not liable to plaintiffs.

**C. Damages**

**Even assuming plaintiffs had proved liability (which they have not) and causation (as to which the Court declines to enter conclusions of law in the absence of proof of liability), plaintiffs have nonetheless failed to prove damages with reasonable certainty for the following reasons:**

21.   As both the factfinder and arbiter of the law in a bench trial, the Court assumes the dual roles of determining 1) the credibility of the witnesses (including experts) and the weight to be accorded to their proffered testimony and 2) the reliability and relevance of the testimony. See Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002).

22.   Under Massachusetts law, uncertainty as to the amount of damages does not bar recovery. Air Safety, Inc. v. Roman Catholic Archbishop of Bos., 94 F.3d 1, 4 (1st Cir. 1996) (internal citations and quotations omitted).  Plaintiffs must, however, establish their claim for damages

> upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise or hypothesis.

Id.

23.  The calculation of damages in this case is dependent upon competing expert testimony with respect to regression analyses.  Much of the case law surrounding regression analysis arises in the context of loss causation in securities cases and proof of disparate impact in employment discrimination cases.  See Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., 49 F. Supp. 3d 385, 399-400 (S.D.N.Y. 2014), aff'd, 638 F. App'x 43 (2d Cir. 2016).  Nevertheless, the Court concludes that the articulated standards with respect to regression analysis are instructive where, as here, plaintiffs' expert proffered regression analyses to calculate damages.

24.  Because the Court concludes that Dr. Williams' testimony lacks probative value and is unreliable, plaintiffs have failed to prove damages with reasonable certainty.  Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 19 (1st Cir. 2009) ("All that is required is a reasonable basis of computation and the best evidence obtainable.").  Accordingly, plaintiffs' Chapter 93A claim is deficient not only for a failure to prove liability but also for failure to prove compensable damages.

25.  When assessing the reliability of expert testimony, the Court considers whether:

a. the subject testimony is based on sufficient facts or data;

b. the testimony is the product of reliable principles and methods; and

c. the expert has reliably applied those principles and methods to the facts of the case. Smith v. Jenkins, 732 F.3d 51, 64 (1st Cir. 2013).

26. When assessing the relevance of testimony, the Court must determine whether it "will assist the trier of fact to understand or determine a fact in issue." Id.

27. Dr. Williams' leasing and medallion regression models are not credited or afforded significant weight because they fail to include major variables, see Bickerstaff v. Vassar Coll., 196 F.3d 435, 449 (2d Cir. 1999), as amended on denial of reh'g (Dec. 22, 1999)), such as:

a. taxi driver hourly wages, despite the fact that Dr. Williams' conceded that such wages and perceived economic health affects drivers' decisions to lease medallions; and

b. regulatory activity, the impact of which Dr. Williams did not explain because he assumed it was part of the disputed conduct.

28. Because Dr. Williams failed to include major variables as part of either his medallion or leasing revenue

regression models, this Court does not afford them probative value.  Moreover, Dr. Williams' omission of those variables amounts to a cherry-picking of data that renders his regression models unreliable. See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 92 (1st Cir. 2014).

29. Furthermore, Dr. Williams' medallion regression model and corresponding damages calculation are unreliable and irrelevant to the Court's determination of damages for other reasons:

a. Dr. Williams' prediction of the medallion price on June 4, 2013, the first day of the conduct period, based upon his regression model was almost $250,000 greater than the actual medallion price on that day (as empirically verified by the testimony of Ms. Stamm); and

b. Dr. Williams also did not utilize reliable principles and methods to calculate disaggregated damages in that:

i. he failed to provide any support or authority for his method of disaggregation (i.e., reducing the total predicted damages in the medallion regression model by the total predicted damages in the leasing regression model, both of which

assume that regulatory impacts are part of the disputed conduct);

ii. he failed to demonstrate the "methodological underpinning" for his ratio analysis (<u>Bricklayers</u>, 752 F.3d at 95);

iii. he failed to "rationally separate" damages from losses which are caused by the purely lawful competitive actions of defendants (<u>MCI Commc'ns Corp.</u> v. <u>Am. Tel. & Tel. Co.</u>, 708 F.2d 1081, 1168 (7th Cir. 1983));

iv. he failed to explain how his alleged disaggregation accounted for the regulatory impact but not the other lawful competitive responses of Lyft and UberX Livery (<u>see Bricklayers</u>, 752 F.3d at 95); and

v. he calculated damages based on leasing revenue from 2015 to 2016 only, despite being in possession of the leasing revenue data for every year in the conduct period (<u>see Bricklayers</u>, 752 F.3d at 92).

30. Because plaintiffs' calculation of damages for reduced medallion value and lost profits are based upon unreliable and flawed regression models, plaintiffs have failed to prove damages with reasonable certainty.

### D. **Noerr-Pennington** Doctrine

31. The Noerr-Pennington Doctrine derives from the right to

    petition in the First Amendment to the Constitution which

    > shields from antitrust liability entities who join
    > together to influence government action[,] even if
    > they seek to restrain competition or to damage
    > competitors.

    Davric Maine Corp. v. Rancourt, 216 F.3d 143, 147 (1st

    Cir. 2000).

32. Because Dr. Williams' calculation of damages was based on

    his regression models which did not disaggregate the

    regulatory impacts, the Court concludes that he

    impermissibly attributed some of Uber's petitioning

    activity in his causation and damages analysis in

    violation of the Noerr-Pennington Doctrine.

### E. Conclusion

33. Because plaintiffs have not demonstrated that defendants'

    conduct amounted to an extreme or egregious business

    wrong and have further failed to prove damages with

    reasonable certainty, judgment will be entered for

    defendants on plaintiffs' Chapter 93A claim.

## II.  **Res Judicata**

34. As an affirmative defense enumerated in Federal Rule of

    Civil Procedure 8(c), res judicata is normally waived

    unless raised in the answer. Davignon v. Clemmey, 322

F.3d 1, 15 (1st Cir. 2003).  Exceptions to that rule may

be invoked if, <u>inter alia</u>,

> (i) the defendant asserts it without undue delay and
> the plaintiff is not unfairly prejudiced by any delay,
> or (ii) the circumstances necessary to establish
> entitlement to the affirmative defense did not obtain
> at the time the answer was filed.

<u>Id.</u> (internal citations omitted).

35.  Uber asserted its affirmative defense of <u>res judicata</u> at

a time beyond the bounds of a "moderate delay." <u>See</u> <u>id.</u>

at 16.  Plaintiffs first filed their consolidated

complaint in December, 2016, six months following the

stipulation of dismissal in the Boston Cab Dispatch

litigation and amended their complaint at least three

times thereafter.  Uber filed a responsive pleading to

each amended complaint but, despite being a party to the

prior litigation, did not assert <u>res judicata</u> as an

affirmative defense until summary judgment. <u>Cf. Bos. Sci.</u>

<u>Corp.</u> v. <u>Schneider (Europe) AG</u>, 983 F. Supp. 245, 254 (D.

Mass. 1997), <u>dismissed sub nom. Bos. Sci. Corp</u>.v.

<u>Schneider (USA) Inc.</u>, 152 F.3d 947 (Fed. Cir. 1998)

(allowing defendant's <u>res judicata</u> defense to proceed

because 1) the precluding event did not occur until <u>after</u>

the answer was filed and 2) there was <u>no question</u> that

plaintiff was aware of the preclusion issue).

36.  This Court disagrees with Uber's contention that
     plaintiffs had ample opportunity to respond to the
     defense.  Uber has offered no rebuttal to the claim that
     plaintiffs became aware of the <u>res judicata</u> defense only
     shortly before the close of fact discovery and its
     suggestion that plaintiffs knew of the first suit and
     that the defense was discussed during depositions is not
     adequate notice. <u>See Davignon</u>, 322 F.3d at 16 (finding
     that inquiries at a deposition regarding a prior
     settlement agreement did not amount to adequate notice
     for purposes of <u>res judicata</u>).

37.  Moreover, while plaintiffs' untimely submission of errata
     sheets may have been designed to defeat summary judgment,
     such evidence, without more, is insufficient to impute
     unethical intent to plaintiffs' counsel, particularly
     where defendants had multiple opportunities to place
     plaintiffs on formal notice of the affirmative defense of
     <u>res judicata</u>.

38.  Had Uber adequately disclosed the defense without undue
     delay, plaintiffs would have been able to probe further
     the matter during discovery. <u>Cf. Lafreniere Park Found.</u>
     v. <u>Broussard</u>, 221 F.3d 804, 808 (5th Cir. 2000) (allowing
     defendants to raise the affirmative defense at summary
     judgment because 1) there was ample time (14 months)

between the filing and judgment and 2) the plaintiff was

not prejudiced in its ability to challenge the defense).

39. Moreover, the First Circuit has held that postponements

become "far less tolerable" where defendants have

tendered "no justification" for the belated assertion of

the res judicata defense. Davignon, 322 F.3d at 16.  Uber

has proffered no explanation, despite being a party to

the prior litigation, as to why its delay is justified.

40. Finally, Uber's claim that the parties joint pretrial

memorandum is binding on this issue is unavailing because

1) procedurally, the Court did not issue a binding

pretrial order and a joint pretrial memorandum is not an

equivalent, 2) the Court, at summary judgment, made clear

that Uber must also prove that it provided adequate

notice (in addition to privity) for res judicata to bar

the claims at issue and 3) even if the joint pretrial

memorandum were binding upon the parties, it would not

resolve the issue of unfair prejudice to the plaintiffs

for the undue delay in asserting the defense.

41. Because Uber has failed to prove that their assertion of

the defense of res judicata was made without undue delay

or does not constitute unfair surprise on plaintiffs, it

fails as a matter of law.

## III. Common Law Claims

### A. Common Law Unfair Competition

42.   This Court has previously held that plaintiffs' common

law claim of unfair competition is indistinguishable,

both in fact and law, from their Chapter 93A claim.

Malden Transportation, Inc., 286 F. Supp. 3d at 273 n.2.

Because this Court finds that plaintiffs have not proven

their Chapter 93A claim, their common law claim for

unfair competition fails as well. See HipSaver Co. v.

J.T. Posey Co., 490 F. Supp. 2d 55, 65 (D. Mass. 2007).

### B. Aiding and Abetting/Conspiracy to Engage in Unfair Competition

43.   Massachusetts recognizes two kinds of civil conspiracy:

1) true conspiracy and 2) conspiracy based on Section 876

of the Restatement (Second) of Torts. Taylor v. Am.

Chemistry Council, 576 F.3d 16, 34-35 (1st Cir. 2009).

44.   True conspiracy is a rare cause of action in which

plaintiffs must demonstrate that defendants

> had some peculiar power of coercion over plaintiff
> that they would not have had if they had been acting
> independently.

Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563

(1st Cir. 1994).  Consistent with its conclusion that

defendants did not act "unfairly" under Chapter 93A, the

Court further concludes that flooding the market with

Uber drivers does not amount to the kind of "coercion" anticipated by this narrow cause of action. Cf. Willett v. Herrick, 136 N.E. 366, 368 (1922) (where plaintiffs alleged that the defendants had worked together to manipulate the plaintiffs' business holdings to acquire certain obligations for themselves).

45. The second kind of conspiracy, which plaintiffs have asserted in their claim of aiding and abetting, requires proof of an underlying tort. Taylor, 576 F.3d at 35. Because plaintiffs have failed to prove their Chapter 93A claim, and subsequently their claim for common law unfair competition, they have failed to prove an underlying tort.  Thus, their claim of aiding and abetting fails as matter of law.

## ORDER

For the foregoing reasons, defendants are found not to have violated Chapter 93A or plaintiffs' common law claims. Accordingly, judgment will enter for defendants.

**So ordered.**

_/s/ Nathaniel M. Gorton____
Nathaniel M. Gorton
United States District Judge

Dated September 6, 2019

- 46 -